# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| PORTIA MCCOLLUM, Derivatively on Behalf of Nominal Defendant UNITEDHEALTH GROUP INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW P. WITTY, STEPHEN HEMSLEY, CHARLIE BAKER, TIMOTHY P. FLYNN, PAUL R. GARCIA, KRISTEN L. GIL, MICHELE J. HOOPER, F. WILLIAM MCNABB, III, VALERIE MONTGOMERY RICE, JOHN H. NOSEWORTHY, and BRIAN THOMPSON,<br><br>Defendants,<br><br>and<br><br>UNITEDHEALTH GROUP INCORPORATED,<br><br>Nominal Defendant. | Case No.: 24-CV-2643 (JMB/JFD)<br><br><br><br>**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><br>**<u>REDACTED PUBLIC VERSION</u>** |

## I.   NATURE OF THE ACTION

1.      Plaintiffs Länsförsäkringar Fondförvaltning AB ("LF"), on behalf of its funds, and Employees' Retirement System of the State of Rhode Island ("ERSRI") (together, "Plaintiffs"), shareholders of UnitedHealth Group Incorporated ("UHG" or the "Company"), bring this shareholder derivative action on behalf of UHG against the Company's current and former officers and directors identified below (collectively, "Defendants" or the "Individual Defendants"), to remedy Defendants' breaches of fiduciary duty and violations of state and federal laws and regulations from September 22, 2021 through July 28, 2025 (the "Relevant Period").[1] Plaintiffs, through their undersigned counsel, investigated the facts supporting the allegations of this Complaint, including a review of: (i) UHG's books and records produced to Plaintiffs in response to their books and records demands served upon the Company pursuant to Section 220 of the Delaware General Corporation Law ("Section 220");[2] (ii) filings by UHG with the U.S. Securities

---

[1] UHG is named solely as a nominal defendant in this action, and references to "Defendants" do not encompass the Company itself.

[2] LF's books and records demands were served on June 25, 2025 and March 11, 2026, respectively. ERSRI's books and records demands were served on August 1, 2025 and March 13, 2026, respectively. Plaintiffs' counsel engaged in substantial follow up with UHG's counsel on the books and records demands, including: (i) conducting meet and confers and (ii) sending deficiency letters, which resulted in production of additional documents. Plaintiffs also received privilege and redaction logs from Defendants. It is reasonable to infer that exculpatory information not reflected in the document production or privilege logs does not exist. *See Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, C.A. No. 2019-0816-SG, 2020 WL 5028065, at *24 n.314 (Del. Ch. Aug. 24, 2020). The books and records provided to LF and ERSRI had Bates designations with unique prefixes but matching designations; in this Complaint, the documents are identified by Bates number using the following convention: UHG_00000001.

and Exchange Commission ("SEC"); (iii) news articles; (iv) securities analysts' reports about UHG; (v) wire and press releases; (vi) interviews with witnesses; and (vii) additional information readily obtainable on the Internet. Plaintiffs believe that discovery will elicit further evidentiary support for their allegations.

## II.   INTRODUCTION

2.      This shareholder derivative action seeks to hold Defendants, who are current and former officers and directors of UHG, accountable for corporate governance failures on a historic scale. On their watch, the Company built its industry-leading earnings on a foundation of systemic wrongdoing and illegality. It defrauded the federal Medicare program, denied medically necessary care to its most vulnerable members, deceived a federal court, violated patient privacy laws, unlawfully suppressed competition, and manipulated earnings. While concealing this misconduct from investors, Defendants themselves profited through more than $237 million in insider stock sales and compensation keyed to manufactured earnings. The consequences were catastrophic: criminal and civil fraud investigations by the Department of Justice (the "DOJ"), exposure to potent federal securities fraud claims, government audits of all of the Company's Medicare Advantage ("MA") contracts, the abrupt departures of the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), the collapse of the vertically integrated business model on which its growth was premised, and the destruction of more than *$277 billion* in stockholder value.

3.      UHG is the largest health insurer in the United States, the nation's largest employer of physicians, and the largest recipient of payments from the Centers for

Medicare & Medicaid Services ("CMS"), which supplies 44% of the Company's consolidated revenue. Throughout the Relevant Period, Defendants publicly committed the Company to earnings growth of 13% to 16% every year, and the Company consistently delivered, beating Wall Street's estimates for more than sixty consecutive quarters. In a January 2025 earnings call, Defendant Andrew Witty ("Witty")—then the Company's CEO—told investors: "*Even in highly challenging periods like 2024, our results bear out that we find a way, even if it's not always how we may have initially envisioned the path.*"[3] Witty's statement to investors was more revealing than he intended. As this Complaint details, with the knowledge of the Company's Board of Directors (the "Board"), UHG always "*found a way*": around Medicare's payment rules, around the profit limits Congress imposed on insurers, around its members' rights to covered care, around the antitrust and securities laws, around the Company's own compliance policies, and around telling investors the truth.

4.      Defendants' schemes included defrauding Medicare. MA pays insurers more to cover sicker patients, so Defendants caused UHG to make its members appear sicker on paper—mining them for lucrative diagnoses through in-home "HouseCalls" visits that their own providers had not diagnosed and for which no medical care was provided; retrospective chart reviews designed to drive revenue rather than provide care; and diagnosis-driven bonuses, quotas, and mandates directed at the Company's 90,000 affiliated clinicians. In the words of one investigative report, the Company pressured

---

[3] All emphases have been added, unless otherwise noted.

doctors to treat patients "as if they were fields of medical codes to be harvested, instead of people[.]" The scale was extraordinary. In 2021 alone, the Company generated diagnoses that yielded it $8.7 billion in payments from CMS—more than half of the Company's net income for the year. The U.S. Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") twice singled the Company out as a suspicious outlier, finding in 2021 that it collected 40% of all payments generated by chart reviews and health risk assessments while enrolling only 22% of MA members, and in 2024 that it collected two-thirds of all payments based on diagnoses reported only on in-home assessments and their linked chart reviews.

5.      At the same time, having inflated the Company's revenue by making members look sicker than they were, Defendants boosted the Company's profits from the opposite direction. Specifically, Defendants caused UHG to cut off post-acute rehabilitation for vulnerable elderly and disabled members in lockstep with a proprietary algorithm's predictions, enforced by threat of contract termination, and rewarded by secret agreements to pay nursing homes bonuses to suppress hospital transfers of ailing residents. When UHG members appealed those denials, they prevailed 99.7% of the time, a failure rate that reflected a calculated bet by Company leadership that most beneficiaries would never appeal at all.

6.      Meanwhile, to achieve the scale that made this misconduct possible, the Company found a way past the antitrust laws by deceiving a federal court. Specifically, seeking approval of its $13 billion acquisition of Change Healthcare Inc. ("Change"), the clearinghouse through which roughly one in three American patient records flows, UHG

assured the United States District Court for the District of Columbia, regulators, and the public that "firewalls" would keep rivals' competitively sensitive data walled off from its insurance business. The Court expressly credited that testimony in permitting the merger. In reality, no such technical firewalls ever existed, and UnitedHealthcare employees in fact accessed and copied competitors' data. The Company and Board's de-prioritization of patient privacy and data security, despite clear obligations under HIPAA and various state and federal laws, led to the largest data breach in American healthcare history: a February 2024 ransomware attack that exposed 190 million Americans' sensitive information in violation of HIPAA and patient privacy laws, froze providers' and pharmacies' ability to process claims, and cost the Company over $2 billion.

7. The Company's vertical integration scheme served the same ends. When the Affordable Care Act ("ACA") capped the share of premium dollars an insurer may keep as profit, Defendants found a way around the cap, using UHG's dual dominance as the nation's largest insurer and largest employer of physicians to route billions of dollars in above-market payments to the Company's own providers, force independent physicians and rival providers from the market, and punish those who dealt with competitors. That conduct drew a DOJ antitrust investigation.

8. All the while, Defendants concealed the Company's mounting problems while its most senior officers personally profited by selling off their UHG stock. Between the time the Company was notified of the DOJ's antitrust investigation and that information becoming public, for example, Defendants Hemsley and Thompson sold more than $117 million of their own Company stock, part of more than $237 million in Relevant Period

insider sales by Defendants Hemsley, Thompson, and Witty. Indeed, ██████████ ████████████████████████████████████████████████ Defendant Hemsley, UHG's dominant executive and Board member, █████████████████████ ██████████████████████████████—representing his largest single day sale by proceeds throughout the entire Relevant Period and the preceding three years, ██████ ████████████████████████████████████████. Defendant Hemsley also had a private investment company (in which certain directors invested), which sold the entirety of its over $190 million in UHG stock in 2023, before the Company's fraud started to be revealed and the stock price crashed. And at the same time those directors knew the truth about the Company's unlawful business practices and were shedding their own stock, they caused the Company to repurchase more than $29 billion in shares from 2021 through the first half of 2025. Those repurchases temporarily insulated Defendants from scrutiny by helping prop up the Company's trading prices in the near-term, but resulted in the Company overpaying for its own stock by more than $14 billion due to the inflated prices.

9.    With government reforms designed to curtail UHG's abuses eroding the profits the upcoding scheme had generated, Defendants found a way to continue manufacturing the earnings they had promised the market. Specifically, in late 2024, they caused the Company to book $3.3 billion in one-time gains from opaque, hastily arranged year-end asset sales, euphemistically described as "portfolio refinement," without which the Company would have missed Wall Street's estimates for the first time in more than fifteen years. The Board then measured and awarded executive compensation against the manufactured results.

– 7 –

10. Binding it all together was a sustained campaign of denials and deflections to regulators, investors, and the public. Among other things, Defendants issued a steady stream of false and misleading statements in SEC filings, on earnings calls, and in four successive Proxy Statements which concealed their misconduct, kept the Company's stock trading at artificially inflated prices while the Company repurchased billions of dollars of its own shares, and secured the Director Defendants' reelections year after year. As public scrutiny mounted, Defendants acted not to reform the Company's practices but to insulate them through an intensive lobbying and public relations campaign. Among other things, the Board supervised a standing, multi-year program that deployed lobbying, Congressional fly-ins, and Company-funded research to defend the practices under federal investigation. The Company even filed a defamation suit against *The Guardian* that a court dismissed, finding that the allegedly-defamatory reporting concerning UHG's pervasive misconduct was "substantially true."

11. The truth, once it emerged in mid-2025, destroyed the Company's credibility and badly impaired its stockholders' investments in a matter of months. In April 2025, the Company slashed its earnings guidance, and its stock suffered the steepest single-day decline of the Relevant Period. In May 2025, Defendant CEO Witty was forced out and the Company withdrew its guidance entirely—days before *The Wall Street Journal* revealed a criminal Medicare-fraud investigation. Then, in July 2025, the Company confirmed both criminal and civil investigations, halved its guidance from approximately $30 to $16 per share, abandoned the portfolio refinement transactions, and removed Defendant John Rex ("Rex") as the Company's President and CFO.

12. The fallout has only widened since. CMS has announced audits of all of UHG's MA contracts for payment years 2018 through 2024, with clawback exposure analysts estimate at as much as $20 billion. Meanwhile, the Attorney General ("AG") of Massachusetts has sued a Company subsidiary for defrauding the Commonwealth's Medicaid program of more than $100 million. All three major credit-rating agencies have cut the Company's outlook.

13. The Officer Defendants (defined below) actively led the Company's operations and directed the misconduct alleged. The Director Defendants (defined below) knew of that misconduct and permitted it to continue on their watch, as borne out through internal records of the Board's practices. The OIG's findings, the investigative exposés, the government's reforms, and the federal investigations concerning the Company's misconduct all reached the boardroom in real time. Yet the Board did nothing: it did not change business practices or commence any meaningful investigation, compliance review, or audit of the practices at the center of the Company's profits and the government's scrutiny.

14. Defendants bear direct responsibility for this catastrophic harm to the Company. Plaintiffs accordingly bring derivative claims against the Defendants for breach of fiduciary duty, insider trading, violations of Sections 10(b) and 14(a) of the Securities Exchange Act of 1934, unjust enrichment, waste, and contribution and indemnification. Through these claims, Plaintiffs seek to recover for UHG the billions of dollars in harm that Defendants' misconduct has caused, and to reform the governance practices that allowed that misconduct. Demand on the Board is futile because a majority of the Demand

Board lacks independence and every member of the Demand Board faces a substantial likelihood of liability for the misconduct alleged in this Complaint—misconduct that raised red flags and that the Board itself oversaw, approved, ignored, and publicly denied for years. Defendants facing that type of exposure cannot be expected to authorize a lawsuit against themselves.

## III.    JURISDICTION AND VENUE

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this Complaint states a federal question, as well as pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, over the claims asserted herein for, *inter alia*, violations of Sections 14(a) and 10(b) of the Exchange Act, 15 U.S.C. §§ 78n(a), 78j(b), and the rules promulgated thereunder. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16.    This Court has personal jurisdiction over each Defendant because each Defendant is either a corporation headquartered and conducting business in this District, or an individual who transacted business in and maintained sufficient minimum contacts with this District, including by serving as an officer and/or director of UHG, a company headquartered in this District, and by committing acts and omissions in this District that give rise to the claims asserted herein.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391, because UHG maintains its principal place of business in this District, a substantial part of the events and

omissions giving rise to the claims occurred in this District—including the issuance of materially false and misleading statements and the Board and committee meetings described herein, Plaintiffs' claims arose in this District, and UHG has suffered and will continue to suffer harm in this District.

18.     In connection with the acts and omissions alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone and electronic communications, and the facilities of the New York Stock Exchange, a national securities exchange.

## IV.    PARTIES

### A.    Plaintiffs

19.     Plaintiff LF is an investment management company headquartered in Stockholm, Sweden. LF manages mutual funds (the "Funds") which are the holders of the UHG common stock. Plaintiff LF, on behalf of the Funds listed in the footnote below, is, and at all times during the Relevant Period was, a shareholder of Nominal Defendant UHG. These holdings in UHG are worth more than $123 million. Under Swedish law, LF has full and exclusive authority to make investment decisions, to bring suit on behalf of the LF managed Funds and is obligated by Swedish law to protect and act on behalf of the Funds it manages.[4]

---

[4] The Funds that hold the UHG stock are: (i) LF SPARMAL 2065; (ii) LF USA INDEX; (iii) LF SPARMAL 2040; (iv) LF SPARMAL 2035; (v) LF SPARMAL 2030; (vi) LF SPARMAL 2025; (vii) LF GLOBAL INDEX; (viii) LF SPARMAL 2045; (ix) LF GLOBALA MAL INDEX; (x) LF Mix Vision; and (xi) LF Global Vision. Under Swedish law, the Funds are not separate legal entities and have no legal capacity to sue, with LF having the exclusive right to sue on their behalf. LF also has voting authority for the Funds.

20.     Established in 1936, Plaintiff ERSRI provides retirement, disability, and survivor benefits to Rhode Island public school teachers, state police, state judges, municipal, police and fire employees of participating communities, and state employees. ERSRI holds over $12 billion in assets and serves approximately 70,000 active members, retirees, and beneficiaries. ERSRI is, and at all times during the Relevant Period was, a shareholder of Nominal Defendant UHG. These holdings in UHG are worth more than $16.7 million.

### B.     Nominal Defendant

21.     Nominal Defendant UHG is incorporated under the laws of Delaware, with its headquarters located at 1 Health Drive, Eden Prairie, Minnesota, 55344. UHG is a healthcare conglomerate, providing health insurance, medical care, health related technology, and pharmacy services. UHG offers products and services through two primary direct corporate subsidiaries (each of which has numerous direct and indirect subsidiaries of its own): (1) UnitedHealthcare, Inc. ("UnitedHealthcare"), a health benefits (*i.e.*, insurance) company, and (2) Optum, Inc. ("Optum"), a health services company. The Company's common stock is traded on the New York Stock Exchange under the ticker symbol "UNH."

### C.     Individual Defendants

#### 1.     Officer Defendants

22.     **Defendant Stephen Hemsley** is currently the Company's CEO, has been CEO since May 2025, and previously served as CEO from 2006 to 2017. When Defendant Andrew P. Witty ended his tenure as CEO on May 12, 2025, Defendant Hemsley

immediately resumed the CEO role while retaining the chairmanship—consolidating complete control over UHG at the height of intense scrutiny over the fraud alleged in this complaint. He has served as a director since 2000; as the Executive Chair of the Board from September 2017 to November 2019, and again from May 2025 to present; and was non-Executive Chair from November 2019 to May 2025. From 2021 to 2023, Defendant Hemsley sat on the Board's Health and Clinical Practice Policies Committee ("HCPP Committee"), which is responsible for "oversight of management's initiatives to improve health care affordability."

23. Prior to the Relevant Period, Defendant Hemsley was a senior officer during UHG's massive stock options backdating scandal and was CEO when the Company's internal audit discovered that UHG had submitted at least $200 million in unsupportable diagnosis codes to the federal government. Rather than remediate this damning finding and demand compliance, Defendant Hemsley supported the decision to eliminate an audit program entirely, ensuring that the fraud could continue undetected. His total compensation from UHG from 2021 through 2025 in his capacity as a director was $2,817,923. In addition, in May 2025, the Board and the Compensation and Human Resources Committee ("CHR Committee") granted Hemsley an annual base salary of $1 million and a one-time $60 million equity award with cliff vesting after three years.

24. **Defendant Andrew Witty** served as CEO of UHG from February 2021 to May 2025, was President of the Company from November 2019 to February 2021, and CEO of Optum from July 2018 to April 2021. He served as a director from 2021 until May

– 13 –

2025, and from August 2017 to March 2018. His total compensation from UHG from 2021 to 2025 was $113,771,772.

25.    **Defendant John Rex** served as CFO of UHG from 2016 to July 2025 and also as president from April 2024 to July 2025. His total compensation from the Company from 2021 to 2025 was $89,752,089.

26.    **Defendant Brian Thompson** served as CEO of UnitedHealthcare from April 2021 to December 2024, when he died. Thompson's total compensation from UHG from 2021 to 2024 was $38,737,853.

27.    Defendants Hemsley, Witty, Rex, and Thompson are referred to collectively as the "Officer Defendants."

### 2.    Director Defendants

28.    **Defendant Charles Baker** has served as a director since 2023. He is a member of the Audit and Finance Committee ("Audit Committee"). In August 2025 he was named Chair of the Governance Committee and a member of the Public Responsibility Committee ("PR Committee"). Prior to August 2025, he served on the HCPP Committee. His total compensation from UHG from 2023 to 2025 was $800,428.

29.    **Defendant Timothy P. Flynn** has served as a director since 2017. He is a member of the Governance Committee and since August 2025 he has served as Chair of the Audit Committee and a member of the PR Committee. Prior to August 2025, he served as Chair of the CHR Committee. His total compensation from UHG from 2021 to 2025 was $1,960,275.

30.    **Defendant Paul R. Garcia** has served as a director since 2021. Since August 2025, he has served as Chair of the CHR Committee and a member of the PR Committee. Prior to that time, he served as a member of the Audit Committee. His total compensation from UHG from 2021 to 2025 was $1,475,727.

31.    **Defendant Kristen L. Gil** has served as a director since 2022. She is a member of the Audit Committee. Her total compensation from UHG from 2022 to 2025 was $1,464,385.

32.    **Defendant Michele J. Hooper** served as a director from 2007 through May 2026. She served as the Lead Independent Director from October 2021 to August 2025. She was also a member of the Audit Committee from 2021 to 2023. From August 2025 through May 2026, she served as Chair of the PR Committee and as a member of the Governance Committee and the HCPP Committee. Her total compensation from UHG from 2021 to 2025 was $2,098,814.

33.    **Defendant F. William McNabb III** has served as a director since 2018. In August 2025, he was named Lead Independent Director and appointed to the CHR Committee. Prior to that time, he served as Chair of the Audit Committee and a member of the Governance Committee. His total compensation from UHG from 2021 to 2025 was $1,916,037.

34.    **Defendant Valerie Montgomery Rice** has served as a director since 2017. She is the Chair of the HCPP Committee and a member of the CHR Committee. Her total compensation from UHG from 2021 to 2025 was $1,940,863.

35.    **Defendant John Noseworthy** has served as a director since 2019. He is a member of the CHR Committee and the HCPP Committee. Prior to August 2025, he served as Chair of the Governance Committee. His total compensation from UHG from 2021 to 2025 was $1,876,511.

36.    Defendants Baker, Flynn, Garcia, Gil, Hooper, McNabb, Montgomery Rice, and Noseworthy—together with Defendants Hemsley and Witty in their capacities as directors—are referred to collectively as the "Director Defendants."

## V.    UHG'S ENDEMIC CORPORATE GOVERNANCE FAILURES

37.    On the Defendants' watch, and throughout the Relevant Period, UHG engaged in myriad forms of misconduct reflecting pervasive and endemic failures of governance, including: exploiting UHG's vertical integration to evade the ACA's limits on insurer profits; collecting billions of dollars in MA payments for diagnoses no doctor treated and generated with faulty or improper tests; using an algorithm to deny care to its most vulnerable members while secretly paying nursing homes to suppress hospital transfers; offering assurances that "firewalls" protected competitors' data—when none existed—to win approval of its Change acquisition, only to later experience the largest data breach in the history of American healthcare; unlawfully suppressing independent physicians and rival providers; allowing more than $237 million of insider sales; manufacturing fraudulent earnings through undisclosed year-end "portfolio refinement" transactions; and squandering approximately $14 billion of the Company's money through a stock repurchase program. All the while, Defendants waged a sustained campaign of false denials and misleading disclosures to conceal this misconduct from investors and

regulators, and the Officer Defendants profited from the wrongful and unlawful practices at issue. The Director Defendants knew of and permitted these illegal practices to continue unabated.

**A.     The Company's Vertical Integration Strategy and Its Deliberate Circumvention of Statutory Guardrails**

38.     Founded in 1977, UHG is today the largest healthcare company in history and, as of July 2026, the fourth-largest company in the world by revenue. Optum, if it were separated from UHG, would itself rank among the Fortune 50.

39.     UHG has two main business lines: UnitedHealthcare and Optum. UnitedHealthcare sells insurance coverage, including MA coverage for Medicare-eligible members. As of December 31, 2024, UnitedHealthcare insured more than 49 million members across more than 150 countries. Within UnitedHealthcare, the Medicare & Retirement segment (which includes MA) is the engine of UHG's profitability. By 2024, it generated approximately 35% of UHG's total revenue.

**UnitedHealthcare revenue by segment, 2005 to 2024 (millions)**



40.     Optum is UHG's other line of business. Optum provides healthcare in three related segments: (i) OptumHealth provides primary, specialty, urgent, surgical, in-home, and virtual care; (ii) Optum Rx is a pharmacy benefit manager ("PBM"); and (iii) Optum Insight sells data-analytics, technology, and operational tools to the healthcare industry.

41.     In 2010, Congress enacted the ACA. The ACA imposed a medical-loss-ratio ("MLR") requirement on insurers, which required insurers to spend a set percentage of collected premiums on actual patient care rather than on overhead and profit.

42.     The Company responded to these profit limits not by operating within them but by circumventing them. It promptly created Optum and its three segments to hold its non-insurance businesses. The Company could redirect revenue from its insurance arm to Optum by increasing payments to Optum Health providers so that the Company satisfied

the MLR ratios on paper, but the Company as a whole retained the outsized profits the ACA was meant to eliminate. According to a March 15, 2024 report from healthcare advisory firm Kaufman, Hall & Associates, LLC, Optum reported "$88B of consolidated revenue" in 2023, but took in "an additional $136B of revenue" from its insurance arm. Indeed, Optum earns the majority of its revenue from UHG's insurance arm. These maneuvers allow UHG to retain profits that would otherwise exceed MLR limits. Prominent health economist Christopher Whaley and healthcare consultant and former Blue Cross Blue Shield ("BCBS"), Cigna, and Kaiser Permanente executive Ron Howrigon publicly stated that the Company was evading federal regulations by shifting profits. In a *STAT News* article, a physician formerly tied to an Optum practice in New York summed it up in one sentence: "[i]t's really a game the way they switch money from their right pocket to their left."

43.   Optum has become the nation's largest employer of physicians, with ties to roughly 10% of all physicians in America. It has done so by acquiring primary-care practices, specialty clinics, and hospitals, including: the $4.34 billion acquisition of DaVita Medical Group, the country's largest kidney-care provider; the $5.4 billion acquisition of LHC Group, an in-home healthcare provider with over 900 locations in 37 states; and the $3.3 billion acquisition of Amedisys, a home-health company.

44.   With this market power, as reported by *STAT News*, the Company has used its dominance to favor Optum-owned physician groups in its insurance contracts while giving rivals worse terms and steering Optum-affiliated providers away from contracting with anyone but UnitedHealthcare, in violation of antitrust laws. *STAT News* hired data-

– 19 –

analysis firm Tribunus Health to compare the Company's payments with those of rival insurers across five common medical procedures that involve flexible reimbursement and high medical spending. Analyzing more than 94 million rows of UnitedHealthcare data against comparable BCBS data, the analysis found that UnitedHealthcare paid Optum providers, on average, 22% more than BCBS paid for the same services:

**UnitedHealthcare's higher rates**

What UnitedHealthcare pays Optum CareMount practices in N.Y. compared to what Anthem BCBS pays

| Service | Anthem BCBS | UnitedHealthcare | % difference |
|---|---|---|---|
| Dermatology office visit (99213) | $184 | $210 | 14% |
| Family medicine office visit (99214) | $275 | $302 | 10% |
| Colonoscopy (45385) | $763 | $2,268 | 197% |
| Oncology office visit (99214) | $275 | $302 | 10% |
| CT scan of abdomen and pelvis (74177) | $992 | $1,298 | 31% |

Table: J. Emory Parker/STAT • Source: Tribunus analysis for STAT

45.    UnitedHealthcare's payments to Optum nearly doubled between 2021 and 2024. Overpaying its own providers allowed the Company to avoid MLR caps, reduce competition, and increase the cost of care paid by consumers. The Company claimed it has performed its own analyses and asserted that "UnitedHealthcare pays Optum Health consistent with other payers in the market" but would not produce its analyses or any evidence to refute *STAT News'* findings.

– 20 –

B.    **The Company's MA Upcoding Scheme: Billions in Taxpayer-Funded Payments for Diagnoses No Doctor Ever Treated**

1.    **The Scheme**

46.    The 1997 Balanced Budget Act ("BBA") created the MA program (originally called Medicare+Choice) as a new Part C of the Medicare program. Unlike traditional FFS Medicare where CMS determined the rate it paid for each claim, under MA, beneficiaries could receive their benefits through MA plans run by private insurance companies who received a fixed, capitated payment for each enrollee. The capitated fee was determined by an enrollee's health risks, and it was supposed to hew to the actual cost the private insurer would incur to care for that beneficiary.

47.    Although the assumption behind capitation was that private insurers could provide care more cheaply than FFS Medicare and save taxpayers money, that premise has never been realized. Throughout the Relevant Period, the government's own experts repeatedly found that MA costs taxpayers *more* than FFS Medicare, which was driven in substantial part by "coding intensity," or the insurer-driven inflation of risk scores. UHG is the worst offender when it comes to "coding intensity"—it is the main driver of UHG's profitability.

48.    The MA capitated payment includes a base amount based on patient demographics (such as location and gender) as well as a risk-adjustment feature under which CMS pays more for sicker members and less for healthier ones. Critically, the diagnosis codes that drive payments are those submitted by the MA insurer—not the

patient's treating physician.[5] Defendants caused UHG to mine its members for lucrative diagnoses, collecting billions of taxpayer dollars for diagnoses that were exaggerated, unsupported, or false. The scheme used three methods to generate insurer-driven diagnoses: in-home "HouseCalls" visits, chart reviews, and sustained pressure on the Company's own physicians.

49.    **HouseCalls** is a UnitedHealthcare unit that sends nurse practitioners ("HouseCalls nurses") into members' homes for Health Risk Assessment visits supposedly to identify "gaps in care." But in reality, the Company trained HouseCalls nurses to use Company-issued laptops with embedded software designed to generate as many new, lucrative diagnoses as possible. The *Wall Street Journal* reported in "Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated" that the HouseCalls software suggested "what illness a patient might have—and even adds some automatically to a 'diagnosis cart.'"[6]

50.    Daily productivity quotas tied pay to visit volume, and evaluations graded coding performance. The visits had little clinical value. Nurses could record new diagnoses but were not allowed to provide any treatment. They lacked the equipment necessary to diagnose serious or complex conditions. And the Company directed its nurses to run

---

[5] CMS supports its reliance on MA insurers with an annual attestation requirement: each insurer must confirm that its diagnosis codes are valid, and under CMS's regulations that attestation is a condition of payment.

[6] Christopher Weaver et al., "Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated," *Wall Street Journal* (July 8, 2024), https://www.wsj.com/health/healthcare/medicare-health-insurance-diagnosis-payments-b4d99a5d?msockid=3a3ed515d08769512d5dc24bd1286842.

unnecessary, unreliable tests that were likely to produce false positives, precisely because those tests produced valuable diagnoses.

51. Another *Wall Street Journal* report, "The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare,"[7] described the pressure nurses faced and how the Company exploited diagnoses. For example, the software suggested the rarely diagnosed condition of secondary hyperaldosteronism (increase in the hormone aldosterone) for *any member* with a history of heart failure or cirrhosis—without confirmation from a laboratory test. The Company diagnosed secondary hyperaldosteronism 246,000 times after in-home visits between 2019 and 2021—worth $450 million. In contrast, all other MA insurers combined diagnosed that condition fewer than 24,000 times, yielding just $42 million in the same period.

52. The Company's intensive "quality assurance" process also promoted upcoding. Reviewers examined patient questionnaires to identify any missed high-value code and pushed nurses to add diagnoses, often by linking a reported symptom to a previously diagnosed chronic condition. For example, if a nurse reported neuropathy for a member with diabetes, the nurse was told to code diabetic neuropathy whether or not that diagnosis fit and whether or not the Company would provide any treatment for that diagnosis. Nurses who pushed back risked losing their jobs. Low-diagnosing providers had

---

[7] Anna Wilde Mathews et al., "The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare," *Wall Street Journal* (Aug. 4, 2024), https://www.wsj.com/health/healthcare/medicare-extra-payments-home-visits-diagnosis-057dca8b?msockid=3a3ed515d08769512d5dc24bd1286842.

to undertake additional training, extra audits, and "ride alongs" with managers watching over them.8

53.    The *Wall Street Journal* investigation revealed that, from 2019 to 2021, all other MA insurers generated an average of $1,818 per visit in additional annual payments from diagnoses identified through home visits, but UHG averaged $2,735 per visit. These profits were the result of the Company recording conditions for which members were never treated, that contradicted their own physicians' assessments, or that were simply wrong.[9]

54.    HouseCalls expanded rapidly from 1 million visits in 2016 to nearly 3 million visits in 2024:



**HouseCalls visits, 2016 to 2024 (millions)**

---

8 U.S. Senate Committee on the Judiciary, "How UnitedHealth Group Puts the Risk in Medicare Advantage Risk Adjustment: Majority Staff Report" (Jan. 12, 2026), at 32.
9  Anna Wilde Mathews et al., "The One-Hour Nurse Visits That Let Insurers Collect $15 Billion    From    Medicare," *Wall    Street    Journal* (Aug.    4,    2024), https://www.wsj.com/health/healthcare/medicare-extra-payments-home-visits-diagnosis-057dca8b?msockid=3a3ed515d08769512d5dc24bd1286842.

55.     That expansion coincided with a massive increase in revenue. From 2019 to 2021, UHG's HouseCalls program generated $10.6 billion in payments, compared to $4.6 billion for all other insurers combined, as depicted in the following chart:

**Total payment from home-visit diagnoses, in billions, 2019 – 2021.10**



56.     The Company's improper reliance on the medical device QuantaFlo as a diagnostic tool provides a striking case study of how HouseCalls facilitated the Company's fraud.

57.     QuantaFlo measures blood volume fluctuations in the arteries using sensors that detect reflected infrared light.

---

[10] Anna Wilde Mathews et al., "The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare," *Wall Street Journal* (Aug. 4, 2024), https://www.wsj.com/health/healthcare/medicare-extra-payments-home-visits-diagnosis-057dca8b?msockid=3a3ed515d08769512d5dc24bd1286842.
; Christopher Weaver et al., "Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated," *Wall Street Journal* (July 8, 2024), https://www.wsj.com/health/healthcare/medicare-health-insurance-diagnosis-payments-b4d99a5d?msockid=3a3ed515d08769512d5dc24bd1286842.

58.    UHG uses QuantaFlo as a standalone diagnostic for peripheral artery disease ("PAD"), which increases the risk adjustment score and the payment to UHG. The financial benefits to UHG of this practice are staggering: between 2019 and 2021, UHG diagnosed PAD 568,000 times after in-home visits and collected $1.4 billion. All other MA Insurers *combined* received just $446 million for the same diagnosis code. Testing-and-diagnosis rates among patients 50 and older doubled from 7 to 14.7 per 100,000 between 2018 and 2023.

59.    UHG has achieved these extraordinary profits from PAD diagnoses generated based on QuantaFlo results by pressuring providers to use the tool improperly and against FDA guidance. QuantaFlo was intended to *assist* physicians in diagnosing PAD—not to serve as a standalone diagnostic. The FDA never cleared QuantaFlo as a standalone diagnostic device, and prevailing medical guidance advised against broad screening of asymptomatic patients for PAD. Since 1980, the CMS National Coverage Determination has deemed photoelectric plethysmography devices (like QuantaFlo) "experimental" and not covered for reimbursement for PAD—a conclusion UnitedHealthcare's own "Reimbursement Policy" for "Plethysmography (NCD 20.14)" echoes, classifying such devices as "experimental and not covered at this time."

60.    A 2018 study supports that same conclusion, finding that QuantaFlo had a positive predictive value of only 14% for moderate and mild cases and 67% for severe cases.[11] Notwithstanding this, the HouseCalls training manual told nurses to not only use

[11] Keith Pereira, "Sensitivity and Specificity of Digital Ankle Brachial Index (ABI) as a Screening Tool in Detecting Peripheral Arterial Disease: A Single Center, Prospective

QuantaFlo for screening but to diagnose peripheral artery disease based on QuantaFlo results alone. UHG's training materials provide in relevant part:[12]



61.    The HouseCalls software, e-HouseCalls, automatically populated a diagnosis of PAD for any QuantaFlo results below 0.90, per the below:

---

Clinical Trial" (Saint Louis Univ., Protocol No. 28225, Continuing Review 1, Aug. 2, 2018).

[12] Second Am. Compl. ¶ 145, *Kane v. UnitedHealth Group Inc., et al.*, No. 16-cv-1516 (M.D. Fla. May 26, 2026), Dkt. No. 109 ("*Kane* SAC").

**terpreting QuantaFlo Results**

suits < 0.90 (abnormal): educate member, recommend statin, provide educational materials and generate Car
arral with call to PCP, if indicated

| QuantaFlo Results | Interpretation | PVD Diagnosis | Contact PCP | Care Manager referral |
|---|---|---|---|---|
| 1.40 to 1.00<br>0.99 to 0.90 | Normal<br>Borderline | No diagnosis based on QuantaFlo results, unless clinical symptoms present | Not required | Not required |
| 0.89 to 0.60 | Mild | Diagnose PVD | No call, unless NEW | Yes, if new |
| 0.59 to 0.30 | Moderate | Diagnose PVD | No call, unless NEW | Yes, if new |
| ≤ 0.29 | Severe | Diagnose PVD | Call PCP | Yes |

62.     The lack of evidentiary basis for QuantaFlo as a standalone diagnostic and the fraudulent nature of UHG's use of it to diagnose PAD and increase payments is borne out by a major False Claims Act settlement between QuantaFlo's manufacturer (Semler) and the DOJ.

63.     In 2016, a *qui tam* lawsuit was brought against the Company and Semler, prompting a DOJ investigation into Semler and "whether federal health programs paid out improper claims based on the use of QuantaFlo."[13] The lead author of a study cited in the complaint concluded that QuantaFlo "was neither sensitive nor specific for PAD" and was so disappointed in QuantaFlo's performance that "he stopped using the machine altogether."

---

[13] Lizzy Lawrence, "Device Maker That Helped UnitedHealth Collect Billions Offers to Settle Fraud Claims with DOJ," *STAT News* (Apr. 16, 2025), https://www.statnews.com/2025/04/16/semler-scientific-quantaflo-unitedhealth-group-peripheral-artery-disease-doj-settle/?\.

64.     In September 2025, the DOJ formally intervened in the case for purposes of settlement with Semler specifically and finalized a settlement of $29.75 million. The Settlement Agreement noted that from 2010-2024, Semler violated the False Claims Act by "knowingly causing, and conspiring to cause, the submission of false claims to Medicare Part B for tests performed using [QuantaFlo's predecessor] and QuantaFlo devices."[14] The Settlement Agreement further acknowledged that QuantaFlo does not satisfy certain billing codes that would entitle its use to reimbursement. Specifically, the Settlement stated:

> The Devices also fail to satisfy Medicare reimbursement requirements because they use photoplethysmography, also known as photoelectric plethysmography, to generate a waveform. National Coverage Determination ("NCD") 20.14 and the Local Coverage Determinations ("LCDs") that incorporate it prohibit reimbursement for noninvasive vascular tests that use photoplethysmography because of concerns about accuracy and reproducibility.

65.     Since the settlement, the plaintiffs filed an amended complaint against UnitedHealthcare for FCA violations based on the Company's "aggressive, centralized, and nationwide strategy to deploy Semler's products as a basis to diagnose its beneficiaries with PAD" and "automatic[]" mechanism to "capture[] the test results in the risk adjustment information submitted to Medicare." Motion to dismiss briefing is ongoing and the United States submitted a Statement of Interest in response to the Company's motion to dismiss stating conclusively that use of QuantaFlo as a standalone diagnostic tool is improper and violates FDA guidance:

> In this case, the Food and Drug Administration approved QuantaFlo to "aid clinicians in the diagnosis and monitoring" of PAD—not to diagnose PAD without further verification. MTD at 21. Accordingly, providers cannot rely

---

[14] *Kane* SAC ¶ 110.

exclusively on QuantaFlo test results to diagnose PAD. Instead, they must exercise some independent clinical judgment to verify that individual patients actually had PAD. In their complaint, Relators allege that in some instances, providers blindly adopted the QuantaFlo test results without exercising any independent clinical judgment. This alleged conduct . . . would not insulate [UHG] from False Claims Act liability for the submission of incorrect diagnosis codes.

*Kane*, Dkt. No. 126 at 5.

66.    Physicians across the country reported similar patterns of unreliable results and patient harm and investigative reporting corroborated UHG's pressure tactics.

67.    An August 4, 2024 *Wall Street Journal* article, "The One-Hour Nurse Visits That Let Insurers Collect $15 Billion from Medicare," described nurse practitioner Shelley Manke, who was required to use QuantaFlo on home visits because every new PAD diagnosis was worth about $2,500 a year. After trying the device on herself and getting mixed readings, she and other nurses raised concerns with Company management but were told to keep using it, a practice she said "made me cringe" because she did not think the diagnosis was justified based on QuantaFlo alone. The article also described Dr. Amy Chappell, an asymptomatic neurologist and avid runner, whose Company-administered QuantaFlo test was positive for PAD—a diagnosis her doctor later confirmed was wrong.

68.    A *STAT News* article, "How UnitedHealth Turned a Questionable Artery-Screening Program into a Gold Mine," provided further confirmation on August 7, 2024, reporting that UHG "pressed thousands of clinicians to use a thinly tested medical device [QuantaFlo] to screen people for artery disease, dramatically boosting payments from the federal government for years even though many of the patients were not sick;" the device was based on "a slim body of evidence generated by its manufacturer"; and it was

"[c]leared in 2015 through a Food and Drug Administration pathway that requires limited clinical testing," and "not as a standalone diagnostic device."

69.    Nine clinicians told *STAT News* that many QuantaFlo diagnoses had no medical value because they were false positives or identified early-stage disease that is not ordinarily treated.

70.    The U.S. Preventive Services Task Force has recommended *against* using QuantaFlo for screening asymptomatic patients. With false-positive rates at 10%, experts called the device "problematic for use in widespread screening," and five physicians at Company-owned clinics dismissed QuantaFlo diagnoses as "nearly useless."

71.    Staff at a Hartford HealthCare vascular clinic stopped ordering follow-up testing because so many QuantaFlo results were false positives. A North Carolina family physician saw three or four falsely diagnosed patients weekly after HouseCalls visits. A Mississippi cardiologist specializing in PAD said he routinely ignored QuantaFlo readings for asymptomatic patients. When physicians objected, UHG assigned QuantaFlo testing to HouseCalls nurses to "work[] around" the skeptical doctors and one protesting doctor had patients removed from his schedule.

72.    Five doctors reported fearing that false diagnoses would confuse patients, lead to unnecessary treatments, or cause problems with disability or life insurance. One recounted "agonizing" calls from patients asking if they had PAD and why he never told them.

73.    After repeated reports and articles on PAD diagnoses that generated billions in risk adjusted payments to UHG, and at diagnosis levels multiples of other MA providers,

the government announced in 2023 that it would eliminate risk adjustment billing for PAD. This change was supported by 19 former CMS officials, physicians, and policy experts, who warned in a letter that MA Insurers "maximize the vascular disease . . . by sending staff into MA patients' homes with digital diagnostic devices to try and find the slightest hint of sclerosis with little or no clinical relevance." UHG's response was swift and telling[15]: it "***stopped using the QuantaFlo device altogether following a change in Medicare rules.***" Once PAD diagnosis was no longer profitable, testing-and-diagnosis rates fell by more than a third to 9.6 per 100,000 by May 2024.

74.     HouseCalls was only part of the system; chart reviews and direct pressure on providers advanced the scheme further.

75.     **Chart Review**: Beyond HouseCalls, the Company deployed risk-adjustment coders to mine members' charts for conditions that might be linked to potential complications even where the diagnosis had no support, with instructions to find anything that would raise risk-adjustment scores. The scheme resulted in additional fraudulent upcoding, with no additional medical care provided. Notably, prior to the Relevant Period, in 2019, the OIG issued a report focused specifically on chart review, titled "Billions in Estimated Medicare Advantage Payments from Chart Reviews Raise Concerns," which found that chart review was overwhelmingly used to add diagnoses, not remove them – a one-way "review" that generated $6.7 billion in risk-adjusted payments in 2017. In 41% of

---

[15] Christopher Weaver & Anna Wilde Mathews, "UnitedHealth Used Aggressive Tactics to Boost Medicare Payments, Senate Report Finds," *Wall Street Journal* (Jan. 12, 2026), https://www.wsj.com/health/healthcare/unitedhealth-medicare-senate-report-706664fd?msockid=3a3ed515d08769512d5dc24bd1286842.

the chart reviews that added diagnoses, "there were no service records of visits, procedures, tests, or supplies." Then in 2021, the First OIG Report expressed significant concern about use of chart review to inflate risk adjustment payments, finding that chart reviews "may provide opportunities for MA companies to circumvent CMS's face-to-face visit requirement for risk adjustment" In 2024, the OIG again flagged concerns with chart review, noting particular concern about an MA insurer conducting chart reviews on top of information it gathered through in-home health-risk assessments (like HouseCalls), noting such a practice "heightens concerns regarding the validity of these diagnoses or the quality of care for MA enrollees" and that adding diagnoses to an in-home health risk assessment via chart review "may further circumvent the provider-enrollee relationships that ensure high-quality coordination of care." Multiple news articles also emphasized UHG's fraud through chart review, finding that coders were told to "lead" providers toward the highest-value diagnosis codes without regard to medical necessity, link chronic conditions like diabetes to complications even where unsupported and maximize upcoding volume. Some coders were Optum employees, others third parties; by 2024, the Company increasingly moved the work offshore, mainly to India.

76. **Pressure on Providers**: The Company also used multiple techniques to pressure its 90,000 affiliated physicians—particularly those in its own Optum network—to upcode. *STAT News* documented the Company "encouraging clinicians through bonuses and performance reviews to identify more health problems in patients, even if those

conditions seemed dubious," and putting physicians through hours of mandatory training on documenting illnesses to increase Medicare payments.[16]

77.     The disparities are stark: the *Wall Street Journal* found that patients who received both their MA coverage *and* medical care through Company-controlled providers had the highest average sickness scores from 2019–2022—triggering approximately $4.6 billion more in Medicare payments than if their sickness scores were consistent with other MA patients:[17]



Average sickness scores of Medicare recipients, by coverage type and doctor, 2019-2022

■ UnitedHealth doctors    ■ Other doctors

UNITEDHEALTH PLANS
1.65
1.31    This gap is worth an estimated $4.6 billion

OTHER MEDICARE ADVANTAGE PLANS
1.43
1.18    $2.7 billion

TRADITIONAL MEDICARE
1.08
0.98    More diagnoses don't lead to higher payments to insurers

---

[16] Bob Herman et al., "How UnitedHealth Harnesses Its Physician Empire to Squeeze Profits Out of Patients," *STAT News* (July 25, 2024), https://www.statnews.com/2024/07/25/united-health-group-medicare-advantage-strategy-doctor-clinic-acquisitions/.

[17] Christopher Weaver, Anna Wilde Mathews & Tom McGinty, "UnitedHealth's Army of Doctors Helped It Collect Billions More From Medicare," *Wall Street Journal* (Dec. 29, 2024), https://www.wsj.com/health/healthcare/unitedhealth-medicare-payments-doctors-c2a343db?.

78.     As with HouseCalls nurses, the Company's physicians were required to use charting software that recommended diagnoses for MA patients and would not let a physician close a chart until every suggested code received a "yes" or "no"—yet no similar prompts existed for non-MA patients, where additional diagnoses meant no extra money. Some suggested diagnoses were so unusual that physicians had to look them up; others had no sound basis, such as a prompt to diagnose a clotting disorder simply because a patient took aspirin regularly. Company personnel followed up whenever physicians rejected a suggested diagnosis, pressing them to reconsider.

79.     According to an August 11, 2025 article from *STAT News*, the Company pressured physicians by disciplining those whose upcoding fell short and rewarding those who met coding expectations with annual bonuses exceeding $30,000. Indeed, the *Wall Street Journal* reported that compensation was tied to the number of chronic disease diagnoses, with bonuses ranging from $20,000 to $78,000.

80.     The *Wall Street Journal*'s December 29, 2024 report found similar incentives for independent physicians: a bonus for every patient whose sickness score exceeded average by at least 20%—a clear incentive to inflate—and $250 to allow a Company nurse practitioner to examine their patients for additional diagnoses, an amount exceeding what the physician would earn for seeing the patient himself. As one former nurse practitioner who performed such exams put it, the goal was "finding diagnoses, that was clear as a bell."

81.     The results were dramatic: according to the same report, members who moved from traditional FFS Medicare to the Company's MA plans saw their sickness

scores rise 55% in the first year—an increase equal to diagnosing every one of them with both HIV and breast cancer in a single year.

### 2.      Red Flags and Board Knowledge

82.      During the Relevant Period, the Board received specific internal warnings, government reports, and extensive media coverage—all of which created actual knowledge or constituted red flags putting the Board on notice of the Company's systematic violation of law.

83.      Defendants bear direct responsibility for this scheme. The upcoding manipulation was deliberate and directed by the Officer Defendants, who ran and publicly defended the business. The scheme's significance to the Company's business was such that the Director Defendants cannot have been ignorant of it. Indeed, Section 220 documents demonstrate that from the start of the Relevant Period, the Officer Defendants kept the Board informed of the Company's upcoding practices, its efforts to counter mounting regulatory scrutiny, and the scheme's economics.

84.      The government's principal expert on MA is the Medicare Payment Advisory Commission ("MedPAC"), an independent advisory body created by Congress. MedPAC issues twice-yearly reports analyzing, *inter alia*, the comparative costs of MA and FFS Medicare. For years, MedPAC warned that the government pays substantially more for MA coverage than for Medicare FFS, and that risk-adjustment "coding intensity" was inflating payments by tens of billions of dollars. Put differently, the program designed to save money was instead overpaying insurers, and insurer-controlled coding was a central reason why.

85.      This conduct drew scrutiny from the HHS OIG. On September 13, 2021, the OIG issued a report exposing the extraordinary extent of UHG's fraudulent coding practices (the "First OIG Report").[18] Examining insurer-driven diagnoses through chart reviews and health risk assessments ("HRAs"), the First OIG Report found that UHG coded far more aggressively than other MA insurers—to a degree that could not be explained by legitimate medical factors.[19] Although UHG enrolled only 22% of all MA Plan members, the Company received 40% ($3.7 billion of $9.2 billion) of the total risk-adjusted payments CMS made based on chart reviews and HRAs in 2017. The Company's share of HRA-only payments was even more disproportionate: 58% ($1.5 billion of $2.6 billion) of every CMS payment based on HRAs, almost all of which were performed in members' homes.

_____

[18] U.S. Dep't of Health & Hum. Servs. Off. Inspector Gen., OEI-03-17-00474, Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments To Disproportionately Drive Payments (Sep. 20, 2021), https://oig.hhs.gov/documents/evaluation/2794/OEI-03-17-00474-Complete%20Report.pdf. This report came on the heels of two earlier OIG evaluations that had estimated at $9.2 billion the 2017 payments to MA Insurers for diagnosis codes reported only on chart reviews or HRAs, which increased the OIG's concern that insurers were using both tools to inflate risk-adjusted payments—a leading source of improper payments.

[19] Though the First OIG report did not identify the Company by name, the *Wall Street Journal* reported on September 22, 2021 that federal data compiled by analysts reflected that the Company was the one identified in the report. Anna Wilde Mathews, "Most of $9.2 Billion in Questionable Medicare Payments Went to 20 Insurers, Investigators Say," *Wall Street Journal* (Sep. 22, 2021), https://www.wsj.com/health/healthcare/most-of-9-2-billion-in-questionable-medicare-payments-went-to-20-insurers-federal-investigators-say11632303001?msockid=3bce06a5c6aa6fc32cf710e2c7156e07; Christopher Snowbeck, "Report Says UnitedHealth Group Was Top Recipient of Questionable Medicare Payments," *Minnesota Star Tribune*, (Oct. 19, 2021) https://www.startribune.com/report-says-unitedhealth-group-was-top-recipient-of-questionable-medicare-payments/600108138.

86.    Most significantly, the OIG found a striking absence of evidence that UHG provided follow-up care for the diagnoses it submitted for payment—a red flag strongly suggesting that UHG was fraudulently adding diagnostic codes solely to extract funds from Medicare. The OIG concluded that this pattern "***raises concerns about the validity***" of UHG's diagnostic coding practices—an unambiguous warning to the Board that UHG's MA business was built on fraud.[20]

87.    The Company responded with categorical denial. In a statement published by the *Wall Street Journal* on September 22, 2021—just nine days after the First OIG Report issued—the Company maintained that its "in-home clinical care programs provide significant benefits to seniors" and that its "Medicare Advantage risk-adjustment program is transparent and compliant with CMS rules." The *Minnesota Star Tribune* reported that the Company stated that the First OIG Report was "based on old data and is inaccurate and misleading." These denials, issued in the face of a federal watchdog's finding that the Company's coding practices "raise[d] concerns" about their validity, established Defendants' pattern of meeting evidence of misconduct with public refutation rather than inquiry.

---

[20] This report was highlighted by UHG's hometown paper, the *Minnesota Star Tribune*, in an October 19, 2021, article titled "Report Says UnitedHealth Group Was Top Recipient of Questionable Medicare Payments." Christopher Snowbeck, "Report Says UnitedHealth Group Was Top Recipient of Questionable Medicare Payments," *Minnesota Star Tribune*, (Oct. 19, 2021) https://www.startribune.com/report-says-unitedhealth-group-was-top-recipient-of-questionable-medicare-payments/600108138.

88.    Throughout the Relevant Period, rather than investing resources in compliance, the Board actively protected UHG's improper practices through lobbying, public relations, and efforts to defeat enforcement—a deliberate Board strategy of obstruction over compliance.

89.    UHG deployed extensive Congressional outreach, partnerships with facially independent lobbying groups, and paid placements in news articles and trade publications to defend what the Company internally characterized as "enterprise priorities"—meaning the diagnostic and coding rules that the Company developed expertise in manipulating. Rather than reform its practices, UHG worked to preserve the regulatory environment that enabled its fraud.

90.    One such partner group was the Better Medicare Alliance, ███████████ █████████████████████████████████████████████████ ██████████████████████████████ Better Medicare Alliance attacked the First OIG Report for "distort[ing] the role of chart reviews and HRAs." █████████ ████████████████████████████████████████████████████ ████████████ UHG_00006943 at -06945):



91.     It was not just the OIG that was concerned about UHG's MA scheme. In June

2022, the Massachusetts AG also launched a non-public investigation of the Company's

improper upcoding and overbilling of MassHealth, the state's Medicaid program.[21]

92.

UHG_00004029

at -04044–45.

UHG_00004029 at -04044–45.

_____

[21] UHG and the Massachusetts AG entered into a tolling agreement in connection with this
investigation in June 2022 – but the investigation would not become public until years later,
when the Massachusetts AG switched from investigating to suing UnitedHealthcare.

– 40 –

But there is no evidence of any actual results or action taken in response to these audit flags.

93.     Board materials demonstrate the Board's focus on profit generation through risk adjustment and that it was well-informed of regulatory concerns about coding inflating payments to MA plans. ████████████████████████

████████████████████████████████████

███████████████████████████████ UHG_00006943 at -006945, -06997. ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████ UHG_00007524 at -07530.

94.     But there is no evidence in any Board or Committee materials of any effort to investigate coding practices, evaluate the validity of the OIG's concerns, or implement compliance measures. The Board's response to a federal agency finding potentially fraudulent conduct was to focus on lobbying and public relations denials.

95.     ████████████████████████████████



████████████████████████████████████

████████████████████████████████████

███████████████ UHG_00007007 at -07013. ███████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████ UHG_00007524 at -07530. ████████

█████████████████████████████████████████████████████████

████████ UHG_00007524 at -07530.

96.     Amidst the public concern and OIG Reports accusing the Company of abusive upcoding, in 2023, under the Biden administration, CMS moved to revise the MA risk-adjustment payment system to limit the coding abuses the Company had developed and better align payments to insurance providers like UHG with their actual expenditures on Medicare beneficiaries.

97.     The new regime was referred to as the "Version 28" ("V28") model. It was intended to eliminate the diagnoses most susceptible to abuse, as demonstrated by the significant disparity between frequency of the codes' use for MA beneficiaries compared to traditional FFS Medicare beneficiaries. V28 also changed how severity and comorbidities influence risk adjustment factors.

98.     Under V28, diagnoses that previously boosted UHG's payments would no longer do so. V28 removed more than 2,000 diagnosis codes and revised payments for chronic conditions such as diabetes and major depression, standardizing them and removing certain payment distinctions based on disease severity or complexity. Accordingly, as of February 16, 2023, experts viewed V28 as having "material implications" for MA Insurers.[22]

---

[22] Brett R. Friedman, Deborah Kantar Gardner & Carolyn Lye, "Extrapolation Has Arrived: CMS Finalizes Medicare Advantage Risk Adjustment Rule," *Ropes & Gray* (Feb. 16,

99.



UHG_00005565 at -05565.

100. On February 23, 2023, the Board met with Defendant Thompson, then-CEO of UnitedHealthcare, and Timothy Noel, CEO of UnitedHealthcare Medicare & Retirement ("M&R"), ████████████████████████████████████████ UHG_00005052 at -05052. A CMS "Advance Notice" is the agency's proposed update to MA payment policies and rates for the future plan year, including changes to risk adjustment, benchmarks, and other components of the payment methodology. Following an opportunity for stakeholders to comment, CMS issues a "Rate Announcement" which finalizes MA payment rates and any methodological changes. This meeting preceded the HCPP Committee meeting the next day ████████████████████████████████████ UHG_00005565; UHG_00005052; UHG_00006281.

2023), https://www.ropesgray.com/en/insights/alerts/2023/02/extrapolation-has-arrived-cms-finalizes-medicare-advantage-risk-adjustment-rule.

101.    UHG lobbied CMS heavily to stop V28, and while not wholly successful, CMS agreed to phase the model in over three years rather than all at once. The agency set a three-year transition: 2024 risk scores calculated from 67% of the older "Version 24" ("V24") model and 33% of V28; 2025 changed to 33% V24 and 67% V28; and 2026 fully on V28, with V24 discontinued.[23]

102.    Despite these explicit acknowledgments that CMS was targeting UHG's coding practices, at this time, neither the full Board nor any Committee directed officers to investigate the Company's coding, HRA, or risk adjustment practices. No audit was commissioned. No compliance review was initiated. ███████████████

████████████████████████████████████████████

████████ UHG_00005807 at -05849. ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

103.    On April 3, 2023, executive leadership—including Defendants Witty and Rex—sent the Board a memorandum ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[23] The V24 and V28 Hierarchical Condition Category ("HCC") models are two versions of the model used by the CMS for Medicare Advantage risk adjustment. V28 is an updated version of V24, with key differences including a larger number of HCC categories, a smaller number of diagnosis codes, and changes to how certain conditions are classified; *see* The Evolution of CMS-HCC Models: V28's Impact on Patient Care and Risk Adjustment, IKS Health (Sep. 18, 2024), https://ikshealth.com/insights/blogs/the-evolution-of-cms-hcc-models-v28s-impact-on-patient-care-and-risk-adjustment/.

███████████████████████████████ UHG_00005564 at -05564; UHG_00005807 at -05848–49. Every member of the Demand Board then serving received this memorandum, ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

104.    At the April 13, 2023 Joint Meeting of the CHR Committee and the Audit Committee, attended by all Board members, Defendant Witty ████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████ UHG_00005571 at -05633.

105.    Having lobbied hard for the phased approach, the Company told investors it viewed the phase-in as favorable. On April 14, 2023, then-CEO Defendant Witty assured investors the changes were "not significant enough to" take the Company off its 13% to 16% EPS growth targets over the next few years.

106.    Defendants Witty and Rex, plus UHG's President and COO Dirk McMahon

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ UHG_00005564 at -05564. They advised the Board that ████████████

█████████████████████████████████████ UHG_00005564 at -05564. Additionally, at the April 13, 2023, Joint Meeting of the CHR Committee and Audit Committee attended by all Board members, UHG_00005056 at -05056, Defendant Witty

██████████████████████████████████████████████████████████████████

████████████████████████████████████ UHG_00005056 at -05059.

107.    ██████████████████████████████████████████████████████

████████████████████████████████████████████████████ at the June

5-6, 2023 Board meeting, the Board materials acknowledged that █████████

█████████████████████████████████████████████████████████████████

███████. UHG_00006325 at -06357. The Board materials provided to every director also

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████. UHG_00006305;

UHG_00006325 at -06328, -06358–59, -06368.

108.    The materials further reported that ███████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████

109.    █████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████████████ UHG_00006325 at -06368.

110.   The June 6, 2023 Governance Committee (Defendants Noseworthy, Flynn, and McNabb) materials ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ UHG_00006325;  UHG_00006305;

UHG_00004879 at -04881. The materials also reflected ███████████████████████

██████████████████████████████████████████████ UHG_00004879 at -04881.

In the wake of this scrutiny on HouseCalls, Board materials highlighted ██████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ UHG_00006325 at -

06328. The Governance Committee's focus ████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████ UHG_00004879 at -04881.

111.   On August 21-22, 2023, the Audit Committee ██████████████████████

████████████████████████████████████████████████████████████████████████████

████. UHG_00005697 at -05709; UHG_00005125.

112.   On November 7, 2023, the Governance Committee noted ██████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

– 47 –

███████████████████████████████████████████████

████ UHG_00005958 at -05960, -05962.

113.   On November 29, 2023, Defendant Witty reiterated that "despite that change, despite that impact, we are committed to the kind of earnings growth rate over the next 12 months that you would expect from us even if there hadn't been a rate notice cut," claiming the Company had "reconfigure[ed] our plans" for the next 5 years.

114.   Rather than examine these risks, or take steps to mitigate them, Board materials ████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ UHG_00005697 at -05713.

115.   And the Company's internal records showed despite positive claims to investors that V28 would not affect the Company's bottom line, the Company knew the opposite was true: the *Wall Street Journal* later reported that an internal Optum analysis of about 900,000 patients from late 2023 had "projected that the new billing rules would cut back sharply on diagnoses of chronic health conditions that led to the higher payments" and that "UnitedHealth had long known the Medicare payment change would be challenging."[24]

116.   The minutes from the February 21, 2024 Board meeting ████████████

███████████████████████████████████████████████

---

[24] Anna Wilde Mathews & Christopher Weaver, "Inside the Spectacular Downfall of UnitedHealth and its CEO," (June 2, 2025), https://www.wsj.com/health/healthcare/unitedhealth-ceo-andrew-witty-medicare-dde1964c?msockid=3a3ed515d08769512d5dc24bd1286842.

– 48 –



Rather than undertaking corrective action, the materials

.

UHG_00005697 at -05713.

117.    But even after the scrutiny from the OIG and CMS's efforts to clamp down on fraudulent upcoding, the Company's improper practices continued. The *Examiner News* reported on the scheme on March 18, 2024, providing an account based on an insider whistleblower and a secret audio recording of an Optum Tri-State/Optum East meeting to teach nurses how to add diagnosis codes during chart reviews. The meeting included eight or nine nurses, three administrators, a physician (Dr. Kevin Baran), and two senior executives—Optum East Director of Clinical Documentation Education Rachelle Gauvin and Vice President of Risk Adjustment Cristy Bauer, who reported to the President of Risk Bearing Entities, Alyssa Pepper. Audio recordings of the meeting captured management instructing attendees to add unsupported diagnoses in chart reviews and to confront physicians who objected, with one executive providing the response to give a skeptical doctor:

> We presented this supported medical condition to you, and you disagreed
> with it. Let me explain to you what the CMS definitions are around the

condition, and then I'd love to hear more about why you felt it might not be appropriate for this patient.

118. The executives also told attendees to use "buddy codes"—a single diagnosis set up to bring related ones in automatically—and when a nurse asked whether any resource actually documented the paired codes, Dr. Baran admitted the Company had invented them: "No one else will know what you're talking about outside of this room."

119. The same *Examiner News* account described a three-step process Optum used to defraud CMS. Step one: nurses ran chart reviews to find a member's prior chronic conditions—no matter how old—and added them back to the chart, "resurrect[ing]" old issues as an "active problem." Step two: the member saw a primary-care provider, whom Optum tried to keep "inoculated" from the scheme. Step three: a coder—"usually offshore in India"—added a code tied to the diagnosis the nurse had inserted in step one but that the primary-care provider had never addressed in step two, and the claim then went to CMS without that provider's involvement, or UHG providing any care for that diagnosis.

120. Unsurprisingly, in its March 2024 Report to Congress, MedPAC documented the exploding cost of MA compared to traditional FFS Medicare:

> Medicare spends approximately 22 percent more for MA enrollees than it would spend if those beneficiaries were enrolled in FFS Medicare, a difference that translates into a projected $83 billion in 2024.

* * *

> Between 2007 and 2024, we estimate that MA coding intensity will have generated $217 billion in aggregate higher payments to MA plans (Figure 12-6). Between 2007 and 2022, MA coding intensity resulted in $124 billion in increased payments to MA plans. Using our projection of MA coding intensity, we estimate that uncorrected coding intensity in 2023 and 2024 will

increase program spending by another $43 billion and $50 billion, respectively.

* * *

We estimate that chart reviews and health risk assessments together accounted for about $33 billion in payments to MA plans, or about 9 percent of all payments to MA plans in 2022.45 Combined with our finding that all sources of coding intensity resulted in MA risk scores that were about 18 percent higher than risk scores for comparable FFS beneficiaries in 2022, we conclude that health risk assessments and chart reviews together accounted for about 50 percent of all MA coding intensity (Figure 12-9, p. 386).

121. MedPAC's 2024 report noted that since 2016, MedPAC has recommended that audits "[f]ully account for MA coding intensity".

122. On April 5, 2024, Defendants Witty and Rex sent another Board memorandum, this time █████████████████████████████████████████ ████████████████████████████████████████████████████████ ████ UHG_00001298 at -01299.

123. On June 4, 2024, the Governance Committee noted ██████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████ UHG_00001742 at -01744.██████ ████████████████████████████████████████████████████████ █████████████████████████████████ HG_00001742 at -01744.████ ██████████████████████████████████." UHG_00001742 at -01743.

124. Beginning in July 2024, the *Wall Street Journal* published a series of investigative reports documenting the upcoding scheme, including "Insurers Pocketed $50

Billion From Medicare for Diseases No Doctor Treated," "The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare," "Medicare Paid Insurers Billions for Questionable Home Diagnoses, Watchdog Finds," and "UnitedHealth's Army of Doctors Helped It Collect Billions More From Medicare."

125.   The *Wall Street Journal*'s findings were based on review of millions of MA enrollees' records including doctor visits, hospital stays, prescriptions, and other care; analysis of roughly two billion diagnoses those patients received; and extensive interviews.

126.   In the first of its series, on July 8, 2024, the *Wall Street Journal* issued an investigative report on MA plans' improperly adding diagnoses for members to fraudulently increase government payments. The *Wall Street Journal's* analysis "found many diagnoses were added for which patients received no treatment, or contradicted their doctors' views." In particular, the Company sought HIV and AIDS diagnoses, yet most members given insurer-driven diagnoses of those conditions probably did not have them— they received none of the routine treatment these conditions require, such as antiviral medication. Whereas 92% of patients diagnosed through normal channels took antiviral drugs, that medication was used by just 17% of patients diagnosed by insurers, and only approximately 11% of UHG members. This disparity showed the diagnoses lacked support—even though each one earned the Company an extra $3,000 per member per year. The report went on to state, "Insurer-driven diagnoses by UnitedHealth for diseases no doctor treated generated $8.7 billion in 2021 payments to the company. . . UnitedHealth's net income that year was about $17 billion."

127.    The Company also differed greatly from its peers in the size of the payments these false diagnoses produced. This same July 8, 2024 *Wall Street Journal* report found that the Company's average payment from an insurer-driven diagnosis—$1,434 per member—was far higher than that of every other large MA insurer: $941 for CVS/Aetna, $573 for Humana, $527 for Elevance Health, and just $131 for Kaiser Permanente. The Company did not dispute those figures.

███████ ████████████████████████████████████████████

███████████████████ UHG_00001342, ███████████████████████████

████████████████████████████

129.    On July 10, 2024, Defendants Witty and Rex sent the Board a memorandum

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ UHG_00001295 at -01296.

130.    As foreshadowed, *STAT News* independently confirmed the same misconduct that *Wall Street Journal* had reported on. From July 2024 through January 2025, its "Health Care's Colossus" series included "How UnitedHealth Harnesses its Physician Empire to Squeeze Profits Out of Patients," "How UnitedHealth Turned a Questionable Artery-Screening Program into a Gold Mine," "Inside UnitedHealth's Strategy to Pressure Physicians: $10,000 Bonuses and a Doctor Leaderboard," "Lawmakers Call for Curbs on UnitedHealth's Growing Empire," and "DOJ Seeks Interviews with Former UnitedHealth Group Doctors." The reporting was based on

interviews with more than two dozen current and former Company physicians and executives, health-policy experts, and patients, as well as review of court records and the Company's roughly 600-page medical-coding manual.

131. On July 25, 2024, *STAT News* published an expose[25] on how the Company used its influence over 90,000 clinicians—almost 1 in 10 US doctors—to code patients as sick as possible, to increase the Company's payments under MA. The report pointed to a 2022 study by the Company's own physician researchers showing the Company's doctors coding MA Plan members for lung disorders, vascular conditions, and kidney disease at a rate 200% above FFS Medicare patients. The same report described a primary-care physician formerly with the Company who told members truthfully that they did not actually have the condition she had added to their chart because the Company had instructed her to upcode so she would be paid more. The DOJ contacted her for help with its ongoing investigation.

132. On August 5, 2024, the Audit Committee—including Defendants McNabb, Garcia, Gil, and Baker— ███████████████████████████████

████████████████████████████████████████████████

███████████████████████████, UHG_00000895 at -00930, ████████████

████████████████████████████████████████████████

---

[25]Bob Herman et al., "How UnitedHealth Harnesses its Physician Empire to Squeeze Profits Out of Patients," *STAT News* (July 25, 2024), https://www.statnews.com/2024/07/25/united-health-group-medicare-advantage-strategy-doctor-clinic-acquisitions/.

██████████████████████████████████████████████████████████████

████████████████

133. A further *STAT News* report on October 16, 2024 confirmed that the Company pressured physicians to document more chronic illnesses for the sake of revenue through a mix of bonuses, peer pressure, and competitive "dashboards" that ranked one physician's diagnosis rate against another's. Physicians at Company clinics, that report found, diagnosed peripheral artery disease in 47% of MA patients—*three to four times* the usual rate among older Americans—with each diagnosis worth about $3,000 a year in extra payments. Physicians who did not code enough were sent to remedial training.

134. On August 6, 2024, just a month after the *Wall Street Journal* published its detailed account of UHG's upcoding scheme, the HCPP Committee—including Defendants Montgomery Rice, Noseworthy, and Baker—met, with every member of the Board attending pursuant to a standing invitation. ████████████████████ ████████████████████████████████████ UHG_00001094. █████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

UHG_00001094 at -01095. ██████████████████████████████████████

██████████████████████████████████████

135. The OIG focused on the Company's fraudulent upcoding again in October 2024 with a report titled "Medicare Advantage: Questionable Use of Health Risk Assessments Continues to Drive Up Payments to Plans by Billions" ("Third OIG Report"), confirming that the scheme had continued through the Relevant Period at the expense of

vulnerable seniors and taxpayers. Of the $4.8 billion in 2023 risk-adjusted payments to MA Insurers based on diagnoses reported only on in-home HRAs and HRA-linked chart reviews, the Company received $3.2 billion—two-thirds of the payments—while covering only 28% of MA members. And across 77 MA plans in 2023 where payment was based solely on a single in-home HRA and no other service or treatment record, the Company generated more than half of the money.

136.  Most damning, the OIG found the Company was billing for diagnoses without providing any care for those conditions. Although UHG was disproportionately diagnosing patients and billing the federal government, the OIG found a striking absence of follow-up care:

> The lack of any other follow-up visits, procedures, tests, or supplies for these diagnoses in the MA encounter data for 1.7 million MA enrollees raises concerns that either: (1) the diagnoses are inaccurate and thus the payments are improper or (2) enrollees did not receive needed care for serious conditions reported only on HRAs or HRA-linked chart reviews.

137.  Either explanation demonstrates fraud: the Company was fabricating diagnoses to extract payments or diagnosing patients with serious conditions and denying them care—both violations of federal law.

138.  The OIG further found that "[b]y adding diagnoses to an in-home [HRA] via a chart review without also implementing best practices for care coordination, MA companies [including UHG] may further circumvent the provider-enrollee relationships that ensure high-quality coordination of care." Based on those concerns —and for the first time ever—the OIG recommended that CMS limit payments for diagnoses generated through in-home visits.

139.    When the *Wall Street Journal* covered the Third OIG report, it obtained additional comments from OIG officials. The agency's assistant inspector general for evaluation and inspections explained that "some Medicare Advantage companies are making billions from the health risk assessment diagnoses without providing care for the conditions that they identify"—which "could mean some of the diagnoses are false" or, if accurate, that "the insurers making them aren't connecting patients to the care they need, even as the companies are paid extra based on the supposed cost of treating the conditions"—and criticized the conduct directly: "[p]rofiting off enrollees' medical conditions without providing treatment for those conditions is wrong." Rather than accept responsibility or implement compliance measures, UHG attacked the OIG's findings. A spokesman claimed that "[a] misleading, narrow, and incomplete view of risk adjustment data is being used to draw inaccurate conclusions about the value of in-home care for America's most vulnerable seniors," asserting that the home visits are "comprehensive assessments by highly-trained clinicians" that "identify and drive needed follow-on care for the vast majority of the patients with whom we engage." The OIG's data contradicted this claim: 1.7 million enrollees received no follow-up care whatsoever for the diagnoses UHG submitted for payment.

140.    On November 4, 2024—after three years of OIG reports, national investigative journalism, and congressional inquiry into the Company's coding practices—

███████████████████████████████████████████████

████████████████████████████████████ UHG_00002285,

██████████████████████████████████████████

████████████████████. UHG_00002285.[26]

141. A December 29, 2024 *Wall Street Journal* report showed the Company's doctors greatly over-diagnosing conditions for the Company's own MA members compared with those other groups. These findings were based on data from the Company's own physicians who diagnosed conditions not only for the Company's MA patients but also for patients on competing MA plans and on FFS Medicare, which showed the Company's pattern of manufacturing high-value diagnoses.

142. The total amount was very large: the *Wall Street Journal* reported that the Company's insurer-driven diagnoses of high-value conditions no doctor treated brought in $8.7 billion in CMS payments in 2021 alone—more than 50% of the Company's $17 billion in net income that year—with the Company adding diagnoses much faster than its peers.

143. On February 21, 2025, the *Wall Street Journal* reported on a new DOJ fraud investigation into its MA upcoding; UHG's stock price declined sharply. The Company then issued a "Statement Regarding Medicare Advantage" that same day describing the *Wall Street Journal*'s reporting as "misinformation." The Company stated that the *Wall Street Journal* "continues to report misinformation on the Medicare Advantage (MA)

---

[26] ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

program." The Company stated that it was "not aware of the 'launch' of any 'new' activity as reported by the Journal," asserted that the *Wall Street Journal* had waged "a year-long campaign to defend a legacy system that rewards volume over keeping patients healthy," and stated that "[a]ny suggestion that our practices are fraudulent is outrageous and false."

144.   But just weeks after branding the *Wall Street Journal*'s reporting "misinformation," as alleged in the Securities Complaint,[27] the Company not only knew of the new government investigation into its coding practices—it had already engaged outside counsel, Latham & Watkins, to assist with it. The proof is in writing: a March 11, 2025 email from Peter Shakow, Optum's Senior Associate General Counsel for Enterprise Investigations and Litigation, to at least one former employee. In it, Shakow disclosed that the government had posed questions to the Company concerning Optum's coding practices—questions that, on the Company's understanding at the time, might touch on the recipient's own work at Optum. And although the inquiry remained at an early stage, with no way to know whether or when investigators would approach the recipient, Shakow moved to get ahead of any such contact: he offered the former employee representation by Latham & Watkins at no cost and said he would have Samantha Koppell of that firm follow up with the recipient directly.

145.   Independent researchers quantified the scope of the Company's upcoding. In April 2025, *STAT News* reported on a study published in the *Annals of Internal Medicine*—

---

[27] Third Am. Suppl. Consol. Compl. ¶ 246, *Cal. Pub. Emps.' Ret. Sys. v. UnitedHealth Grp. Inc., et al.*, No. 24-cv-1743 (JMB/JFD) (D. Minn. Aug. 27, 2025), Dkt. No. 157 ("Securities Complaint" OR "Securities Compl.").

"the first to comprehensively compare the extra revenue from Medicare Advantage coding among individual insurers"—showing how far the Company "stands out from the rest for its prowess at raking in extra cash." The study found that MA Insurers collected an estimated $33 billion in extra government payments in 2021 by making members appear sicker than comparable enrollees in traditional FFS Medicare—and more than $13 billion of that, 42%, went to the Company.

146. The study's lead author—Richard Kronick, a professor in the Herbert Wertheim School of Public Health at the University of California, San Diego—stated it directly: "United[Healthcare] is just coding a lot more than the other largest insurers." Examining the coding differences between private MA and FFS Medicare, where there is no financial incentive for upcoding, he concluded that those differences come mainly from insurers' business practices and how hard they work to find more diagnoses, with nearly all of them concentrated in just ten diagnostic groups—including vascular disease, major depressive disorder, and drug and alcohol dependence. The study also traced the codes to their source: about half came from chart reviews and HRAs—two-thirds of that half from chart reviews, the rest from HRAs—and on both measures the Company exceeded every other insurer, leading the field in dollars obtained from in-home HRAs and in its use of chart reviews.

147. In its July 2025 Data Book, MedPAC "estimate[d] that MA benchmarks in 2025 will average 130 percent of what FFS [Medicare] spending would have been for MA beneficiaries" and explained: "[a]ltogether, we estimate that MA payments are 20 percent

higher than what Medicare would have spent to cover the same group of enrollees in FFS Medicare. That estimate incorporates adjustments for the effects of coding and selection."

### C.    Profiting from Denied Care: Algorithmic Post-Acute Care Denials and Incentivizing Nursing Homes to Deny Care to Vulnerable Patients

148.    Having inflated revenue by making members look sicker than they were, the Company simultaneously boosted profits from the opposite direction—by denying actually sick members the care they needed. Under Defendants' watch, UHG used a proprietary algorithm to cut off post-acute rehabilitation for elderly and disabled members, limited treatment for children with autism, and secretly paid nursing homes to suppress hospital transfers, subordinating patient safety to the Company's margins.

149.    On April 27, 2022, the OIG issued the Second OIG Report, exposing that 13% of the Company's prior authorization denials and 18% of its payment denials were inappropriate because the Company set improperly restrictive criteria or insisted on unnecessary documentation.[28]

150.    On November 14, 2023, *STAT News* published "UnitedHealth pushed employees to follow an algorithm to cut off Medicare patients' rehab care," reporting that UHG pressured staff to "cut off payments for seriously ill patients in lockstep with a computer algorithm's calculations, denying rehabilitation care for older and disabled Americans as profits soared." Publicly, the Company conceded it used an algorithm

---

[28] U.S. Dep't of Health & Hum. Servs. Off. Inspector Gen., OEI-09-18-00260, Some Medicare Advantage Organization Denials of Prior Authorization Requests Raise Concerns About Beneficiary Access to Medically Necessary Care (Apr. 27, 2022), https://oig.hhs.gov/documents/evaluation/3150/OEI-09-18-00260-Complete%20Report.pdf.

(NaviHealth) that predicted how long patients would need rehabilitation but claimed it was only a "guidepost." Privately, UHG managers told staff something very different: that the algorithm "was to be followed precisely so payment could be cut off by the date it predicted." Internal UHG documents showed the Company had a target to keep MA rehabilitation stays within 1% of the algorithm's projected days. Former employees said failing to meet these targets risked discipline up to termination.

151.   A putative class action was filed that same day in the District of Minnesota, alleging that the Company improperly terminated coverage for MA members' skilled nursing facility and home health services based on algorithmic guidance because denying coverage inured to the Company's financial benefit.[29] The court sustained the complaint as to breach-of-contract and good-faith claims. *See Est. of Lokken v. UnitedHealth Grp., Inc.*, 766 F. Supp. 3d 835 (D. Minn. 2025).

152.   On October 17, 2024, the Senate Permanent Subcommittee on Investigations released a Majority staff report titled "Refusal of Recovery: How Medicare Advantage Insurers Have Denied Patients Access to Post-Acute Care," based on over 280,000 pages

---

[29] Casey Ross & Bob Herman, "UnitedHealth Faces Class Action Lawsuit Over Algorithmic Care Denials in Medicare Advantage Plans," *STAT News* (Nov. 14, 2023), https://www.statnews.com/2023/11/14/unitedhealth-class-action-lawsuit-algorithm-medicare-advantage; Brendan Pierson, "Lawsuit Claims UnitedHealth AI Wrongfully Denies Elderly Extended Care," *Reuters* (Nov. 14, 2023), https://www.reuters.com/legal/lawsuit-claims-unitedhealth-ai-wrongfully-denies-elderly-extended-care-2023-11-14; Elizabeth Napolitano, "UnitedHealth Uses Faulty AI to Deny Elderly Patients Medically Necessary Coverage, Lawsuit Claims," *CBS News* (Nov. 20, 2023), https://www.cbsnews.com/news/unitedhealth-lawsuit-ai-deny-claims-medicare-advantage-health-insurance-denials; Compl., *Est. of Lokken v. UnitedHealth Grp., Inc.*, No. 0:23-cv-3514 (D. Minn. Nov. 14, 2023), Dkt. 1.

of internal documents from the three largest MA insurers, including UHG. It found that between 2019 and 2022, UHG denied prior-authorization requests for post-acute care far more often than for other types of care—in 2022, at roughly three times its overall denial rate. The report concluded that these denials left frail seniors recovering from strokes, fractures, and complex infections without access to necessary rehabilitation and skilled nursing facilities and pointed to the Company's algorithmic decision-making as a part of the problem.

153.   Relatedly, on November 19, 2024, *ProPublica* reported that, although California, Massachusetts, and New York sanctioned the Company for systematic algorithmic denials of mental health coverage, UHG continued using its algorithm for coverage assessment in other states, employing a quota system that scrutinized frequent users of mental health services. A Department of Labor spokesperson noted that more stringent review of medical health treatment than physical health treatment could violate the mental health parity act.

154.   A *Boston Globe* report found that UHG denied about one of every three claims in 2023—the most of any major insurer and roughly *double* the 16% industry average. *Forbes* also reported on new UHG policies to deny claims for routine services.

155.   The Company also prioritized profits by discouraging hospital transfers at nursing homes due to their cost. On May 21, 2025, after review of internal Company documents, *The Guardian* revealed that over the past seven years, the Company "secretly paid nursing homes thousands in bonuses to help slash hospital transfers for ailing residents—part of a series of cost-cutting tactics that has saved the company millions, but

at times risked residents' health." The Company placed its own medical teams inside nursing homes and pushed them to reduce costs; it reported that, after Company staff became involved, residents who needed immediate hospital care did not get it and "[a]t least one lived with permanent brain damage following his delayed transfer, according to a confidential nursing home incident log, recordings and photo evidence." A current UHG nurse practitioner filed a congressional complaint about UHG's "Quality and Shared Risk," program which included something akin to a quota system for hospital admissions; internal emails showed supervisors giving their teams "budgets" of how many hospital admissions they had "left" for patients.

156.   *The Guardian* also reported on UHG's use of incentive payments, including bonuses for nursing homes with a low "admits per thousand" ("APK") metric, referring to frequency of sending residents to the hospital, and as much as hundreds of thousands of dollars in payments to nursing homes that increased enrollment and reduced medical spending. Of course, residents were unaware of these "confidential incentive payments and anti-hospitalization tactics."

157.   In response, UHG sued *The Guardian* for defamation. *The Guardian* prevailed in full on its motion to dismiss; the court found its reporting was "substantially true" and that it was "not required to publish facts just because United would have preferred more favorable facts."

158.   On December 17, 2025, *The Guardian* published another article on UHG's deployment of Optum nurse practitioners and physician assistants into nursing homes. It reported that while the Company claims the program provides extra support and reduces

unnecessary hospital admissions, families of three elders who died after Optum pushed back on hospital visits had filed lawsuits alleging the program was designed to cut expensive hospital admissions at the expense of patient care. *The Guardian* also reported that nurse practitioners were rewarded with bonuses for reducing hospital transfers. Multiple whistleblower complaints—including submissions to Congress and federal agencies—alleged that Optum engaged in unethical tactics and violated federal law to reduce costly hospital care: managers pressured residents into signing "Do-Not-Resuscitate" orders; and nurses were instructed to call Optum, not the patient's primary care provider, when a patient's health worsened. *The Guardian* reported on one patient who died after an off-site Optum hotline employee urged monitoring at the home rather than a hospital transfer the day after she was knocked out of her wheelchair and hit her head on the concrete floor and now was nauseous and vomiting—symptoms consistent with potential internal bleeding that could only be assessed with a CT or MRI scan. Her attorneys allege the nurse practitioner was acting as an insurance adjuster rather than an independent medical professional.

159. Even after the extensive reporting and scrutiny, UHG continued these improper practices. On June 11, 2026, the OIG issued two reports on prior-authorization requests for post-acute care—skilled nursing facilities, long-term-care hospitals, and inpatient rehabilitation facilities—using data from June 2024. It found that UHG was one of the most egregious actors. For patients needing more intensive care than a nursing home can provide, the Company denied most requests: 66% of requests for inpatient rehabilitation facilities (versus a 54% study-wide average) and 71% of requests for long-

term-care hospitals (versus a 65% average). The OIG separately found that NaviHealth—the algorithm described above—had a high denial rate of 14% for nursing-home care.

160.   The most revealing fact is what happened when a beneficiary appealed (which rarely happened). UHG members won appeals 99.7% of the time, more than with any other insurer. This "raise[d] concern" to the OIG that the Company was denying access to medically necessary care. A denial system that fails on nearly every challenge does not reflect good-faith clinical judgment, but rather a deliberate bet that most beneficiaries will never appeal.

> **D.    The Company's Knowingly False Firewall Representations to Secure Antitrust Approval of the Change Acquisition Result in Largest Healthcare Data Breach in U.S. History**
>
> **1.    UHG Touts Firewall Protections to Defeat DOJ Antitrust Challenge**

161.   Change is the country's largest healthcare electronic data interchange ("EDI") clearinghouse. It stands at the "center of the health ecosystem" by moving claims, payments, and related information electronically between payers and providers. On January 6, 2021, the Company announced it would acquire Change for $13 billion and add it to its Optum Insight segment. The acquisition gave UHG access to highly sensitive patient information ("customer sensitive information" or "CSI") and competitor data.

162.   As the largest EDI clearinghouse in the nation, Change connected more than 2,000 payers, 1 million physicians, and 6,000 hospitals and health systems. When the deal was announced, Change was processing more than 15 billion transactions a year, worth

more than \$1.5 trillion in adjudicated value and amounting to roughly half of all commercial medical claims in the United States.

163.   Concern about the deal's effect on competition arose immediately.

164.   In a March 17, 2021 letter, the American Hospital Association ("AHA") warned that the transaction would reduce competition in healthcare information-technology services and concentrate a large share of the nation's healthcare data in one company and specifically challenged the Company's and Optum's claimed "firewalls," noting that the Company "has never demonstrated that the firewalls are sufficiently robust to prevent sensitive and strategic information sharing." A Deutsche Bank analyst gave the same warning, cautioning that the merger "would lead to a significant consolidation of data in healthcare and would end up giving [UnitedHealth] solo access to nearly all competitive payers information."

165.   On February 24, 2022, the DOJ, joined by the attorney general of Minnesota and New York, sued to block the transaction. The complaint alleged that the merger violated antitrust laws by giving the Company unmatched access to information on nearly every health insurer and health data on nearly every American; a near-monopoly over EDI clearinghouse services and claims editing, two of the most important processes in commercial health insurance, plus near-complete visibility into the plans and coverage of 38 of the top 40 health insurers in the country, so that it could structure its own plans for competitive advantage.[30]

---

[30] Claims editing involves reviewing and checking healthcare insurance claims before submission to ensure they comply with applicable standards, regulations, and payer

166. The United States AG warned that letting "America's largest health insurer . . . acquire a major rival for critical health care claims technologies" would "undermine competition for health insurance and stifle innovation in the employer health insurance markets."

167. Analysts identified the same central issue: as alleged in the Securities Complaint, a Credit Suisse analyst noted that the "crux of the issue is that [UHG] would have access to sensitive data that could be wielded against competitors on the insurance side of the business," while noting that approval might still come because the Company had promised "strict firewalls keeping insurance data obtained by Optum from flowing through to the United Healthcare insurance business."

168. Board materials reflected that since at least June 7, 2021,



UHG_00004410 at -04411.

UHG_00008069 at -08222.

As Public Policy Strategies and Responsibility Committee minutes from August 10, 2021 reflect,

" UHG_00004338 at -04348.

169. The DOJ lawsuit proceeded to a two-week trial, during which UHG made sworn representations about firewalls it claimed protected customers' data and CSI, stating

---

requirements. This process helps identify errors, reduce fraud risk, and reduce claim denials and payment delays.

it maintained "internal firewalls that prevent the sharing of competitively sensitive information across business units." It also claimed to have effective firewalls to prevent subsidiaries from accessing rivals' data held by Change.[31] On September 19, 2022, the court ruled for the Company under seal, with the redacted opinion made public two days later. *See United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118 (D.D.C. 2022) ("*United States v. UHG*"). The court specifically credited UHG's "history of compliance with its own firewalls" and "convincing testimony from senior executives." *Id.* at 150. UHG completed the acquisition of Change soon after.

### 2. UHG Knew That Its Firewall Protections and Other Security Measures Were Deficient

170. The firewalls the Company presented to the court and the public, however, were false. Before and after the Change announcement, Optum's business applications

---

[31] *See* Susan Morse, "Data Did Not Drive Acquisition of Change, UnitedHealth Says," *HealthCare Finance* (Sep. 13, 2022), https://www.healthcarefinancenews.com/news/data-did-not-drive-acquisition-change-unitedhealth-says; David McCabe, "Justice Dept. Sues to Block $13 Billion Deal by UnitedHealth Group," *New York Times* (Feb. 24, 2022), https://www.nytimes.com/2022/02/24/business/doj-antitrust-lawsuit-unitedhealth.html; Anna Wilde Mathews & Brent Kendall, "Justice Department Sues to Block UnitedHealth's Planned Buy of Change Healthcare," *Wall Street Journal* (Feb. 24, 2022), https://www.wsj.com/health/healthcare/justice-department-sues-to-block-unitedhealths-planned-buy-of-change-healthcare-11645719693; John Tozzi, "UnitedHealth's Expansion Strategy Is Threatened by US Regulators," *Bloomberg News* (July 28, 2022), https://www.bloomberg.com/news/articles/2022-07-28/health-data-antitrust-concerns-overshadow-unitedhealth-deal; Paige Minemyer, "UnitedHealth-Change Healthcare Deal Trial Has Begun. Here Are 3 Things to Know," *Fierce Healthcare* (Aug. 1, 2022), https://www.fiercehealthcare.com/payers/unitedhealth-change-healthcare-deals-trial-has-begun-here-are-3-things-know; Leah Nylen & John Tozzi, "Change Data 'Could' Help UnitedHealth Insurer, Ex-CEO Testifies," *Bloomberg News* (Aug. 4, 2022), https://news.bloomberglaw.com/antitrust/change-data-could-help-unitedhealth-insurer-ex-ceo-testifies; Am. Pretrial Br. at 14, *United States v. UnitedHealth Grp. Inc.*, No. 1:22-cv-00481 (CJN) (D.D.C. July 22, 2022), Dkt. No. 103.

operated under an open-access policy for customer data, including CSI, and Optum's intracompany businesses had neither role-based security nor a technical firewall.[32] Without role-based security, Optum could not limit data access by user role or permission, so once it approved a user's access request, nothing stopped that user from viewing or handling *any data*—including CSI. The intra-Optum businesses therefore had free access to Change's customers' data. With no technical firewall in place, any unauthorized access or breach could not be contained because an intruder would reach all of Optum's data. Access to Change's data was not incidental to the deal—it was the point. Then-CEO David Wichmann admitted that UHG's access to Change's data was the "foundation by which the business case was made" for the acquisition, and that "a network with no data isn't worth very much."[33] The Company's own records confirmed as much. UnitedHealthcare's and Optum's permission logs—which document when employees access information outside their business unit—showed that UnitedHealthcare-affiliated employees, including directors and analysts across its commercial, Medicare & Retirement, and clinical segments, were routinely granted access to external customers' competitively sensitive data.[34] Further, internal communications showed employees knew the safeguards were

---

[32] Role-based security, or role-based access control (RBAC), limits system access by assigning permissions and privileges based on a user's role, ensuring that only authorized individuals can access specific resources.

[33] Proposed Findings of Fact & Conclusions of Law of the United States, State of Minnesota, and State of New York ¶ 4, *United States v. UnitedHealth Grp. Inc.*, No. 1:22-cv-00481-CJN (D.D.C.), Dkt. No. 119 (Sept. 6, 2022) ("Gov't Proposed Findings") ¶¶ 4, 95.

[34] Gov't Proposed Findings ¶ 28 & Part IV.A.4(d), at 109–14 (concluding that "United's data governance is characterized by repeated failures, contradicting the rosy picture painted by United's trial witnesses").

illusory: in a March 3, 2022 chat, a UHG employee called the Company's security protocols "[s]carey" [sic] and "worthless" because they relied on "having requesters sign a confidentiality agreement that they won't look at things they shouldn't" rather than any "technical control in place to block access"—this after employees described as "very, very concerning" a prior incident in which UnitedHealthcare employees "access[ed] their competitors['] data" and "actually copied [it] over into [UnitedHealthcare's] own case tracking system."[35]

171.   The absence of meaningful firewalls created a serious conflict. For every product Change sold, Optum had a competing business that could access competitor data within the system. This created an ongoing risk of both exposing sensitive information and anticompetitive misuse. The Optum applications that shared data across business lines without role-based protections included:

- ContractHub—stored all of Optum's commercial contracts, including CSI such as pricing information and contract terms—and lacked role-based security to prevent cross-business;[36]

- Salesforce Growth Office ("Salesforce GO")—tracked and reported sales activity as a relationship management system, including CSI such as pricing information—and did not prevent users from seeing all past and present sales activity for every Optum customer, including Change customers;

- the Business Intelligence Data Warehouse ("BIGW")—received data from ContractHub, Salesforce GO, the Peoplesoft Enterprise Resource Planning tool ("Peoplesoft ERP"), the Change Enterprise Data Warehouse, and more,

---

[35] Securities Compl. ¶¶ 373–74 (alterations in original).

[36] Between September 19, 2022—the date the Change acquisition was approved—and January 2024, ContractHub lacked a technical firewall. Role-based security was not implemented until January 2024.

and stored CSI—and lacked role-based protections against cross-business access;

- the Data Governance Tracking System ("DGTS")—reviewed contracts to determine if Optum could de-identify customer data or use offshore resources, stored CSI including the contract terms Change had reached with its customers—and lacked role-based protections against cross-business access;

- Peoplesoft ERP—managed Optum's billing and accounts receivable, stored CSI including billing information, accounts receivable, and system-usage volumes—and lacked role-based protections against cross-business access (and which did not implement role-based security until the fall of 2023);[37] and

- the Optum ERP Data Store ("OEDS")—reported data from Peoplesoft ERP, storing the same categories of CSI—and lacked role-based protections against cross-business access.

172. As alleged in the Securities Complaint, as the post-acquisition integration proceeded after October 2022, the absence of technical firewalls inside Optum's systems was reported to the Integration Management Office ("IMO") as a concern and a risk to completing integration on schedule. The IMO's role is to raise issues with executive leadership, including the Company's then-CEO Defendant Witty and the Board, on which Witty sat and which then-Chairman Stephen Hemsley led during the Relevant Period.

173. The court's ruling in *United States v. UHG* reflected the success of the Company's representations, not their truth. The government argued to the court that "the evidence shows failures in [UHG's] compliance" and that the Company's data governance was "characterized by repeated failures, contradicting the rosy picture painted by United's

---

[37] Although Peoplesoft ERP implemented role-based security in Fall 2023, it likewise lacked a technical firewall from September 19, 2022, when the Change acquisition was approved, until that time.

trial witnesses."[38] But applying Section 7 of the Clayton Act—which asks whether a merger is likely to lessen competition in the future, not whether the acquirer's existing data governance is sound—the court credited the evidence the Company presented (including senior executive testimony) about its firewalls, contractual commitments, and compliance history, finding that "United's incentives to protect external customers' data outweigh its incentives to 'misuse' that data" and that the Company would not "uproot its entire business strategy and corporate culture," including its firewall policies, in order to exploit rivals' data.[39] As alleged in the Securities Complaint, the Company never disclosed to the court that, at that very moment, its intra-Optum business applications lacked the technical firewalls it had represented, as alleged in the Securities Complaint.

174.    Former Change personnel with direct knowledge confirm both the worsened state of Change's security after the acquisition and the Company's knowing acceptance of the risks.

175.    Confidential Witness 1 ("CW1")[40] served as Change's Director of Risk Management from September 2017 to March 2023, working with Change's Risk and Treasury organization—the group responsible for keeping Change's payment systems and payment connections secure and operational—where CW1 managed Change's commercial

---

[38] United States' Proposed Findings of Fact and Conclusions of Law ¶¶ 13, 28, *United States v. UnitedHealth Grp. Inc.*, No. 1:22-cv-00481 (CJN) (D.D.C.), Dkt. No. 119 (Sep. 6, 2022).

[39] *United States v. UnitedHealth Grp.*, 630 F. Supp. 3d at 141, 144.

[40] Former employees are referred to herein as Confidential Witnesses ("CW").

insurance program and reported to Change's Senior Vice President of Risk and Treasury, who in turn reported to Change's CFO.

176.    According to CW1, the Company carried out the post-acquisition transition at a deliberately fast pace because the district court's decision allowing the transaction to proceed in September 2022 was on appeal. According to CW1, the Company wanted the two companies so fully combined that, if the appeal succeeded, separating them would be "too late and nearly impossible."

177.    That speed, CW1 explained, left the integration lacking in information concerning how Change actually operated, the risks the Company was taking on or the steps needed to address them. In CW1's words, "when you rush, you miss things" because the detailed analysis is absent. CW1 believed the rushed transition caused the resulting cyberattack.

178.    CW1 stated that the Company chose to let Change's catastrophic cyber coverage lapse entirely and to bear the exposure through its own self-insurance, on the view that a loss of that size "wasn't catastrophic" to a company of the Company's size.

179.    Confidential Witness 2 ("CW2") confirmed the worsened state of Change's information security systems and disclosed that the Company's senior leadership knew of, and deliberately accepted, the problems that led to the breach. CW2 served as Change's Director of Information Services responsible for identity and access management for the twelve years before December 2022—part of more than two decades at Change—and led a team of about thirty employees managing Change's privileged access management,

single sign-on, identity governance, and directory services. CW2 reported to Change's Chief Information Security Officer.

180.   CW2's account directly contradicts the Company's statement that Change would receive "the benefit of the Company's technology and security." Change had been a "CrowdStrike shop," running what CW2 considered, in his opinion, best-in-class endpoint protection, and the Company required Change to remove CrowdStrike from its systems in favor of Microsoft Defender, which CW2 and his team believed offered less security. According to CW2, the Company lacked the tools to detect rogue identities, orphan accounts, or non-human identities, capabilities for which Change's own tools were better.

181.   CW2, who met with the Company's integration team several times each week, found that team unskilled for identity-management integration. They were, in CW2's description, junior employees following a checklist, separated from the Company's actual security team.

182.   CW2 also identified a specific source of unaddressed risk. A set of older business units that Change had earlier acquired from McKesson had serious and long-standing security problems—including a lack of multi-factor authentication, outdated servers, and offshore contractors who accessed Change's environment from non-secure devices and logged into Citrix desktops without multi-factor authentication. Although CW2 and his team worked to fix these problems, they were told that management would not provide significant funding because the systems were being moved to cloud-based

services. CW2 called this approach "a perfect recipe for a disaster" and believes the breach started in these older units.

183. These conditions, CW2 explained, were the result of a culture of accepting risk rather than fixing it. According to CW2, executives agreed to identify this decision as a "risk exception" because they did not believe the risk justified the necessary funding—and, in particular, did not want to disrupt the thousands of offshore contractors by requiring multi-factor authentication. Under the governance process CW2 described, a formal risk register leaves a record of every decision: a business-side Vice President or Senior Vice President accepts each risk, and the Chief Information Security Officer or Chief Security Officer approves it. CW2 believes the register itself was approved at the chief-executive level within Change. The register did not stay at Change: it was shared with the Company— "for sure," in CW2's words—where it "went up the chain of command," and the response that came back was that the Company was "accepting these risks."

184. The problem also extended beyond Optum. As alleged in the Securities Complaint, certain UnitedHealthcare and Optum systems shared technical resources, including the Consumer Database ("CDB"), which used Line of Business ("LOB") tags to keep data properly separated and to control whether Optum or UnitedHealthcare employees could see it. Across more than 100 systems within the CDB, the LOB tags on certain records were never set or applied to keep UnitedHealthcare employees from seeing Optum's customer data. A user reported the failure in September 2023. The Company's Privacy Team—which reports to Rupert Bondy, the Company's senior counsel and

executive vice president of governance, compliance, and security—investigated, and Optum did not correct the faulty tags until October 2024.

> **3.    UHG's Deficient Data Security Practices Cause a Disastrous Cyberattack Impacting More Than Half of All Americans**

185.    Unsurprisingly, there were catastrophic consequences for Defendants' decision to de-prioritize patient privacy and data security and allow the Company's false firewalls and weak security, despite clear HIPAA and other legal obligations to protect the extensive sensitive data in their control. On February 21, 2024, hackers gained entry to Change's network using compromised login credentials.[41] With that login, the intruders entered a large database of the nation's most sensitive information and were in the system for at least nine days without the Company detecting them. The hackers attacked Change's pharmacy, medical claims, and payment systems.[42] Unable to contain the threat, the Company disconnected Change's systems—shutting down hospital and pharmacy systems nationwide.

---

[41] James Rundle, "Hackers Broke Into Change Healthcare's Systems Days Before Cyberattack," *Wall Street Journal* (Apr. 22, 2024), https://www.wsj.com/articles/change-healthcare-hackers-broke-in-nine-days-before-ransomware-attack-7119fdc6?mod=cybersecurity_news_article_pos1; James Rundle & Catherine Stupp, "UnitedHealth Hack: What You Need to Know," *Wall Street Journal* (May 2, 2024), https://www.wsj.com/articles/change-healthcare-hack-what-you-need-to-know-45efc28c?mod=article_inline.

[42] Press Release, *UnitedHealth Group*, "UnitedHealth Group Update on Change Healthcare Cyberattack" (Mar. 7, 2024), https://www.sec.gov/Archives/edgar/data/731766/000073176624000085/pressreleasedatedmarch7202.htm (attached to Mar. 8, 2024 Form 8-K/A).

186.   On February 22, 2024, the Company disclosed the cyberattack—the largest healthcare data breach in American history. Defendant Witty[43] authorized a $22 million ransom payment to regain access.[44]

187.   Because roughly one in three U.S. patient records passes through Change, 190 million people—more than half of all Americans—had sensitive information exposed, and the attackers reported taking tens of millions of Americans medical information. The Company's failure to implement multi-factor authentication—a basic, industry-standard cybersecurity measure—and deficient data storage practices[45] enabled hackers to access and exfiltrate six terabytes of sensitive data, including[46] names, contact information, dates of birth, Social Security numbers,[47] health insurance member IDs, patient diagnoses, treatment records, and billing codes in violation of HIPAA.

188.   In fact, in the ongoing multidistrict data breach putative class action brought against the Company, Optum, Change, and affiliates, the district court judge concluded that the plaintiffs stated a claim for negligence per se based on the defendants' breach of their "duty to provide adequate cybersecurity" pursuant to the Federal Trade Commission Act

---

[43] UnitedHealth Group Inc., Current Report (Form 8-K) (Feb. 22, 2024).

[44] James Rundle, "Hackers Broke Into Change Healthcare's Systems Days Before Cyberattack," *Wall Street Journal* (Apr. 22, 2024), https://www.wsj.com/articles/change-healthcare-hackers-broke-in-nine-days-before-ransomware-attack-7119fdc6?mod=cybersecurity_news_article_pos1.

[45] *Id.*

[46] James Rundle & Catherine Stupp, "UnitedHealth Hack: What You Need to Know," *Wall Street Journal* (May 2, 2024), https://www.wsj.com/articles/change-healthcare-hack-what-you-need-to-know-45efc28c?mod=article_inline.

[47] Steve Alder, "Nebraska AG's Lawsuit Against Change Healthcare Survives Motion to Dismiss," *HIPAA Journal* (Nov. 17, 2025), https://www.hipaajournal.com/change-healthcare-responding-to-cyberattack/.

and HIPAA.[48] Relying on the plaintiffs' allegations, he noted that Change's cybersecurity system "did not implement sufficient internal monitoring," which is encouraged by the FTC and HIPAA. He also found that the plaintiffs had plausibly alleged that the defendants violated (i) the Minnesota Uniform Deceptive Trade Practices Act because their deficient cybersecurity was "unfair or unconscionable"; and (ii) the Minnesota Health Records Act because the defendants "caused the unauthorized release of Individual Plaintiffs' medical records."

189.   This security failure—involving protections that even small businesses routinely implement—demonstrated that the Company's representations were false despite having assuaged the federal court about merger concerns.[49]

190.   The breach threw the healthcare industry into disarray by freezing pharmacies and providers across the country, which for weeks could not verify insurance, submit claims, generate bills, or process payments, forcing many physicians either to turn patients away or to treat them with no way to get paid, threatening their payroll and pushing many toward financial ruin. Analysts estimated providers' total losses at $1 billion a day, and an AHA survey of 1,000 hospitals found more than 90% of American hospitals were financially affected, with more than 70% reporting harm to patient care and nearly 60%

---

[48] *In re Change Healthcare, Inc. Customer Data Sec. Breach Litig.*, 820 F. Supp. 3d 820, 845–46 (D. Minn. 2025).

[49] Sriparna Roy, "Hack at UnitedHealth's Tech Unit Impacted 192.7 Million People, US Health Dept Website Shows," *Reuters* (Aug. 14, 2025), https://www.reuters.com/business/hack-unitedhealths-tech-unit-impacted-1927-million-people-us-health-dept-website-2025-08-14/.

reporting revenue impacts of $1 million or more per day.[50] Some smaller practices were forced to furlough staff, use personal funds to pay employees, or consider closing.[51]

191.   It took UHG months to fully restore systems; two months after the attack, the Company was still at only 80% restoration. [52]

192.   UHG eventually provided public notice of the breach under HIPAA.[53]

193.   Ultimately, the Company incurred approximately $2.2 billion of direct response costs—including interest-free loans, increased medical care expenditures, network restoration, and notifications of impacted persons, amounting to a $2.60 impact per share of UHG stock.[54] Optum Insight also experienced approximately $867 million in lost revenue due to business disruption.[55]

---

[50] "AHA Survey: Change Healthcare Cyberattack Significantly Disrupts Patient Care, Hospitals' Finances," *American Hospital Association* (Mar. 15, 2025), https://www.aha.org/2024-03-15-aha-survey-change-healthcare-cyberattack-significantly-disrupts-patient-care-hospitals-finances.

[51] James Rundle & Catherine Stupp, "UnitedHealth Hack: What You Need to Know," *Wall Street Journal* (May 2, 2024), https://www.wsj.com/articles/change-healthcare-hack-what-you-need-to-know-45efc28c?mod=article_inline; James Rundle, Catherine Stupp & Kim S. Nash, "Medical Providers Fight to Survive After Change Healthcare Hack," *Wall Street Journal* (Mar. 1, 2024), https://www.wsj.com/articles/medical-providers-fight-to-survive-after-change-healthcare-hack-328c2e5a?mod=article_inline.

[52] James Rundle, "Hackers Broke Into Change Healthcare's Systems Days Before Cyberattack," *Wall Street Journal*, (Apr. 22, 2024), https://www.wsj.com/articles/change-healthcare-hackers-broke-in-nine-days-before-ransomware-attack-7119fdc6?mod=cybersecurity_news_article_pos1.

[53] UnitedHealth Group Inc., Quarterly Report (Form 10-Q) (Aug. 9, 2024) at 17.

[54] UnitedHealth Group Inc., Annual Report (Form 10-K) (Feb. 27, 2025) at 24.

[55] *Id.* at 24; Press Release, UnitedHealth Group, UnitedHealth Group Reports 2024 Results, (Jan. 16, 2025) at 8, https://www.sec.gov/Archives/edgar/data/731766/000073176625000022/a2024q4exhibit991.htm (attached to Jan. 16, 2025 Form 8-K).

194.    The cyberattack exposed the Company to unprecedented federal scrutiny, as lawmakers recognized that a single company's security failure brought the entire healthcare industry to a halt. HHS's Office of Civil Rights launched an investigation into whether the Company violated federal health privacy laws. The House Energy and Commerce Committee and the Senate Finance Committee required Defendant Witty's testimony on May 1, 2024, where he faced withering bipartisan criticism. ██████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████ UHG_00001315 at -01318. Senate Finance Committee Chair Senator Ron Wyden (D-Or.) condemned the Company for failing to implement basic protections, stating "this hack could have been stopped with cybersecurity 101."[56] Representative Frank Pallone (D-NJ) expressed outrage at "one of the largest companies in the world failing to meet its obligations under existing law."[57] Senator Thom Tillis (R-NC) emphasized that "basic stuff . . . was missed."

---

[56] Emily Olsen, "Congress Grills UnitedHealth CEO Over Change Cyberattack," *HealthCare Dive* (May 2, 2024), https://www.healthcaredive.com/news/change-healthcare-cyberattack-congress-unitedhealth-andrew-witty/714954/.
[57] *Id.*

195.   The hearings became a platform for broader concerns about the Company. Senator Elizabeth Warren called the Company a "monopoly on steroids" that "will stop at nothing to get bigger, bigger, and bigger," and Senator Bill Cassidy (R-La.) questioned whether the Company is "too dominant" because "it's into everything . . . messes up everybody."[58] Representative Buddy Carter (R-Ga.) opined that the Company "needs to be busted up."

196.   The full Board received a memo on May 30, 2024, including



UHG_00001332, -01336, -01337.

### 4.   Red Flags and Board Knowledge

197.   The representations to the court concerning data security and firewalls, as well as receipt of information from the Integration Management Office—the body to which the absence of the represented firewalls was reported after the acquisition closed— escalates issues to executive leadership, including the CEO.



---

[58] *Id.*

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████  UHG_00007233 at -07363.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

199. In addition, as the plaintiffs in the data breach putative class action alleged, the Company "knew or should have known about the risks of having deficient cybersecurity because healthcare companies are particularly at risk of cyberattacks," particularly since the Company had experienced over 450,000 intrusion attempts each year.[59] And HIPAA security standards—which govern the Company—obligate organizations to "protect against anticipated threats."[60]

## E.    The Company's Anti-Competitive Suppression of Independent Physicians and Rival Providers

200. In violation of antitrust laws, Defendants used UHG's power as the nation's largest network of employed physicians (Optum) and its largest insurer (UHG) with a contractual network of hospitals, surgical centers, and specialist physicians, to force

---

[59] *In re Change Healthcare, Inc. Customer Data Sec. Breach Litig.*, 820 F. Supp. 3d 820, 834 (D. Minn. 2025).
[60] *Id.* at 834.

competitors out of the market, punish providers and hospitals who worked with rivals, and steer patients to its own Optum practices—raising the cost of care while entrenching the Company's control.

201.    Optum threatened to cancel contracts unless hospitals agreed to terms that pushed non-affiliated physicians out of the primary-care market. It demanded a first and last right of refusal on any sale of a hospital's primary-care business; an agreement not to recruit Optum's physicians; and reductions in the payments Optum made for certain hospital services. When a hospital refused these terms, Optum terminated its contract and redirected the Company's MA Plan members to other facilities, despite laws requiring continuity of care for MA members.

202.    Optum imposed oppressive restrictive covenants on physicians and threatened litigation against physicians who left and the practices that hired them. Optum even instructed staff to tell patients that physicians who left had retired or were on vacation, and disciplined employees who did not comply.[61]

203.    Anti-competitive and predatory payment practices of this kind made it difficult, and often impossible, for independent practices to compete, recruit providers, or remain financially viable, further entrenching the Company's market power.

---

[61] The Board was on notice of the risk of anti-competitive employment practices. The ▮▮▮▮ ▮▮▮▮—described *supra* ¶ 198—records that ▮▮▮▮

UHG_00007233 at -07363.

204.   The Board was attuned to these concerns. At the August 21-22, 2023 Board meeting, materials discussed ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████ UHG_00005697 at -05713. And on August 22, the Governance Committee noted ██████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████

205.   Then, on November 25, 2024, *STAT News* published a first-of-its-kind analysis revealing that the Company was overpaying the physician practices it owned, raising significant consumer and antitrust concerns.[62] In New York, UHG's commercial plans paid Optum practices as much as twice the average market rate for colonoscopies, upper endoscopies, and breast imaging; in Texas, more than twice the market rate for MRIs, colonoscopies, Mohs skin-cancer procedures, and routine primary-care visits; and in Oregon, double the market rate for CT scans, MRIs, and mammograms. In some instances, UHG paid Optum practices as much as 111% above the market rate, while reimbursing non-Optum providers at far lower rates. As *STAT News* put it, "[r]ather than use its size and market power to drive down the cost of care . . . [UHG] capture[d] larger profits by

---

[62] Bob Herman et al., "UnitedHealth Pays Its Own Physician Groups Considerably More Than Others, Driving Up Consumer Costs and Its Profits," *STAT News* (Nov. 25, 2024), https://www.statnews.com/2024/11/25/unitedhealth-higher-payments-optum-providers-converts-expenses-to-profits/.

paying itself higher prices for basic checkups, surgeries, and procedures." Former top DOJ antitrust enforcer Jonathan Kanter criticized the Company's vertical integration model for creating "perverse incentives, conflicts of interest, and opportunities for self-preferencing, steering, and self-dealing."[63]

206.    On February 28, 2024, the *Wall Street Journal* reported that the DOJ was conducting an antitrust investigation into UHG. The Company's stock fell sharply, management sent the Board a memorandum ███████████████████████████████ ████████████████████████████████ reflecting management and the Board's ongoing attitude towards the DOJ investigation. UHG_00001294.

F.    **The Company's Mounting Exposure Across Criminal, Civil, and Congressional Investigations**

207.    Since 2023, the Company's practices have triggered an avalanche of civil litigation and federal and state enforcement actions creating billions of dollars in potential liability. Defendants tried to conceal the underlying misconduct and extent of legal and regulatory concern from investors even as the Company's exposure ballooned. These enforcement actions and lawsuits include:

- DOJ criminal and civil investigations into fraud in UHG's MA billing practices, and an analogous action by the Massachusetts AG into fraud in its state healthcare program;

- DOJ antitrust investigation into the Company's vertically integrated structure and whether it has engaged in illegal measures to eliminate competition, as well as whether the relationship between UnitedHealthcare and Optum allows for anti-competitive evasion of federal MLR rules;

---

[63] *Id.*

– 86 –

- A *qui tam* False Claims Act lawsuit alleging that the Company defrauded the Medicare program by orchestrating a nationwide scheme to generate false diagnoses by using QuantaFlo as a standalone diagnostic tool for PAD, despite that violating FDA guidance and the known high error rate (which lawsuit led the DOJ to investigate and settle with QuantaFlo's manufacturer);

- HHS investigation and private class action stemming from the Change data breach and attendant massive violation of HIPAA;

- Securities fraud class action regarding false and misleading statements regarding MA billing practices, anti-competitive practices, and the data breach; and

- Investigations and lawsuits by state Attorneys General and private litigants regarding unlawful denials of access to care.

**G.  The Company's Manufactured Earnings: Undisclosed "Portfolio Refinement" Transactions Designed to Mask the Financial Impact of Medicare Reforms**

    **1.  In 2024, UHG's 15-Year Earnings Streak Was in Danger of Ending, So It Executed a "Portfolio Refinement" Scheme to Manufacture Earnings and Meet Targets**

208.  As government reforms eroded the profits from UHG's coding scheme, the Company turned to financial engineering to make up the difference. For over 15 years and 60 consecutive quarters, UHG consistently beat Wall Street earnings estimates—a streak central to the Company's market identity and valuation. As *Bloomberg* reported, maintaining that streak reflects leadership creating "a culture of meeting financial targets and pressure to find ways to make up for missing targets."[64] Defendant Witty underscored

---

[64] Michelle F. Davis et al., "Stealth Stake Sales Helped UnitedHealth Beat Wall Street Targets," *Bloomberg News* (July 15, 2025), https://www.bloomberg.com/news/features/2025-07-15/how-unitedhealth-quietly-boosted-earnings-with-asset-sales.

this culture: "Even in highly challenging periods . . . our results bear out that we find a way, even if it's not always how we may have initially envisioned the path."[65]

209.    V28 put the Company's upcoding-dependent growth at risk, eliminating over 2,000 diagnosis codes and flattening payment differences for chronic conditions. Between June 2023 and February 2025, ███████████████████████████████████████ ███████████████████████████. UHG_00010680 at -10687. Even so, ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████. UHG_00010680 at -10688.

210.    But the V28 headwinds combined with approximately $3 billion in Change cyberattack costs rendered the Company's earnings targets unattainable. To make up for the revenue gap, in Q4 2024, UHG engineered a series of asset dispositions and minority-stake sales for at least 64 businesses and assets with private equity firms to manufacture earnings and mask the collapse of its core business.[66] The Company euphemistically labeled these accounting manipulations "business portfolio refinement, including strategic transactions," masking their real purpose. The transactions generated $3 billion in cash plus $1.9 billion in equity method investments from retained interests. The carrying value of disposed assets was approximately $1.0 billion—primarily goodwill—resulting in total gains of approximately $3.3 billion.

---

[65] UnitedHealth Group, Inc., Q4 2024 Earnings Call Transcript (Jan. 16, 2025).
[66] George Hill et al., "UnitedHealth Group: Revisionist History: UHG Q2 Preview, Reducing Estimates," *Deutsche Bank* (July 21, 2025).

211.    As examples, Warburg Pincus acquired a controlling interest in EPIC Hearing Healthcare (the Company's hearing-benefits business) and invested in the Company's subrogation unit. KKR invested in a Company business providing fitness programs to seniors—an investment not even mentioned on the Company's website.

### 2.    The Transactions' Suspicious Terms

212.    Put and call options were a critical feature of these deals. UHG retained options to repurchase divested stakes within a specified timeframe; if it did not exercise its call options, the private equity counterparties could force UHG to repurchase at a higher price. The 2024 Form 10-K disclosed that certain transactions valued at $630 million were included in other liabilities, █████████████████████████████████ ████████████████████████.[67]

213.    Beyond these aggressive terms, timing and confidentiality requirements raised significant red flags. According to *Bloomberg*, the Company insisted that transactions close by December 31, 2024, and that counterparties refrain from publicizing the deals even after closing. Delaware business records show UHG formed a limited partnership in December 2024 whose general partner is located at KKR's headquarters—

---

[67] UnitedHealth Group Inc., 2024 Annual Report (Form 10-K) (Feb. 27, 2025) at 65; UHG_00010746 at -10832.

yet no public announcement was made.[68] According to *Bloomberg*, people with knowledge of the deals believed they were created "with an eye toward meeting earnings targets."[69]

214. The precise match between the recorded value of the deals and the revenue gap also raised suspicion. According to the 2024 Form 10-K, the gains from these transactions "contributed about 80 basis points ($3.3 billion) to the operating cost ratio, nearly half ($1.4 billion) related to Optum Health with the remainder split between UnitedHealthcare ($1.1 billion) and Optum Insight ($800 million)."[70] The Company recognized $2.5 billion in gains in Q4 2024, "almost one-third of operating earnings,"[71] and approximately $3.50 per share—the precise amount needed to transform an earnings miss into beating Wall Street consensus by approximately $0.10 per share. Further, the gains were included in both reported operating income and adjusted earnings per share— the Company's most closely watched metrics.[72]

215. When the transactions were revealed, John Ransom of Raymond James slashed his profit forecast for UHG, calling the earnings "low-quality and non-recurring in nature." Jeff Jonas of Gabelli Funds stated the gains "probably should not have been

---

[68] Michelle F. Davis et al., "Stealth Stake Sales Helped UnitedHealth Beat Wall Street Targets," *Bloomberg News* (July 15, 2025), https://www.bloomberg.com/news/features/2025-07-15/how-unitedhealth-quietly-boosted-earnings-with-asset-sales.

[69] *Id.*

[70] UnitedHealth Group Inc., 2024 Annual Report (Form 10-K) (Feb. 27, 2025) at 65; *see also* UHG_00010746 at -10832.

[71] George Hill et al., "UnitedHealth Group: Revisionist History: UHG Q2 Preview, Reducing Estimates," *Deutsche Bank* (July 21, 2025).

[72] UnitedHealth Group Inc., 2024 Annual Report (Form 10-K) (Feb. 27, 2025).

included in the adjusted earnings." Wolfe Research observed that stripping out the transactions would yield a lower earnings baseline.

216. Notably, the transactions were treated differently than a $7.1 billion loss on the Company's Brazilian operations during the same period. The Board approved excluding the Brazil loss from adjusted earnings, with the presentation stating: "As an unusual one-time, significant amount, we will exclude the entire charge from our reported adjusted earnings measure, treatment which is consistent with how other large companies have handled such market exits." This disparate treatment—including a $3.3 billion gain while excluding a $7.1 billion loss—violated the fundamental principle that non-GAAP measures be presented consistently. Former FASB member Tom Linsmeier called UHG's treatment "curious," noting: "It's reasonable to ask why losses on strategic transactions are outside of operating income, but a huge gain on a strategic transaction is within operating income."[73]

### 3. After Bad Press, UHG Halts the Portfolio Refinement Scheme

217. The Board was clearly monitoring these transactions. █████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

---

[73] *Id.*

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

UHG_00010163; UHG_00002646 at -02647; UHG_00003461 at -03467; *see also* UHG_00010938 at -10944.

218.    On July 15, 2025, *Bloomberg* reported that the Company had continued its 60-quarter streak and concealed declining MA profits through portfolio refinement transactions that boosted profits by $3.3 billion.

219.    Only after receiving bad press did the Company halt the portfolio refinement scheme. On the Q2 2025 earnings call on July 29, 2025, the Company disclosed that $3.65 billion of its outlook downgrade was attributable to halting "previously planned portfolio actions." Defendant Rex disclosed that the 2025 outlook reflected "$6.5 billion more in medical costs than we anticipated," with "[a] little over half, or $3.6 billion" concentrated in Medicare and "[a]bout one-third, or $2.3 billion" in commercial business. Rex confirmed that "the updated 2025 outlook removes about $1 billion from previously planned portfolio actions."[74] Optum Health CEO Dr. Patrick Conway separately confirmed that "another $2 billion or 30% relates to the decision to discontinue previously planned portfolio actions."[75]

220.    These disclosures confirmed that the Company's original 2025 guidance of $29.50–$30.00 adjusted EPS had embedded portfolio refinement gains unachievable through ordinary operations—and that the transactions were discretionary, non-

---

[74] UnitedHealth Group, Inc., Q2 2025 Earnings Call Transcript (July 29, 2025).
[75] *Id.*

operational, and non-recurring. The Company revised its 2025 adjusted EPS outlook to at least $16.00—far below the original guidance and the analyst consensus of $20.64—once the portfolio refinement transactions were removed from the projections.

221.   As alleged in the Securities Complaint, Jefferies noted: "Until recent headlines, we underappreciated the extent of earnings 'management' (e.g. asset sales booked as EBIT, some previously included in '25, too)"; and Morgan Stanley noted that "shares fell ~7% on a meager '25G EPS' of 'at least' $16.00, below general investor expectations of ~$18.00."[76] Deutsche Bank concluded that without the $3.3 billion gain, "actual adjusted EPS for 2024 was ~$25 vs reported $27.65"—over 9% of reported 2024 EPS. Deutsche Bank stated the transactions "reflect an increasing reliance on financial engineering rather than regular operational executions to meet earnings targets."[77]

222.   Shortly after these revelations, on July 31, 2025, the Company announced the removal of CFO and President Defendant Rex, effective September 2, 2025.

### 4.   Board Knowledge and Approval of the Scheme

223.   As set forth above, in December 2023, the Board ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[76] *Id.* ¶ 499 (citing Morgan Stanley Report, July 30, 2025).
[77] George Hill et al., "UnitedHealth Group: Revisionist History: UHG Q2 Preview, Reducing Estimates," *Deutsche Bank* (July 21, 2025).

████████UHG_00002646 at -02647.████████████████

███████████████████

224.    A 2024 performance summary specified █████████████████

████████████████████████████████████████████

                                        UHG_00010938 at -10944███

████████████████████████████████████████████

███████████████████████████████████████████████

225.    The February 20–21, 2025 Board meeting materials stated ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ UHG_00003461 at -03467.

226.    Despite their knowledge of these transactions, the Board and Audit Committee failed to: ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████ These failures evidence Defendants' bad faith and breach of fiduciary duties.

– 94 –

### 5.    Improper Incentives and the Impact on Executive Compensation

227.    The transactions also had the effect of inflating compensation metrics. The 2024 annual cash incentive plan ███████████████████████████████████████ ████████████████████████████████████████ UHG_00011670 at -11684. Similarly, 50% of long-term incentive performance shares are weighted equally between cumulative EPS and average return on equity for the three-year period.[78] The internal February 2024 Compensation Committee resolution stated ████████████ ████████████████████████████████████████████ UHG_00011670 at -11691. Portfolio refinement gains inflated these metrics and increased the bonus pool, incentivizing management to pursue these transactions regardless of whether they served the Company's long-term interests or were accurately accounted for.

### H.    Defendants Squandered Approximately $14 Billion in Corporate Capital on Stock Repurchases at Fraud-Inflated Market Prices

228.    While managing earnings, Defendants also caused the Company to repurchase billions of dollars of stock that they were propping up at artificially inflated prices, resulting in approximately $14 billion in value evaporating once the truth emerged.

229.    According to its Form 10-Ks, the Company repurchased $7 billion of stock in 2022 at an average price of approximately $501.67 per share, $8 billion of stock in 2023 at an average price of $493.79 per share, $8.942 billion of stock in 2024 at an average price of $529.85 per share, and $5.503 billion of stock at an average price of $454.82 in the first

---

[78]    UnitedHealth Group Inc., 2025 Proxy Statement (2025) at 46, https://www.unitedhealthgroup.com/content/dam/UHG/PDF/investors/2025/2025_proxy_statement_final.pdf.

half of 2025. The Company made no repurchases of stock in the second half of 2025, after the scheme was disclosed and UHG's stock price crashed.

230.    Following the full revelation of the truth, UHG's stock price fell to $261.07 per share as of July 29, 2025 (end of the Relevant Period). Comparing the repurchase price to the true value of UHG stock as reflected in the price post-disclosures, the Company expended approximately $14 billion in excess corporate capital on repurchases at prices inflated by the fraudulent misstatements and omissions described *infra* § VII.A.

**I.    The Unraveling: Defendant Witty's Forced Resignation, Withdrawn Guidance, the Destruction of More than $277 Billion in Stockholder Value, and the Collapse of the Dual Engine Model**

231.    When the truth emerged in 2025, the reckoning was swift and severe. UHG slashed and then withdrew its financial guidance, the CEO and CFO left abruptly, and an avalanche of investigations and credit downgrades followed, wiping out over $277 billion in stockholder value between December 2024 and August 2025—the predictable result of the litany of governance failures.

**1.    The Company's Financials Crumble and Witty Resigns the Day Before DOJ's Criminal Investigation Is Revealed to the Public**

232.    On February 20, 2025, the Board met. Meeting materials for the Board and the Audit Committee ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

233.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

UHG_00002871 at -02872. ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ [79] Additionally, under Chair Rep. David Schweikert (R-AZ), the House Ways and Means Committee began an inquiry into UHG's tactics.[80]

234.    ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[79] *Id.*

[80] Christopher Weaver & Anna Wilde Mathews, "Sen. Grassley opens Inquiry Into UnitedHealth's Medicare Billing Practices", *Wall Street Journal* (Feb. 25, 2025), https://www.wsj.com/health/healthcare/sen-grassley-launches-inquiry-into-unitedhealth-groups-medicare-billing-practices-ad63a53c.

235.    The unraveling began in earnest in April 2025. On April 10, 2025, Defendant Witty and Defendant Rex sent a memorandum to the Board, ████████████████████ ████████████ ██████████████████████████████████████

236.    Before the market opened on April 17, 2025, the Company reported disappointing first-quarter 2025 results and slashed its 2025 earnings guidance by roughly 12%, attributing the cut to problems in its MA business. On the analyst call that followed, Defendant Witty tied the reduced outlook chiefly to rising medical-care utilization in MA and to the Company's difficulty adapting to the V28 reforms the Biden administration had begun phasing in to curb abusive practices on which the Company's MA profits depended. The market's reaction was severe, with the steepest single-day drop of the Relevant Period. Despite the Company's poor performance, the Board awarded Defendant Hemsley $60 million in stock in May 2025—a grant that ISS and institutional investors criticized, given their mounting concerns about UHG.

237.    On May 20, 2025, the Board met and accepted Defendant Witty's resignation. UHG_00002733. ████████████████████████████████ ██████████████████████████████. UHG_00002735.

---

[81] UHG_00002874.

238. The Board allowed the Company to make the implausible claim that Witty's departure was for "personal reasons"—when a day later, the *Wall Street Journal* reported that the Company was under criminal investigation by the DOJ for possible Medicare fraud. The news raised serious questions about Defendant Witty's role in the misconduct under investigation.

239. The Company's regulatory exposure deepened. On May 21, 2025, CMS announced a significant expansion of its auditing of MA plans, stating that it would immediately begin auditing every eligible MA contract for each payment year and devote additional resources to completing the long-delayed audits for payment years 2018 through 2024, to root out fraud, waste, and abuse across the program.

240. Industry analysts immediately recognized what the announcement meant for the Company: they called it a "bitter pill to swallow" and a "gut punch," observing that the Company—"the largest Medicare Advantage insurer that may have been more aggressive than peers in risk assessments"—faced exposure to a substantial "clawback of overpayments and lower margins in that business." Analysts at HSBC downgraded the Company's common stock to a "reduce" (sell) rating and cut their price target by roughly 45%, from $490.00 to $270.00 per share, pointing to the leadership change, withdrawn 2025 guidance, and Medicare fraud allegations.

241. And that same day, as detailed *supra* § V.C, *The Guardian* reported that the Company had secretly paid nursing homes bonuses to suppress hospital transfers for its MA members.

242. The next day, May 22, Morningstar issued a report titled "UnitedHealth: Cutting Fair Value Estimate as Medicare Advantage and Other Practices Questioned," warning that, as the largest and seemingly most aggressive MA insurer, the Company could face a substantial clawback of overpayments and compressed margins. Morningstar estimated that the 2018–2024 audits could result in an outflow of as much as $20 billion were the OIG's estimate of roughly $3.7 billion in 2023 overpayments correct, and it reduced its price estimate for the Company's stock by $57.00 per share, an 11% cut. These clawbacks threatened to force the Company to return billions of dollars in fraudulently obtained Medicare payments.

243. Then on June 4, 2025, the Company disclosed that the CHR Committee cancelled the ███████-based restricted stock units granted to Defendant Witty back on February 20, 2025, UHG_00003852 at -03913—less than four months earlier.

244. The same day, the Board met and meeting materials noted ██████

████████████████████████████

████████████████████ UHG_00003951 at -03956█████████

██████████████████████████████████

██████████████ UHG_00003951 at -03956█████████

██████████████████████████████████

██████████████ UHG_00003951 at -03956.

245. On July 9, 2025, the *Wall Street Journal* reported further detail of the DOJ's criminal investigation into the Company's MA billing practices, including that the DOJ was interviewing former employees and asking them detailed questions about UHG's

efforts to encourage the documentation of certain lucrative diagnoses, including testing patients, implementing procedures to ensure that medical conditions were captured, and sending nurses to patients' homes. The FBI and OIG participated in interviews. But according to the *Wall Street Journal*, the Company claimed DOJ had not notified it of any criminal investigation and that it stood "by the integrity of our Medicare Advantage program."

246. On July 15, 2025, *Bloomberg* published an article disclosing the portfolio refinement transactions and how UHG had "found a way" to boost year-end earnings.

247. On July 24, 2025, the Company finally confirmed the DOJ's civil and criminal investigations of its MA billing practices. As financial analysts and the press noted, just two months prior the Company had called reports of a criminal investigation "deeply irresponsible."

248. The admissions that followed confirmed both the scheme and the Board's years of knowledge. On the July 29, 2025 earnings call, the Company disclosed that the V28 changes would cost approximately $11 billion over three years— ███████████ ██████████████████████████ —and conceded that it had "misexecuted the planned efforts to offset these V28 funding cuts." The Company announced that it would target a historically low MA margin and exit plans covering approximately 600,000 enrollees. Further, the Company admitted that $3.65 billion in planned portfolio refinement gains had been embedded in the 2025 guidance, but the practice was now being discontinued.

249. Two days later, on July 31, 2025, the Company announced the removal of Defendant Rex as Chief Financial Officer and President, effective September 2, 2025. The Company also slashed its earnings guidance nearly in half.

250. On August 11, 2025, the Audit Committee met. Meeting materials revealed

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ UHG_00003481

at -03571. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

251. That same day, *STAT News* published an investigative report revealing that the Company funded and shaped studies designed to validate its MA model. Following the playbook of the tobacco and opioid industries, the Company was not producing legitimate scientific research—it was manufacturing disinformation to obstruct enforcement and counter MedPAC's findings of tens of billions of dollars in annual MA overpayments. UHG would select physician groups likely to yield favorable results, restricting access to the underlying data so the findings could not be independently tested, and promoting the studies through industry lobbying groups and university partnerships to create the appearance of independent support. *STAT News* described the body of research the Company and its allied interest groups produced as "an alternate reality," with articles riddled with "obvious biases" and fatal methodological defects.

252. On August 26, 2025, *Bloomberg* reported that the federal probe of UHG had expanded into "business practices at the company's pharmacy benefit manager Optum Rx,

in addition to the physician payments" as well as how the Company "reimburses its own doctors."

253.    The Senate Judiciary Committee Releases a Damning Report on UHG's MA Abuse.

254.    On January 12, 2026, the Senate Judiciary Committee's Majority Staff released a comprehensive report ("Judiciary Committee Report") confirming systematic MA fraud following review of thousands of documents and interviews with dozens of UHG insiders. Corroborating years of investigative reporting, the Judiciary Committee found that UHG uses HouseCalls, chart review, pay-for-coding, and provider oversight methods to capture dubious diagnoses. The Company's average risk score was significantly higher than its peers; it earned more through in-home visit diagnoses; and its enrollees have significantly higher rates of certain more easily gamed diagnosis codes. Strikingly, when a patient switched from FFS Medicare to MA through UHG, those who went to a non-UHG provider saw their risk score increase by about 30%, while those who went to a UHG provider saw their risk score increase by 55%.

255.    The Judiciary Committee found that UHG "found opportunities" to enter extra, closely related codes to raise risk scores in direct contradiction of CMS instructions.

256.    The Judiciary Committee also found that UHG instructs HouseCalls providers to diagnose "based on probability rather than definitive diagnostic confirmation"—in other words, to guess rather than actually determine what conditions enrollees have, an approach "likely to produce a number of false positives." As examples, the Company instructed providers to capture diagnoses of secondary immunodeficiency,

physical dependence, polyneuropathy, atrial fibrillation (irregular heart rhythm), chronic obstructive pulmonary disease, and unspecified angina, based on either existing diagnoses or prescribed medications (regardless of any actual signs or symptoms), limited risk factors or symptoms, or patients expressing pain, and often in contravention of medical literature or medical best practices. UHG also instructed providers to use a particular testing device to screen for diabetes, even though its user guide specifically states that the "test is NOT for the screening or diagnosis of diabetes" and "has a high false positive rate."

257. The Committee concluded that UHG's vertical integration—bringing healthcare providers under the same corporate umbrella as the insurance business—gave it unprecedented ability to control MA coding and extract fraudulent payments. By owning the providers who generate diagnoses, UHG could force the use of AI and screening tools to identify revenue opportunities; direct providers to conduct specific tests designed to generate lucrative codes; set up workflows that maximize coding value; and financially incentivize providers to upcode.

258. On January 7, 2026, Senators Elizabeth Warren and Ron Wyden sent a follow-up letter to the Company renewing their inquiry, noting that the Company had failed to produce internal records, and noting that the Senate Finance Committee ("SFC") spoke with two nurse practitioner whistleblowers who provided evidence that Optum imposed a maximum threshold on nursing homes for sending residents to the hospital and that UHG "exert[ed] implicit pressure on Optum staff to avoid hospitalizations, including through bonus programs and policies." Whistleblowers also shared a Company document outlining policies contradicting what the Company previously told SFC.

259.    Soon after, on January 22, 2026, Defendant Hemsley was called before two House committee hearings: an Energy and Commerce Subcommittee on Health hearing on insurance affordability and a Ways and Means Committee hearing. Congressmembers asked Defendant Hemsley about denials of care; the Judiciary Committee Report; and the Change data breach.

260.    In late January 2026, the Company announced UHG's first revenue decline in decades, and that they were scaling back the dual-engine model.[82]

**J.      Defendants Made More than $237 Million from Insider Stock Sales While in Possession of Material Non-Public Information**

261.    The Defendants did not merely conceal the Company's mounting legal exposure—three of them traded on it. While UHG stock traded at prices artificially inflated by the concealment of the Company's pervasive misconduct, Defendants Hemsley, Witty, and Thompson (the "Insider Trading Defendants") sold 462,387 shares for proceeds of approximately $237.7 million—with no indication these sales were made pursuant to a Rule 10b5-1 plan, ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████   UHG_00000258 at -00259; see also UHG_00000530 at -00673. Each sale was made while the material facts the seller knew remained concealed from the investing public: Hemsley sold approximately $56

---

[82] Sriparna Roy, "UnitedHealth Forecasts First Revenue Drop in Nearly Four Decades; Share Plunge," *Reuters* (Jan. 27, 2026), https://www.reuters.com/business/healthcare-pharmaceuticals/unitedhealth-forecasts-2026-profit-slightly-above-estimates-2026-01-27.

million of stock on October 25–26, 2021, while the Company concealed that pervasive upcoding was driving its MA revenue and publicly dismissed the First OIG Report as "based on old data and is inaccurate and misleading."[83] With one exception, this two-day sale exceeded every sale Hemsley made during the preceding three and a half years—April 23, 2018 through September 21, 2021 (the "Control Period"). Further, in July 2022, Witty made his largest open-market sale in the Relevant Period and Control Period and Hemsley sold another approximately $53 million while the pervasive upcoding driving its MA revenue and the falsity of the Company's representations to the DOJ that it maintained internal firewalls preventing the sharing of competitively sensitive information remained concealed.

262.    The selling accelerated after the Company's confidential October 10, 2023 notice of the DOJ's antitrust investigation, which circulated internally through Bondy's October 24, 2023 email but was never disclosed to investors.[84] Over the next four months, Hemsley and Thompson sold approximately $117.1 million worth of shares: on October 17, 2023, one week after the notice, Hemsley sold 121,515 shares for approximately $65.7 million — his largest single-day sale, by proceeds, in either the Relevant Period or the

---

[83] Christopher Snowbeck, "Report Says UnitedHealth Group Was Top Recipient of Questionable Medicare Payments," *Minnesota Star Tribune*, (Oct. 19, 2021) https://www.startribune.com/report-says-unitedhealth-group-was-top-recipient-of-questionable-medicare-payments/600108138.

[84] Adam Stone, "Justice Department Probing UnitedHealth/Optum Over Antitrust Concerns; Local Layoffs Enacted, More Forecast," *Examiner News* (Feb. 26, 2024), https://www.theexaminernews.com/justice-department-probing-unitedhealth-optum-over-antitrust-concerns-local-layoffs-enacted-more-forecast.

Control Period. ████████████████████████████████████████████

████████████████████████████████████████████. UHG_00000249.

████████████████████████████████████████████

████████████████████████████████████████████

UHG_00000250. On December 5, 2023, he sold another roughly $36.4 million; and on February 16, 2024, just eleven days before *The Wall Street Journal* revealed the antitrust investigation, Thompson made his only open-market sale since becoming a Section 16 reporting officer in 2021, disposing of 28,943 shares for approximately $15.1 million — more than half the UHG shares he beneficially held at the time — leaving him with 25,543 shares.

263.    The sales were suspicious in timing and quantity. Comparing each seller's open-market sales in the Relevant Period against the Control Period reveals a common pattern: before the Relevant Period, these Defendants traded rarely or not at all, and their sales tracked market conditions[85]; during the Relevant Period, their selling concentrated on a handful of trading days, each while material adverse facts known inside the Company remained concealed from—and in several instances were being actively denied to—the investing public.

264.    Hemsley sold in both periods—but the character of his selling changed fundamentally. His Control Period sales were spread across six trading days across just

---

[85] Maggie Fitzgerald & Nick Wells, "Executives Are Selling Stock As The Market Experiences Its Epic Rebound," *CNBC* (July 24, 2020), https://www.cnbc.com/2020/07/24/executives-are-selling-stock-as-the-market-experiences-its-epic-rebound.html.

over a year at an average of roughly $346 per share as the stock rode the post-pandemic rally; his Relevant Period sales occurred on five trading days across approximately two years, at an average of roughly $505 per share, each while the concealed misconduct inflated the price.

265.   The contrast is starker for the others: in the entire Control Period Witty made exactly one open-market sale, less than half the size by proceeds of the July 18, 2022 sale he executed four days before the Company's firewall representations to the DOJ[86]; and Thompson never sold a share until his single sale of February 16, 2024. These sales are summarized below:

| Defendant | Date | Shares Sold | Avg. Price | Proceeds |
|---|---|---|---|---|
| Hemsley | Oct. 25–26, 2021 | 125,000 | $451.46 | $56,432,330 |
| Hemsley | July 26, 2022 | 99,312 | $534.27 | $53,059,224 |
| Hemsley | Oct. 17, 2023 | 121,515 | $540.58 | $65,688,591 |
| Hemsley | Dec. 5, 2023 | 66,081 | $550.39 | $36,370,196 |
| Witty | July 18, 2022 | 11,376 | $527.90 | $6,005,390 |
| Witty | Apr. 27, 2023 | 6,160 | $487.49 | $3,002,949 |
| Witty | July 19, 2023 | 4,000 | $506.19 | $2,024,760 |
| Thompson | Feb. 16, 2024 | 28,943 | $521.00 | $15,079,303 |
| Total | — | 462,387 | — | $237,662,743 |

---

[86] Defs.' Am. Pretrial Br. at 14, *United States v. UnitedHealth Grp. Inc.*, No. 1:22-cv-00481-CJN (D.D.C.), Dkt. No. 103 (July 22, 2022).

266.    The Board had the tools to prevent these sales and did not use them. █



UHG_00000258 at -00259; UHG_00000270 at -00280–81; UHG_00000081 at -00084.

[87]

## VI.    THE DEFENDANTS' DUTIES TO UHG AND ITS SHAREHOLDERS

267.    Defendants owed duties to UHG and its shareholders arising from mutually reinforcing sources: fiduciary duties under Delaware law; disclosure obligations under

---

[87] John Tozzi & Anders Melin, "UnitedHealth Chair, Execs Sold $102M In Stock Before DOJ Probe Became Public," *Crain's New York* (Apr. 16, 2024), https://www.crainsnewyork.com/health-care/unitedhealth-chair-execs-sold-102m-stock-doj-probe-became-public. For documents reflecting preclearance requests and approvals as to Hemsley, *see* UHG_00000254 and as to Thompson, *see* UHG_00000230 (request granted by Bondy on January 26, 2024; window good through February 2, 2024); UHG_00000229 (request granted by Bondy on February 2, 2024; window good through February 9, 2024); UHG_00000228 (request granted by Bondy on February 9, 2024; window good through February 16, 2024).

federal securities laws; and the specific obligations the Company adopted through its Code of Conduct, internal policies, and Board committee charters. As officers and directors of a Delaware corporation, and because of their ability to control the business and corporate affairs of UHG, Defendants owed the Company and its shareholders fiduciary duties of loyalty, good faith, and care.

268.   To discharge these duties, Defendants were required to: (a) ensure the Company was operated diligently, honestly, and prudently, in compliance with all applicable federal and state laws, rules, and regulations, and with the Company's own governance documents, codes, and policies; (b) remain informed of Company operations and, upon notice of unlawful conditions or practices, make reasonable inquiry and correct them; (c) establish and maintain adequate internal controls and procedures for reporting material compliance risks to the Board; (d) ensure the Company's public disclosures were accurate and complete, including by exercising reasonable control and supervision over the Company's public statements and SEC filings so that the Company's stock price—including prices at which it repurchased its own shares—reflected truthful and accurate information; (e) refrain from using their positions or knowledge of the Company's affairs, including material non-public information, for personal advantage; and (f) deal fairly with the Company.

269.   A fiduciary breaches these duties, and acts in bad faith, by knowingly causing or permitting the corporation to maintain unlawful business practices, or consciously disregarding red flags of misconduct, including deliberately avoiding knowledge that a reasonable inquiry would have confirmed. Such conduct implicates the duty of loyalty, is

unprotected by the business judgment rule, and is beyond the reach of any exculpatory charter provision.

### A.    Duties Under the Company's Code of Conduct, Internal Policies, and Board Committee Charters

270.    The Board adopted a Code of Conduct, applicable to officers and directors, which represented to shareholders that it "provides guidelines to help us sustain the highest possible standards of ethical behavior in our work."

271.    The Code's "Act with Integrity" section, *inter alia*, forbids trading on material non-public information and makes each person involved in disclosure "responsible for the accuracy and completeness of facts regarding the Company."

272.    The Code's "Accountability" section acknowledges the Company's responsibility "for preventing fraud, waste, and abuse in the health care system," requires prompt reporting of suspected violations and potentially illegal or unethical conduct, and requires compliance with the antitrust laws.

273.    The Audit Committee charter includes oversight for: "the conduct and integrity of the Company's financial reporting," "the Company's compliance with legal and regulatory requirements including privacy, cybersecurity and data protection," enterprise risk management, and the internal audit function. Among its enumerated duties, the Committee must review the Company's Form 10-K, significant internal audit results, the enterprise risk management framework, and the effectiveness of compliance, ethics, privacy, cybersecurity, and data protection policies; and establish procedures for the receipt and treatment of complaints regarding accounting, internal controls, and auditing matters.

274. The Company's proxy statements provide, "[e]ach of our Board's committees is responsible for oversight of risk management practices for categories of risks relevant to their functions." And the Board "oversees the work of its various committees by receiving regular reports from the Committee Chairs regarding their work."

275. The HCPP Committee oversees clinical practices, care quality, patient safety, and AI ethics, including: (i) "management's initiatives to improve health care affordability, clinical care and safety," (ii) "legislative, regulatory and policy issues . . . that affect or could affect the Company's business reputation, business activities and performance," and (iii) "the responsible and ethical application of artificial intelligence."

276. The Governance Committee reviews and approves related-person transactions, oversees the Company's lobbying and political activity and its director-independence determinations, and has oversight of "Board processes and corporate governance-related risk, public policy, government relations and external relations activities."

277. The CHR Committee sets executive compensation and oversees compensation-related risks. The Company's proxy statements stated, "[e]ach of our Board's committees is responsible for oversight of risk management practices for categories of risks relevant to their functions."

278. These obligations—adopted by the Board, published to shareholders, and invoked in every proxy statement—are mandatory. Defendants violated them throughout the Relevant Period.

279. In addition, as recognized by the court in *United States v. UHG*, in May 2022, the Company adopted a new firewall policy addressing the sharing of External Customer CSI between Optum and UnitedHealthcare following the Change acquisition, which provided, among other things, that: "*[t]he disclosure of External Customer CSI to [UnitedHealth] business units that are competitors of such External Customers is strictly prohibited*"; "*[t]he use of External Customer CSI to benefit [UnitedHealth] business units that are competitors of such External Customers is strictly prohibited*"; UHG employees "*may not access External Customer CSI unless such access is necessary to perform their job responsibilities*"; "*External Customer CSI shall be logically separated from other [UnitedHealth] business unit data within Electronic Data Sites*"; and no employees of competing business units "*shall have access to the location where External Customer CSI is stored.*" 630 F. Supp. at 146.

280. In fact, during the Bernstein Strategic Decisions Conference on June 1, 2023, Defendant Witty acknowledged the Company's firewall requirements, stating that the Company was focused on improving performance by "*exploiting the core synergy between Optum and UnitedHealthcare as much as we possibly can appropriately, of course, given the firewall requirements [that] are needed there.*"

281. Nevertheless, Defendants violated its firewall policy throughout the Relevant Period.

**B.    UHG Is Subject to Extensive Federal Regulations and Laws**

282. The misconduct described above did not occur in a legal vacuum. UHG makes clear in its own SEC filings that it is subject to many laws and regulations governing

Medicare billing, false claims, kickbacks, privacy, HIPAA, cybersecurity, and antitrust and competition laws, among others. UHG's Proxies and Form 10-K filings also recognize the risks of violating these laws, including severe fines, sanctions, and exclusion from federal programs. The Defendants thus understood both the rules the Company was breaking and the magnitude of the exposure they were courting.

283. Government business is UHG's largest segment. The Company's 2025 annual report states that "[p]remium revenue from CMS represented 44% of UnitedHealth Group's total consolidated revenue for year ended December 31, 2025." Defendants were aware of the critical need for compliance, noting in the Form 10-K that CMS "has the right to audit our performance to determine our compliance with CMS contracts and regulations and the quality of care we provide to Medicare beneficiaries" and the business is "subject to CMS audits related to medical loss ratios (MLRs) and risk adjustment data." The Form 10-K further acknowledges that violating government rules can lead to "[g]overnment investigations, audits, reviews and assessments" and, in turn, "adverse publicity, the assessment of damages, civil or criminal fines or penalties, or other sanctions, including restrictions or changes in the way we conduct business, loss of licensure or exclusion from participation in government programs, any of which could have a material adverse effect on our business, results of operations, financial position and cash flows."

**VII.  DEFENDANTS VIOLATED SECTIONS 10(b) AND 14(a) OF THE EXCHANGE ACT BY CAUSING THE COMPANY TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS, INCLUDING IN PROXIES, DURING THE RELEVANT PERIOD**

284.   In violation of Sections 10(b) and 14(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9, Defendants waged a sustained campaign of false and misleading disclosures throughout the Relevant Period. In SEC filings (including four Proxy Statements), investor conferences, earnings calls, and other outlets, Defendants routinely made or failed to correct materially false and misleading statements and omissions to the market. Defendants had either actual knowledge that their statements were false or misleading, or recklessly disregarded their obligations to ensure their accuracy. Meanwhile, with Company stock trading at prices inflated by their misrepresentations, Defendants caused the Company to squander more than $14 billion repurchasing its own shares, while the Insider Trading Defendants personally sold more than $237 million at those same prices—all before the truth emerged and the stock collapsed.

**A.  Throughout the Relevant Period, Defendants Made Materially False and Misleading Statements and Omissions**

**1.  False and Misleading Statements and Omissions Concerning the MA Program in 2021**

285.   *September 22, 2021* **Wall Street Journal** *Statement.* Shortly after the First OIG Report was released, the *Wall Street Journal* identified UHG as the company referred to in the report for particularly egregious upcoding. To minimize the First OIG Report's impact on investors and public perception, the Company falsely denied the reports' findings, claiming in the article:

UnitedHealthcare's in-home clinical care programs provide significant benefits to seniors and for years have been valuable offerings to ensure our members continue to receive cost-effective, appropriate care. ***Our Medicare Advantage risk-adjustment program is transparent and compliant with CMS rules.***

286. This statement was materially false and misleading when made because: (a) the First OIG Report found UHG "may have inappropriately leveraged both chart reviews and HRAs to maximize adjusted payments . . . without encounter records of any other services provided to the beneficiaries for those diagnoses," revealing the Company's scheme generated $3.7 billion in payments from insurer-driven diagnoses; (b) the First OIG Report exposed that the Company received 40% of all payments derived from insurer-driven diagnoses while covering only 22% of MA beneficiaries—a disparity the OIG concluded "raise[s] concerns about the validity" of the Company's practices; (c) as reported by *Wall Street Journal*, during 2018-2021, the Company was an outlier in coding-driven payments with a striking absence of follow-up care for submitted diagnoses; (d) as reported by *STAT News*, the Company's own 600-page coding manual conceded its practices were driven by a "desire to make a profit"; and (e) MedPAC issued warnings from as early as 2016 that "coding intensity" by MA Insurers, including UHG, drove tens of billions in excess payments.

287. ***October 19, 2021 Statement*** **Published in Minnesota Star Tribune.** In an article about the First OIG Report, the Company was quoted falsely denying the reporting, saying that the report was "***based on old data and is inaccurate and misleading — a disservice to seniors and an attack on the [federal government's] payment system.***"

288. This statement in the *Minnesota Star Tribune* relating to UHG's MA program was materially false and misleading for the reasons described *supra* ¶ 286.

289. ***November 30, 2021 Annual Investor Conference.*** Defendants Witty, Thompson, and Rex participated, and the Board were present for this conference.

290. Regarding UHG's MA program, OptumHealth's CEO described the Company's expansive provider network and training, stating that they brought doctors "***on board***" and "***educat[ed]***" them on "***the process of providing value-based care [on] what's necessary***."

291. Additionally, Defendant Witty claimed the Company was a "***growth organization***" and that a "13% to 16% long-term earnings growth rate" was "***absolutely the right and appropriate level of ambition for the company going forward***."

292. These statements relating to UHG's MA program were materially false and misleading for the reasons discussed *supra* ¶ 286.

> **2.    False and Misleading Statements and Omissions in 2022 Concerning UHG's MA Program, Fair Competition, Information Security, Earnings, Risk, and Internal Controls**

293. In 2022, Defendants made materially false and misleading statements and omissions described in this section.

294. ***February 15, 2022 Form 10-K for FY2021 ("FY2021 Form 10-K").*** The Company filed its Annual Report on Form 10-K for FY2021, signed by Defendants Witty, Flynn, Garcia, Hemsley, Hooper, McNabb, Rice, Noseworthy, and Rex.

295. The FY2021 Form 10-K made several false and misleading statements relating to UHG's MA program. First, it stated its "***senior-focused care management***

*model operates at a medical cost level below traditional Medicare, while helping seniors live healthier lives*" and that "through our HouseCalls program, nurse practitioners performed more than 2.1 million clinical preventive home care visits in 2021 *to address unmet care opportunities and close gaps in care*."

296.    Second, it reported that "*increases in revenues were primarily driven by the increase in the number of individuals served through [MA]*" and other items, and that MA "*increased due to growth in people served through individual and group [MA] plans*."

297.    In addition, the FY2021 Form 10-K made false and misleading statements relating to fair competition, stating:

> *We compete fundamentally on the quality and value we provide to those we serve* which can include elements such as product and service innovation; use of technology; consumer and provider engagement and satisfaction; and sales, marketing and pricing.

298.    These statements in the FY2021 Form 10-K relating to UHG's MA program were materially false and misleading for the reasons cited *supra* ¶ 286.

299.    Defendants' statements in the FY2021 Form 10-K relating to fair competition were false and misleading because: (a) since at least 2011, the Company operated a scheme to vertically integrate across the medical industry, using Optum on the provider side and UnitedHealthcare on the insurance side, including through tactics like coercive terms to force rural hospitals to partner with the Company and restrain physicians; (b) as alleged in the Securities Complaint, in January 2021, a Company executive downplayed concerns that UnitedHealthcare-affiliated employees gained access to Optum

Rx external customer data despite contracts prohibiting that access, merely because the data was de-identified, thus disregarding serious antitrust implications; (c) in January 2021, the DOJ brought a criminal no-poach prosecution against an Optum subsidiary acquired in 2017 for agreeing with competitors not to solicit one another's senior-level employees; and (d) Policy Strategies and Responsibility Committee materials from August 10, 2021 indicate that the Company was ███████████████████████████ ████████████████. UHG_00004338 at -04348, -04351.

300.   ***March 13–14, 2022 Answer and Public Statement Regarding Firewalls.*** On March 13, 2022, the Company filed its Answer to the DOJ's complaint in the antitrust action then pending in the U.S. District Court for the District of Columbia. The following day, the Company publicly stated that it had "agreed to make binding commitments to its customers and the Government" to "maintain its robust firewall processes—and extend them to Change's business—to protect sensitive customer data and provide information to customers to allow them to verify those firewall processes."

301.   These statements relating to information security were materially false and misleading because: (a) the Company did not actually maintain robust cybersecurity firewalls; (b) Optum's business applications operated under an open-access policy for customer data, including CSI, and lacked the role-based security and technical firewalls the Company represented were in place, both before and after these statements were made; (c) as alleged in the Securities Complaint, in January 2021, a Company executive downplayed concerns that UnitedHealthcare-affiliated employees gained access to Optum Rx external customer data despite contracts prohibiting that access, merely because the

data was de-identified; (d) per the AHA's March 17, 2021 letter, the Company "never demonstrated that the firewalls are sufficiently robust to prevent sensitive and strategic information sharing," a sentiment echoed by a Deutsche Bank analyst; (e) the Company kept no access logs at all for the Optum database dNHI before May 2021, approximately three months *after* the government began investigating the Change acquisition; and (f) as alleged in the Securities Complaint, in December 2021, UHG's Internal Audit conducted an audit noting "'heightened risk of data being mismanaged'" and assigned a "Needs Improvement to the Data Governance Internal Audit" rating—which CEO Witty forwarded to his COO with the notation, "A lot to do here."

302. ***March 17, 2022 "Benefits of Combination with Change Healthcare" Website Statement.*** On March 17, 2022, a document titled "Benefits of Combination with Change Healthcare" was posted on the Company's website addressing the DOJ's lawsuit. The document stated that "***Optum will maintain robust firewall processes and extend them to Change Healthcare's business—to protect sensitive customer data and provide information to customers to allow them to verify those firewall processes,***" and further claimed that Optum "***invests extraordinary time, money, and resources into safeguarding [CSI] and keeping it walled off from UnitedHealthcare***" and that "***UnitedHealth Group's existing firewalls and data-security policies prohibit employees from improperly sharing external-customer CSI.***"

303. These statements relating to information security were materially false and misleading for the reasons stated *supra* ¶ 301.

304.   ***April 22, 2022 Proxy Statement ("2022 Proxy").*** Director Defendants Flynn, Garcia, Hemsley, Hooper, McNabb, Rice, Noseworthy, and Witty caused the Company to file the 2022 Proxy, stating "[o]ur Board of Directors has nominated eight directors for election at the 2022 Annual Meeting" and asking "for your voting support" for each nominee.

305.   The 2022 Proxy made several false and misleading statements and omissions ("2022 Proxy Misstatements"), including:

306.   First, the 2022 Proxy touted the Company's 45% shareholder return in 2021, and that in 2021 revenues had increased 12%, net earnings had increased 12%, fully diluted earnings per share had increased 13%, adjusted earnings per share had increased 13%, and the dividend had increased 16%, and further stated that the "***Company's projected long-term growth rate [for adjusted earnings per share] [was] 13% to 16%.***"

307.   Second, it repeatedly touted the Company's "value-based system of care focused on better outcomes at lower costs," and claimed its initiatives were "[c]ontinu[ing] to enhance the quality and operations of our government benefit businesses" (*e.g.*, UHG's MA Program).

308.   Third, it asserted that the Company "[m]aintain[ed] strong and effective corporate governance to drive sustained shareholder value and respond to the interests of our shareholders."

309.   Fourth, in describing the Board's Enterprise Risk Oversight efforts, the 2022 Proxy represented that the Board "oversees management's enterprise-wide risk management activities" including "assessing and taking actions necessary to manage risk

incurred in connection with the long-term strategic direction and operation of our business."

310.   The 2022 Proxy described, among other oversight activities, the Audit Committee's oversight of "management's internal controls and compliance activities" and "management's processes to identify and quantify material risks facing the Company; the CHR Committee's oversight of "risks associated with our compensation policies, practices and plans and human capital management practices"; the Governance Committee's oversight of "Board processes and corporate governance-related risk"; and the HCPP Committee's oversight of "management's initiatives to improve health care affordability, clinical care and safety," as well as "risk associated with the public policy arena, including health care reform and modernization activities, government relations, and risk related to health and clinical practices." It further stated that the Board "maintains overall responsibility for oversight of the work of its various committees by receiving regular reports from the committee chairs regarding their work."

311.   The 2022 Proxy made representations regarding information security, explaining that the Audit Committee oversaw the Company's "cyber security program" and "receive[d] regular updates from [the] Chief Information Security Officer." It also claimed that the Audit Committee reviewed and assessed "the effectiveness of the Company's policies, procedures and resource commitments in the areas of compliance, ethics, privacy and cyber security."

312.   Fifth, the 2022 Proxy claimed that the "compensation program is designed to attract and retain highly qualified executives and to maintain a strong link between pay

– 122 –

and the achievement of enterprise-wide goals," with revenue, operating income, and cash flows as key components. It reported that "[a]fter considering the results of the risk assessment, management concluded the level of risk associated with the Company's enterprise-wide compensation programs is not reasonably likely to have a material adverse effect on the Company."

313.   Sixth, the 2022 Proxy further stated that the Company was "committed to high standards of ethical behavior, corporate governance, and business conduct." Part of this commitment, was a representation that "[t]o avoid potential conflicts of interest, a director is required to seek approval of the Governance Committee if the director or his/her immediate family member proposes to engage in a transaction or activity in the health care field."

314.   Seventh, the 2022 Proxy described the Company's commitment to its Code of Conduct, stating that the Code is "[f]oundational to the Company's compliance and ethics program and subject to periodic ethical risk assessments." The 2022 Proxy further represented that the Company "strongly and broadly encourage[s] employees to raise ethics and compliance concerns."

315.   Eighth, the 2022 Proxy described the Board's annual Board and Committee Evaluation process, which purportedly covered topics including "oversight of business strategy, results and operations" and "risk management topics."

316.   Finally, the Annual Letter to Shareholders accompanying the 2022 Proxy touted UHG's dual engine model:

[UHG was] starting 2022 with strong momentum — well-positioned to deliver ***high-quality care to even more people and create greater long-term value for our shareholders and the communities we serve as we pursue our mission of helping people live healthier lives and helping the health system work better for everyone.***

Combining Optum's clinical expertise, technology and data capabilities with UnitedHealthcare's leadership in health benefits, we are determined to help connect the fragmented pieces of the health system. Through innovations and realigning incentives, we are working in partnership with care providers, employers, and public sector leaders to help build a modern, high-performing health system and improve access, affordability, outcomes and experiences for everyone who depends on it.

317. The 2022 Proxy Misstatements were false and misleading because: (a) in describing governance, committee structure, and risk management, the 2022 Proxy omitted the Board's failure to address known red flags of material risks from the upcoding scheme, deficient information security, and anticompetitive conduct; (b) the Board's risk oversight framework was never deployed to investigate MA coding fraud despite the First OIG Report presenting an unambiguous warning; (c) the 2022 Proxy touted revenue and earnings growth without disclosing the business model was built on Medicare fraud; (d) it touted Company compliance and ethical culture without disclosing the risks of the MA business, upcoding scheme, and anticompetitive conduct; (e) the executive compensation assessment never evaluated whether the Company's earnings-focused culture incentivized fraudulent upcoding and "find[ing] a way" to hit earnings targets; (f) the Board had taken no action in response to the First OIG Report; and (g) the 2022 Proxy sought election based on Company performance without disclosing the true risks of the business practices alleged herein.

318. The Company's own internal records further show that the 2022 Proxy Misstatements in the 2022 Proxy concerning the Company's compliance, internal controls, and risk oversight were false when made because the Company's internal audits identified at least $200 million in unsupportable diagnosis codes, yet rather than remediate, the Company eliminated the relevant audit program.

319. The 2022 Proxy Misstatements relating to UHG's MA program were also false and misleading for the reasons stated *supra* ¶ 286; and because (a) ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████ and (b) MedPAC's March 15, 2022 Report to Congress reinforced that "coding intensity" continued to drive excess payments.

320. The 2022 Proxy Misstatements relating to information security were also false and misleading for the reasons stated *supra* ¶ 301.

321. ***June 14, 2022 Sustainability Report.*** On June 14, 2022, the Company published its 2021 Sustainability Report, which declared that the Company was "***focused***" on "***maintaining data privacy and cybersecurity,***" recognized its "***obligation***" to "***protect the information of all those we serve,***" and represented that the Company "***manages a robust Information Security Risk Management and Privacy Program.***"

322. These statements relating to information security were materially false and misleading for the reasons stated *supra* ¶ 301.

323.    *November 29, 2022 Annual Investor Conference.* Defendants Witty, Rex, and Thompson participated in the 2022 Annual Conference.

324.    Regarding UHG's MA program, SVP Robert Hunter touted HouseCalls, stating that the Company "expect[ed] to complete 2.2 million house calls this year, ***bringing personalized care into the home to address both immediate and preventive medical care needs*** in addition to social needs, including access to healthy food, safe housing, transportation and medical appointments and more." He also stated, "We have been testing people for underdiagnosed conditions such as diabetes, prediabetes, hep C and colon cancer. ***And what we found is nearly 1 out of every 4 people we screened had a condition, they didn't realize they had*** and the hep C positivity rates for dual special needs members are nearly double the national average."

325.    Second, Defendant Rex discussed MA's importance to the Company, stating that UnitedHealthcare revenues would "approach $276 billion, growth of $27 billion or 11% over 2022," which was "***driven by ongoing strength from our [MA] offerings*** and innovative commercial products."

326.    In addition, materials provided to investors at the conference made false and misleading statements regarding information security:

> ***With long-established firewalls and strong legal, reputational, ethical and financial incentives to protect patient and customer information, we standardize, link and integrate data from disparate sources resulting in a database of deidentified clinical and claims data representing approximately 285 million lives.***

327.    These statements made at the 2022 annual investor conference relating to UHG's MA program were materially false and misleading for the reasons stated *supra* ¶

– 126 –

319, and because by this point in time, Defendants were aware of additional regulatory scrutiny into UHG's upcoding by the Massachusetts AG, which commenced in or before June 2022.

328. The statements at the 2022 annual investor conference relating to information security were also materially false and misleading for the reasons stated *supra* ¶ 301, and because UHG integrated Change without basic security safeguards such as multi-factor authentication, despite representations to a federal court about robust firewalls and a December 2021 internal audit finding "heightened risk of data being mismanaged at Optum." Contrary to Defendants' representations, Optum applications saved data across business lines without role-based protections, including Salesforce GO, DGTS, OEDS, and Peoplesoft ERP (until fall 2023) and ContractHub (until January 2024). As explained by CW-1, the integration of Change was rushed, including with no real analysis of the risks the company was taking or the steps needed to address them. CW-2 explained that the Company downgraded the security at Change, including use of in-house identity-governance tools that did not detect rogue identities, orphan accounts or non-human identities, and with risk-assessment reports going to senior management.

329. *2022 Code of Conduct ("2022 Code")*. The Company's Code of Conduct—adopted by the Board in 2021, remained operative in 2022 and touted in the 2022 Proxy, and published to investors between 2021 and 2023[88]—made several false and misleading statements.

---

[88] What is referred to herein as the "2022 Code" was first published to the market sometime between May 13, 2021 (when the 2019 Code of Conduct was last captured on the Wayback

330.   First, regarding "Privacy and Information Security," it stated:

Maintaining the privacy and security of personal information that we collect, use, or that is entrusted to our care is an essential component of UnitedHealth Group's mission and its commitment to integrity and ethical behavior. […]
*Managing an individual's personal information respectfully, responsibly, and in accordance with all applicable laws* builds trust individual-by-individual, serves our business objectives, and fosters enduring relationships with our stakeholders.

331.   Second, regarding "Fair Competition and Fair Dealings," it stated:

*UnitedHealth Group's success is founded on honest competition.*
[…]
*We seek competitive advantages only through legal and ethical business practices. We succeed by outperforming our competitors honestly and fairly.*
[…]
*To comply with [antitrust] laws, each employee, director, and contractor must deal fairly with the Company's customers, service providers, suppliers, competitors, and employees.* No employee or director should take advantage of anyone through unfair-dealing practices.

332.   By the end of 2022, the 2022 Code's statements relating to information security were false and misleading for the same reasons stated *supra* ¶ 328.

333.   By the end of 2022, the 2022 Code's statements relating to fair competition were false and misleading for the same reasons stated *supra* ¶ 299, and because as *STAT News* later reported, data going back to July 1, 2022 indicated that on average,

---

Machine) and July 20, 2021 (when the 2021 Code was first captured). The 2021 Code continued to be published to the market, remained operative, and continued to govern the Company through 2023: it was in place until sometime between October 16, 2023 (when the 2021 Code was last captured) and June 2, 2024 (when the 2023 Code was first captured).

UnitedHealthcare paid UHG's Optum practices more than non-UHG practices, raising significant antitrust concerns.

> **3.  False and Misleading Statements and Omissions in 2023 Concerning UHG's MA Program, Fair Competition, Information Security, Denial of Care, Earnings, Risk and Internal Controls**

334.  ***February 24, 2023 Form 10-K for FY2022 ("FY2022 Form 10-K").*** On February 24, 2023, the Company filed with the SEC its Annual Report on Form 10-K, signed by Defendants Witty, Flynn, Garcia, Hemsley, Hooper, McNabb, Rice, Noseworthy, and Rex.

335.  Regarding HouseCalls, it claimed that "nurse practitioners performed nearly 2.3 million clinical preventive home care visits in 2022 ***to address unmet care opportunities and close gaps in care***."

336.  Regarding revenue growth, it claimed:

> ***The increases in revenues were primarily driven by growth in the number of people served through Medicare Advantage and Medicaid, pricing trends and growth across the Optum businesses.***
> […]
> ***Medicare Advantage increased due to growth in people served through individual and group Medicare Advantage plans.* . . .**

337.  Regarding fair competition, it claimed:

> ***We compete fundamentally on the quality and value we provide to those we serve which can include elements such as product and service innovation; use of technology; consumer and provider engagement and satisfaction; and sales, marketing and pricing.***

338.  The statements relating to UHG's MA program in the FY2022 10-K were materially false and misleading for the reasons stated *supra* ¶ 327, and because: (a) ███

███████████████████████████████████████████████████████████

– 129 –

████████████████████████████████████████

████████████████████████████; and (b) the Company was pressuring doctors to add diagnosis codes "even if they thought those codes didn't fit patients' conditions" and coaching providers to diagnose patients "based on probability rather than definitive diagnostic confirmation."

339. The statement relating to fair competition in the FY2022 10-K was materially false and misleading for the reasons stated *supra* ¶ 333.

340. *April 14, 2023 1Q FY2023 Conference Call.* Defendants Witty, Rex and Thompson participated and several false and misleading statements were made.

341. First, Defendant Witty stated that with MA compared to FFS Medicare, seniors "*experience better health outcomes, such as an over 40% lower rate of avoidable hospitalizations and consistently derive much greater value*."

342. Second, McMahon explained that "*in-home clinical visits [were] designed to identify care needs and help patients with other physical and social needs*."

343. Third, Defendant Witty made further statements about MA and revenue:

> We believe this is an incredibly important program for seniors. *We think value-based care as a piece of this program is a crucial and best way of managing members to give them the best quality outcome, best experience and best cost outcome*.
>
> *Given our established capabilities and our ability to focus on cost management as well as the broad portfolio of value-based services, clinics, in-house activities provided by Optum, we feel super confident in our ability to manage the evolving funding landscape*.
> […]
> . . . *We remain firmly of the view that the 13% to 16% long-term growth rate of adjusted earnings per share is very much the zone we're in* . . . .

344. These statements related to UHG's MA program were materially false and misleading for the reasons described *supra* ¶ 338.

345. ***April 21, 2023 Proxy Statement ("2023 Proxy").*** Director Defendants Flynn, Garcia, Gil, Hemsley, Hooper, McNabb, Rice, and Noseworthy and Defendant Witty caused the Company to file the 2023 Proxy in connection with the 2023 annual shareholders meeting. It stated "[o]ur Board of Directors has nominated nine directors for election at the 2023 Annual Meeting" and "ask[ed] for your voting support" for each.

346. The 2023 Proxy made several false and misleading statements and omissions ("2023 Proxy Misstatements"), including:

347. First, the 2023 Proxy touted that in 2022 that revenues had increased 13%, net earnings had increased 16%, fully diluted earnings per share had increased 17%, adjusted earnings per share had increased 17%, and the dividend had increased 14%, and stated the Board's "***support [of] our long term 13% to 16% earnings per share growth objective.***"

348. Second, it repeatedly touted the Company's "more effective value-based model that aligns payer and providers to deliver the highest quality care at the lowest cost," and specifically described that its initiatives included "[c]ontinu[ing] to enhance the quality and operations of our government benefit businesses," referring to UHG's MA Program.

349. Third, the 2023 Proxy described, among other oversight activities, the Audit Committee's oversight of "management's internal controls and compliance activities" and "management's processes to identify and quantify material risks facing the Company"; the CHR Committee's oversight of "risks associated with our compensation policies, practices

and plans and human capital management practices"; the Governance Committee's oversight of "Board processes and corporate governance-related risk, public policy, government relations and external relations activities"; and the HCPP Committee's oversight of "management's initiatives to improve health care affordability, clinical care and safety" and "in cooperation with management, the identification, evaluation and monitoring of the implementation of legislative, regulatory and policy issues, both domestic and international, that affect or could affect the Company's business reputation, business activities and performance."[89] The 2023 Proxy further stated that the Board "oversees the work of its various committees by receiving regular reports from the Committee Chairs regarding their work."

350. Fourth, the 2023 Proxy included substantially similar language about corporate governance, Enterprise Risk Oversight, and cybersecurity as the prior year.

351. Fifth, in addition to substantially similar language regarding compensation, it added "[o]ur robust oversight and governance practices discourage excessive or unnecessary risk-taking and include a balanced set of performance measures with different metrics used for our annual and long-term incentive plans" and claimed that "[a]fter considering the results of the risk assessment, management concluded the level of risk associated with the Company's enterprise-wide compensation programs is not reasonably likely to have a material adverse effect on the Company."

---

[89] The CHR Committee members were Defendants Flynn, Rice and Noseworthy; Governance Committee members were Defendants Noseworthy, Flynn, and McNabb; and HCPP Committee members were Defendants Rice, Noseworthy, and Hemsley.

352. Sixth, the 2023 Proxy described the Company's Code of Conduct as defining "responsibilities, accountabilities and reporting lines related to business conduct, conflicts of interest, public disclosure practices, compliance obligations, and other areas." It further represented that the Company "strongly and broadly encourage[s] and train[s] employees to raise ethics and compliance concerns."

353. Seventh, the 2023 Proxy described the Board's annual Board and Committee Evaluation process, which purportedly covered topics including "oversight of business strategy, results and operations" and "risk management topics."

354. Finally, the Annual Letter to Shareholders accompanying the 2023 Proxy touted the Company's dual engine model and omitted to disclose its fraudulent MA program practices. It stated that the Company "***is maintaining strong momentum on our mission of helping people live healthier lives and helping the health system work better for everyone. Optum's clinical expertise, technology and data capabilities and UnitedHealthcare's leadership in health benefits is helping us lead the development of a simpler, more consumer-oriented health system that delivers better outcomes for all Americans — and, in so doing, will continue to create lasting stockholder value for the decades ahead.***"

355. The 2023 Proxy Misstatements were materially false and misleading for the reasons described *supra* ¶¶ 317–18; and because: (a) despite two OIG reports and a state attorney general investigation, no Board or Committee materials reflect any effort to investigate the Company's coding practices or implement compliance measures; (b) in response to two federal government reports identifying fraudulent conduct, the Board took

no action to investigate or reform the conduct; (c) the Governance Committee ████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████; (d) HCPP materials from

November 4, 2022 ████████████████████████████████████████████

███████████████████████████████████████; (e) the Board ████

███████████████████████████████████████████████████████████████

███████████████████████████████████; and (f) the HCPP Committee ████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████

356.   The 2023 Proxy Misstatements relating to UHG's MA program were also materially false and misleading for the reasons described *supra* ¶ 338.

357.   The 2023 Proxy Misstatements relating to information security were also materially false and misleading for the reasons described *supra* ¶ 328.

358.   ***November 29, 2023 Annual Investor Conference.*** Defendants Witty, Rex and Thompson participated, and several false and misleading statements were made:

359.   First, SVP Robert Hunter claimed:

> ***Through our partnership with Optum, we have continually demonstrated the value of bringing these services into the home. This year, we will conduct more than 2.5 million in-home visits through our house calls program, completing approximately 200,000 tests for diabetes and hep C, which are consistently underdiagnosed conditions. . . . This year, we will screen nearly 3.8 million people, helping connect them to necessary***

*resources with over 40% of those screenings occurring during a house calls visit.*

360.    Second, Defendant Thompson stated, "[w]hen you compare it to fee-for-service, people in our fully accountable MA arrangements with Optum experience better complex care management," and UnitedHealthcare Medicare & Retirement CEO Timothy Noel stated, "[c]onsumers in Medicare Advantage also experienced better health outcomes across a broad range of measures, including more preventative care visits and fewer hospital visits."

361.    Finally, Defendant Witty stated that despite CMS's rate notice, UHG's earnings growth would not be impacted:

> *[D]espite that change, despite that impact, we are committed to the kind of earnings growth rate over the next 12 months that you would expect from us even if there hadn't been a rate notice cut. And the reason for that is we spent the last 6 months, reconfiguring our plans for the next year and 2 and 3 and 5 years in response to the change in circumstance. We focused on how we can protect members and their benefits. We focused on how we can take more cost and efficiency into our organization, and we focused on how we can double down on eliminating waste and unnecessary care in the health system more generally.*

362.    These statements regarding UHG's MA program were materially false and misleading for the reasons described *supra* ¶ 338; and because (a) as the *Wall Street Journal* confirmed on June 2, 2025, internal Company documents showed the Company "had long known the Medicare payment change would be challenging" as an internal Optum analysis of about 900,000 patients from late 2023 "projected that the new billing rules would cut back sharply on diagnoses of chronic health conditions that led to the higher

– 135 –

payments"; and (b) the Governance Committee ████████████████████

████████████████████████████████████████████

363.    The statements regarding "better health outcomes" and "fewer hospital visits" were also false and misleading because they were not the product of better care: (a) as disclosed by *The Guardian* in May 2025, since at least 2018, the Company paid nursing homes hundreds of thousands of dollars annually through programs like "Premium Dividend," "Shared Savings," and "Quality and Shared Risk" to decrease hospital "admits per thousand" rates, while placing its own medical teams in nearly 2,000 nursing homes to implement cost-cutting tactics; and (b) as *STAT News* reported in November 2023, the Company used an algorithm to cut off patients from rehabilitation care. Statements attributing better outcomes to superior clinical management concealed that the reductions reflected financial incentives to withhold hospital transfers and cut off post-acute rehabilitation.

364.    ***2023 Code of Conduct ("2023 Code")***. The Company's 2023 Code—adopted by the Board, touted in the 2023 Proxy, and published on the Company website sometime after October 16, 2023—made several false and misleading statements substantially similar to those in the previous Codes.

365.    First, it made the same "Privacy and Information Security" statement as the 2021 and 2022 Codes.

366.    Second, it made substantially the same "Fair Competition and Fair Dealings" statement as the 2022 Code.

367. The 2023 Code's statements relating to information security were false and misleading for the reasons stated *supra* ¶ 328.

368. The 2023 Code's statements relating to fair competition were false and misleading for the reasons stated *supra* ¶ 333; and because in October 2023, the DOJ notified the Company of an antitrust investigation, of which every director had been briefed in executive session on November 6, 2023, but which the Company did not publicly disclose.

4.   **False and Misleading Statements and Omissions in 2024 Concerning UHG's MA Program, Fair Competition, Information Security, Earnings, Risk and Internal Controls[90]**

369. ***February 28, 2024 Form 10-K for FY2023 ("FY2023 Form 10-K").*** The Company filed its Annual Report on Form 10-K, signed by Defendants Witty, Baker, Flynn, Garcia, Hemsley, Hooper, McNabb, Rice, Noseworthy, and Rex. The 10-K made several false and misleading statements relating to UHG's MA program.

370. First, the FY2023 Form 10-K reported on the HouseCalls program, stating that its "nurse practitioners performed more than 2.7 million clinical preventive home care visits in 2023 to address unmet care opportunities and close gaps in care."

371. In addition, the FY2023 Form 10-K made a false and misleading statement relating to fair competition:

---

[90] The Section 220 production did not include a specific Code of Conduct for 2024, ███

*We compete fundamentally on the quality and value we provide to those we serve which can include elements such as product and service innovation; use of technology; consumer and provider engagement and satisfaction; and sales, marketing and pricing.*

372. The FY2023 Form 10-K's statements relating to UHG's MA program were false and misleading when made for the reasons described *supra* ¶ 362, and because the Board ███████████████████████████████████████████████████

███████████████████████████████████████████████████

373. The FY2023 10-K's statements relating to fair competition were false and misleading when made for the reasons described *supra* ¶ 368.

374. ***April 22, 2024 Proxy Statement ("2024 Proxy").*** Director Defendants Baker, Flynn, Garcia, Gil, Hemsley, Hooper, McNabb, Rice, Noseworthy, and Witty caused the Company to file the 2024 Proxy, stating "[o]ur Board of Directors has nominated ten directors for election at the 2024 Annual Meeting" and "ask[ed] for your voting support" for each nominee. The 2024 Proxy made several false and misleading statements and omissions ("2024 Proxy Misstatements"), including:

375. First, the 2024 Proxy touted that 2023 revenues had increased 15%, net earnings had increased 11%, operating earnings had increased 14%, fully diluted earnings per share had increased 13%, adjusted earnings had increased 13%, and the dividend had increased 14%. The 2024 Proxy stated that total shareholder return was 123% for the five-year period ended 2023. And further stated the "***Company's projected long-term growth rate of 13% to 16%***" for adjusted earnings per share.

– 138 –

376.    Second, the 2024 Proxy repeatedly touted the Company's "[a]ccelerating the U.S. health system's transition to a value-based model that aligns incentives across care providers, health plans and consumers can deliver the highest quality outcomes at the lowest cost." The 2024 Proxy specifically described that the Company's initiatives included "[c]ontinu[ing] to enhance the quality and operations of the public-sector businesses," referring to UHG's MA Program.

377.    Third, the 2024 Proxy asserted that the Company "[m]aintain[ed] strong and effective corporate governance to drive sustained shareholder value and respond to the interest of our shareholders."

378.    Fourth, the 2024 Proxy used substantially the same language as the 2022 and 2023 Proxies regarding the Board's Enterprise Risk Oversight efforts.

379.    The 2024 Proxy described, among other oversight activities: the Audit Committee's oversight of "management's internal controls and compliance activities" and "management's processes to identify and quantify material risks facing the Company"; the CHR Committee's oversight of "risks associated with our compensation policies, practices and plans and human capital management practices"; the Governance Committee's oversight of "Board processes and corporate governance-related risk, public policy, government relations and external relations activities"; and the HCPP Committee's oversight of (i) "management's initiatives to improve health care affordability, clinical care and safety," (ii) "in cooperation with management, the identification, evaluation and monitoring of the implementation of legislative, regulatory and policy issues, both domestic and international, that affect or could affect the Company's business reputation,

business activities and performance," and (iii) "the responsible and ethical application of artificial intelligence in support of modernizing and improving the health care system."[91] The 2024 Proxy further stated that the Board "oversees the work of its various committees by receiving regular reports from the Committee Chairs regarding their work."

380.   The 2024 Proxy made representations regarding information security, explaining that the Audit Committee also had oversight of the Company's "*cybersecurity program*" and was responsible for "*reviewing and assessing the Company's cybersecurity and data protection policies, procedures and resource commitment*" As part of this process, the Audit Committee "*receive[d] regular updates from management on critical issues related to our information security risks.*"

381.   Fifth, the 2024 Proxy claimed that the "compensation program is designed to attract and retain highly qualified executives and to maintain a strong link between pay and the achievement of enterprise-wide goals." Revenue, operating income, and cash flows were key components of executive compensation. It further represented that "[o]ur robust oversight and governance practices discourage excessive or unnecessary risk-taking and include a balanced set of performance measures."

382.   The 2024 Proxy further reported that the CHR Committee had reviewed the Company's incentive practices and that, "[a]fter considering the results of the [annual risk] assessment, management concluded the level of risk associated with the Company's

---

[91] The Audit Committee members were Defendants McNabb, Garcia, Gil and Baker; CHR Committee members were Flynn, Rice and Noseworthy; Governance Committee members were Noseworthy, Flynn and McNabb; and HCPP Committee members were Rice, Noseworthy and Baker.

enterprise-wide compensation programs is not reasonably likely to have a material adverse effect on the Company."

383. Sixth, the 2024 Proxy included substantially similar language about corporate governance as the prior year.

384. Seventh, the 2024 Proxy described the Company's Code of Conduct as setting "expectations for ethical conduct across our company, including but not limited to, integrity, accountability, fair competition and fair dealing, privacy and information security, our assets and the environment, government interactions, communications and marketing and a safe and supportive work environment." It further represented that the Company "strongly and broadly encourage[s] and train[s] employees to raise ethics and compliance concerns."

385. Eighth, the 2024 Proxy also described the Board's annual Board and Committee Evaluation process, which purportedly covered topics including "*oversight of business strategy, results and operations*" and "*risk management topics*."

386. Ninth, the 2024 Proxy represented, with respect to the HCPP Committee's oversight of clinical care, that "*[o]ur Board provides oversight of our clinical quality and patient safety (QPS) efforts*."

387. Tenth, the 2024 Proxy described its commitment to "Chief Executive Officer Succession Planning," stating that "[o]ur succession plan, which is reviewed annually by our Board, addresses both an unexpected loss of our CEO and longer-term succession."

388. Finally, the Annual Letter to Shareholders accompanying the 2024 Proxy touted the Company's dual engine model and omitted to disclose its fraudulent MA

program practices. It stated that the Company "*remains dedicated in 2024 to serving more people with high-quality, affordable care to advance our mission of helping people live healthier lives and helping the health system work better for everyone. In so doing, we will continue to create long-standing, durable shareholder value for the decades ahead. Our differentiated, long-term growth is rooted in two core ambitions: advancing value-based care and empowering health care consumers.*"

389. The 2024 Proxy Misstatements were materially false and misleading for the reasons described *supra* ¶ 355; and because the Board's actual engagement focused on lobbying, public relations campaigns, and obstruction of regulatory enforcement—including paid placements in news outlets, partnerships with lobbying groups, and Congressional outreach to defeat MA reforms—rather than oversight of compliance and risk, as they touted.

390. The 2024 Proxy Misstatements relating to UHG's financial results were also materially false and misleading because no assessment was made of whether pressure to meet earnings targets incentivized fraudulent coding or the portfolio refinement transactions that inflated 2024 financial results.

391. The 2024 Proxy Misstatements relating to UHG's MA program were also materially false and misleading for the reasons described *supra* ¶ 372; and because: (a) in March 2024, a recording surfaced showing UHG employees coaching nurses to "upcode"; and (b) MedPAC's March 15, 2024 report quantified that "coding intensity" by MA Insurers amounted to $33 billion in excess payments for insurer-driven diagnoses, and

average risk scores for MA patients were 18% higher than in traditional fee-for-service Medicare.

392.    The 2024 Proxy Misstatements relating to cybersecurity were false and misleading for the reasons stated *supra* ¶ 328; and because: (a) the largest healthcare data breach in American history—compromising approximately 190 million individuals— began on February 21, 2024 because the Company recklessly integrated Change without basic security safeguards such as multi-factor authentication, despite sworn representations to a federal court; and (b) ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

393.    The 2024 Proxy Misstatements relating to fair competition were false and misleading for the reasons stated *supra* ¶ 368.

394.    ***July 16, 2024 Q2 FY2024 Conference Call.*** Defendants Witty, Rex and Thompson, along with other executives, participated.

395.    Defendant Witty stated that UHG's "home visit programs help patients live healthier lives and save taxpayers' money" and that "[i]t is only [MA] that makes programs and results like this possible."

396.    The statement regarding UHG's MA program was materially false and misleading when made for reasons described *supra* ¶ 391.

397. *July 25, 2024 STAT News Statement*. The July 25, 2024 *STAT News* exposé about the Company wielding its influence over doctors to generate ill-gotten profits quoted a UHG spokesperson denying the allegations:

> . . . *the company's* "*providers and partners make independent clinical decisions, and we expect them to diagnose and document patient information completely and accurately in compliance with [federal] guidelines.* We provide training and other practice support to providers because *it leads to better care management, coordination, and patient follow-up. Regulators routinely audit this documentation.*"

398. The statements, which related to UHG's MA Program and vertical integration, were materially false and misleading when made for the reasons described *supra* ¶ 391, and in light of the July 25, 2024, *STAT News* report, which found, among other things, that UHG was pressuring doctors and practitioners to add diagnosis codes "even if they thought those codes didn't fit patients' conditions."

399. *August 8, 2024 Denial of Recent* **Wall Street Journal** *Articles.* The Company issued a response to the *Wall Street Journal*'s July 8 and August 4, 2024 articles about UHG's upcoding scheme, findings, claiming that the *Wall Street Journal's* "*core thesis, methodology and conclusions are flawed,*" and that UHG was providing "*a more complete picture.*" UHG claimed that the *Wall Street Journal* "*fundamentally misrepresents HouseCalls, which provides in-home clinical assessments at no cost to millions of seniors each year to better understand their current health status, identify conditions, and connect patients to necessary specialists and high-quality medical care,*" and that HouseCalls are "*a critical touchpoint in the care continuum, supplementing annual physician visits — not replacing them.*"

400.  As for the *Wall Street Journal*'s finding that many "questionable diagnos[es]" were made that triggered extra payments, the Company stated, "***This assertion is unsubstantiated, and the WSJ presented no credible evidence to support this claim***." The Company's chief physician, Dr. Wyatt Decker, claimed that the disparity reflected the Company's "***sicker patient population***" and its nurse practitioners "***being so effective at their jobs.***" The Company also stated that it would provide "[a] look at the real numbers."

401.  The statements related to UHG's MA program were materially false and misleading for the reasons described *supra* ¶ 398. In addition, just a few weeks later, UHG was supplying counsel to former employees for the investigation. Further, the *Wall Street Journal*'s data refuted the Company's explanation: 60% of the Company's home visits "generated at least one new revenue-producing diagnosis of a condition no doctor was treating," compared with only 39% for Humana, the second-largest MA insurer. If the Company's patients were genuinely sicker, their treating physicians would have identified those conditions. UHG's figures came from biased research that the Company funded and supported, as detailed above.

402.  ***October 24, 2024 Denial of the Third OIG Report.*** *FierceHealthcare* reported the following statement from a UHG spokesperson refuting the Third OIG Report:

> ***A misleading, narrow and incomplete view of risk adjustment data is being used to draw inaccurate conclusions about the value of in-home care for America's most vulnerable seniors in Medicare Advantage*** . . . The 45–60 minute in-home visits provided by highly trained and board-certified advanced practice clinicians ***are among the most comprehensive and thorough assessments of a patient's health and physical environment***

*available in the healthcare system, helping to identify and drive needed follow-on care for the vast majority of the patients with whom we engage*.

403. The statements made in response to the Third OIG Report, which related to UHG's MA program, were materially false and misleading when made due to the reasons described *supra* ¶ 401, and because: (a) of the contents of the Third OIG Report, which found, among other things, insurer-driven diagnoses resulted in $3.7 billion in MA risk-adjusted payments to the Company and that the Company received two-thirds of all payments from insurer-generated diagnoses reported on in-home HRAs while covering just over one-quarter of beneficiaries; and (b) the statements obscured that the Senate Permanent Subcommittee on Investigations' October 17, 2024 report found that the Company "intentionally" used prior authorization to deny post-acute care.

404. ***December 29, 2024* Wall Street Journal *Statement.*** The *Wall Street Journal* reported that UHG pressured its doctors to diagnose conditions resulting in higher risk-adjusted payments for MA members, garnering billions in overpayments. The Company denied wrongdoing, claiming its practices led to "***more accurate diagnoses, greater availability of care and better health outcomes and prevention, including less hospitalization, more cancer screenings and better chronic disease management***" and "***helped to avert more serious health problems later, and to achieve Medicare Advantage's goals of improving quality and reducing costs***".

405. The statements related to UHG's MA program were materially false and misleading for the reasons described *supra* ¶ 403 and because the December 29, 2024 *Wall Street Journal* report found that the Company pressured affiliated doctors to diagnose

conditions to obtain higher risk-adjusted payments, and that UHG MA patients had higher sickness scores than either FFS Medicare patients or MA patients of other companies.

> **5.    False and Misleading Statements and Omissions in 2025 Concerning UHG's MA Program, Fair Competition, Information Security, Earnings, Risk, and Internal Controls**

406.    In 2025, Defendants made a series of materially false and misleading statements and omissions ("2025 Misstatements") described below.

407.    ***January 16, 2025 Press Release.*** On January 16, 2025, the Company issued a press release containing false and misleading statements relating to its financial results. The press release disclosed the Company's financial results for year-end 2024, as well as its "performance outlook [for 2025] established in December 2024, including ***revenues of $450 billion to $455 billion, net earnings of $28.15 to $28.65 per share, adjusted net earnings of $29.50 to $30.00 per share and cash flow from operations of $32 billion to $33 billion***."

408.    The press release also discussed the portfolio refinement transactions:

> ***The full year 2024 operating cost ratio of 13.2% compared to 14.7% in 2023, reflecting gains from business portfolio refinement and strong improvement in operating efficiencies and consumer experiences. The business portfolio refinement, including strategic transactions, will enhance growth opportunities and contributed about 80 basis points,*** nearly half at Optum Health with the remainder split between UnitedHealthcare and Optum Insight.

409.    These statements were materially false and misleading for reasons stated *supra* ¶ 390 regarding UHG's financial results, and because they misleadingly omit that the Company engaged in improper portfolio refinement transactions to hit earnings targets.

410.   *January 16, 2025 Conference Call*. Defendant Witty stated that MA was "*proven to deliver better health outcomes at a lower cost to consumers and taxpayers compared to fee-for-service Medicare.*"

411.   Similarly, Defendant Rex stated, "*[MA] patients with chronic conditions who receive a home care visit have a lower rate of ER visits, fewer inpatient stays, stronger health outcomes and a better experience, all while saving the health system billions.*"

412.   The statements related to UHG's MA program were materially false and misleading for the reasons stated *supra* ¶ 405.

413.   *February 21, 2025 Response to* **Wall Street Journal** *Article.* In response to the *Wall Street Journal*'s February 21, 2025 article regarding the civil DOJ investigation, the Company issued a response titled "Statement Regarding Medicare Advantage," stating:

> *The Wall Street Journal continues to report misinformation on the Medicare Advantage (MA) program. The government regularly reviews all MA plans to ensure compliance and we consistently perform at the industry's highest levels on those reviews. We are not aware of the "launch" of any "new" activity as reported by the Journal. We are aware, however, that the Journal has engaged in a year-long campaign to defend a legacy system that rewards volume over keeping patients healthy and addressing their underlying conditions. Any suggestion that our practices are fraudulent is outrageous and false.*

414.   These statements related to UHG's MA program were materially false and misleading for the reasons stated *supra* ¶ 405.

415.   *February 27, 2025 Form 10-K for FY2024 ("FY2024 Form 10-K").* This Form 10-K was signed by Defendants Witty, Baker, Flynn, Garcia, Hemsley, Hooper, McNabb, Rice, Noseworthy, and Rex.

416.   It made false and misleading statements relating to UHG's MA Program, including that HouseCalls "nurse practitioners performed 2.9 million clinical preventive home care visits in 2024 *to address unmet care opportunities and close gaps in care*."

417.   The FY2024 Form 10-K also discussed the portfolio refinement transactions:

*As a result of continued portfolio refinement, the Company sold other businesses and assets and entered into strategic transactions. These transactions resulted in total consideration received of $3.0 billion and an additional $1.9 billion of equity method investments related to the valuation of our retained interests in certain transactions*. The carrying value for these transactions was $1.0 billion, primarily related to goodwill. *The gains from business portfolio refinement, including strategic transactions, were recorded within operating costs in the Consolidated Statement of Operations and contributed about 80 basis points ($3.3 billion) to the operating cost ratio*, nearly half ($1.4 billion) related to Optum Health with the remainder split between UnitedHealthcare ($1.1 billion) and Optum Insight ($800 million). Certain transactions also included various put and call options, which were valued at $630 million and included in other liabilities on the Consolidated Balance Sheet. As of December 31, 2024 the total estimated future obligation under these arrangements if the Company decided or was required to repurchase these interests was up to $3.4 billion.

418.   Finally, FY2024 Form 10-K made a false and misleading statement relating to fair competition:

*We compete fundamentally on the quality and value we provide to those we serve which can include elements such as product and service innovation; use of technology; consumer and provider engagement and satisfaction; and sales, marketing and pricing.*

419.   The statements relating to UHG's MA program were materially false and misleading for the reasons stated *supra* ¶ 405, and because Senator Grassley launched a formal inquiry on February 24, 2025 demanding documents about the Company's coding compliance.

– 149 –

420.   The FY2024 Form 10-K's statements relating to the Company's portfolio refinement transactions were materially false and misleading for the reasons stated *supra* ¶ 409.

421.   The FY2024 Form 10-K's statements relating to fair competition were materially false and misleading for the reasons stated *supra* ¶ 398.

422.   ***April 17, 2025 Form 8-K and Conference Call.*** The Company filed a Form 8-K with the SEC including its first quarter 2025 results and revised financial guidance for full year 2025, "***Revised 2025 Earnings Outlook to $24.65 to $25.15 Per Share, Adjusted Earnings $26 to $26.50 Per Share.***"

423.   Defendants Witty and Rex participated in the investor conference call that day. Defendant Witty stated that MA "***also cost taxpayers less and delivers more to seniors than fee-for-service Medicare, especially in value-based care arrangements***" and that HouseCalls, "***which is only available in [MA], provides a thorough in-home clinical visit at no cost to seniors.***"

424.   In addition, in response to an analysts' question about "get[ting] back to that long-term growth rate," Defendant Witty expressed confidence, stating: "***we think that an awful lot of the issue that we're seeing early in '25, we can fix in '25 and help us deliver stronger performance for '26, and we expect that to then be a kind of ramp into reacquiring our target growth rate momentum that we aspire to as an organization***."

425.   These statements in UHG's Form 8-K relating to UHG's earnings were materially false and misleading for the reasons stated *supra* ¶¶ 409, 419.

426. The statements during the conference call related to UHG's MA program were false and misleading for the reasons stated *supra* ¶ 419, and because MA actually costs taxpayers *more* than traditional FFS Medicare, as found by MedPAC, due to MA insurers' fraud.

427. ***April 21, 2025 Proxy Statement ("2025 Proxy").*** Defendants Baker, Flynn, Garcia, Gil, Hemsley, Hooper, McNabb, Rice, Noseworthy, and Witty caused the Company to file the 2025 Proxy, stating "[o]ur Board of Directors has nominated ten directors for election at the 2025 Annual Meeting" and "ask[ed] for your voting support" for each nominee. The 2025 Proxy contained the following false and misleading statements and omissions ("2025 Proxy Misstatements"):

428. First, the 2025 Proxy touted that 2024 revenues had increased 8%, operating income 13%, adjusted earnings $2.54 per share to $27.66, and the dividend $0.88 to $8.40 per share. Total shareholder return over the five-year period ending 2024 was 83%.

429. Second, the 2025 Proxy made statements regarding the UHG's MA program, repeatedly touting that the Company was "***focused on the essential work of improving the health system through value-based care and consumer-centered offerings***" and specifically stating, "***[f]or more than a decade, we have focused on primary and preventive care, supporting successful programs like Medicare Advantage and Medicaid, and building upon the foundations of value-based care.***" The 2025 Proxy specifically described that the Company's initiatives "***[c]ontinue to enhance the quality and operations of the public-sector businesses.***"

430. Third, the 2025 Proxy asserted that the Company was "[m]aintaining strong and effective corporate governance to drive sustained shareholder value and respond to the interest of shareholders."

431. Fourth, the 2025 Proxy used substantially similar language as previous Proxies regarding the Board's Enterprise Risk Oversight efforts.

432. The 2025 Proxy described, among other oversight activities: the Audit Committee's oversight of "*management's internal controls and compliance activities*"; the CHR Committee's oversight of "*risks associated with our compensation policies, practices and plans and human capital management practices*"; the Governance Committee's oversight of "*Board processes and corporate governance-related risk, public policy, government relations and external relations activities*"; and the HCPP Committee's oversight of (i) "*management's initiatives to improve health care affordability, clinical care and safety,*" (ii) "*in cooperation with management, the identification, evaluation and monitoring of the implementation of legislative, regulatory and policy issues, both domestic and international, that affect or could affect the Company's business reputation, business activities and performance,*" and (iii) "*the responsible and ethical application of artificial intelligence in support of modernizing and improving the health care system.*"[92] The 2025 Proxy further stated that the Board

---

[92] The Audit Committee members were Defendants McNabb, Garcia, Gil and Baker; CHR Committee members were Flynn, Rice and Noseworthy; and Governance Committee members were Noseworthy, Flynn and McNabb; and the HCPP Committee members were Rice, Noseworthy and Baker.

*"oversees the work of its various committees by receiving regular reports from the Committee Chairs regarding their work."*

433. The 2025 Proxy had substantially similar language as the prior year regarding cybersecurity.

434. Fifth, the 2025 Proxy claimed that the "compensation program is designed to attract and retain highly qualified executives and to maintain a strong link between pay and the achievement of enterprise-wide goals." Revenue, operating income, and cash flows were key components of executive compensation. It further represented that "[o]ur robust oversight and governance practices discourage excessive or unnecessary risk-taking and include a balanced set of performance measures."

435. The 2025 Proxy further disclosed that annual cash incentive awards were based on Revenue (30%), Operating Income (30%), and Cash Flow from Operations (15%), and that the 2022–2024 performance shares were weighted on cumulative adjusted earnings per share and average return on equity—metrics that included the portfolio refinement transactions—and again reported the CHR Committee's conclusion that "*management concluded the level of risk associated with the Company's enterprise-wide compensation programs is not reasonably likely to have a material adverse effect on the Company*."

436. Sixth, the 2025 Proxy stated, "[w]e are committed to high standards of corporate governance and ethical business conduct" and that "[t]o avoid potential conflicts of interest, a director is required to seek approval of the Governance Committee if the

director or his/her immediate family member proposes to engage in a transaction or activity in the health care field."

437.   Seventh, the 2025 Proxy described the Company's Code of Conduct as setting "expectations for ethical conduct across our company, including but not limited to, integrity, accountability, fair competition and fair dealing, privacy and information security, our assets and the environment, government interactions, communications and marketing and a safe and supportive work environment." It further represented that the Company "strongly and broadly encourage[s] and train[s] employees to raise ethics and compliance concerns."

438.   Eighth, the 2025 Proxy described the Board's annual Evaluation process, which purportedly covered "oversight of business strategy, results and operations," "succession planning and talent development," and "risk management topics."

439.   Ninth, the 2025 Proxy contained identical language as 2024 regarding clinical quality and patient safety.

440.   Tenth, the 2025 Proxy described its commitment to "Chief Executive Officer Succession Planning," stating "[o]ur succession plan, which is reviewed annually by our Board, addresses both an unexpected loss of our CEO and longer-term succession."

441.   Eleventh, the 2025 Proxy presented the Company's non-GAAP reconciliation of adjusted earnings per share of $27.66, explaining exclusions for intangible amortization, "South American impacts," and the direct costs of the Change cyberattack—while including within adjusted earnings the $3.3 billion in portfolio refinement gains that had inflated reported results.

442. Finally, the Annual Letter to Shareholders touted the Company's "longstanding mission is to help people live healthier lives and help make the health system work better for everyone," stating also:

> *We remain focused on the essential work of improving the health system through value-based care and consumer centered offerings, while continuing our longstanding efforts to improve simplicity, connectivity and transparency for consumers and health care providers.* Our innovative health plan designs, modernized payment capabilities and best-in-class digital and technology platforms *position us to greatly enhance the way people engage with the health system. Our commitment to serving more people with high-quality, affordable care and innovating to make the system work better will also create long-standing, durable shareholder value for the decades ahead.*

443. The 2025 Proxy Misstatements were materially false and misleading for the reasons described *supra* ¶ 389, and because: (a) the Board continued to take no meaningful compliance action even after the *Wall Street Journal*, *STAT News*, and OIG Reports exposed the Company's coding fraud— ███████████████████████████████ ████████████████████████████████████████████████████████; (b) the Audit Committee failed to challenge the misleading non-GAAP treatment of the $3.3 billion in portfolio refinement gains—representing approximately 12.8% of reported AEPS—while the $7.1 billion Brazil loss was excluded, an asymmetric treatment that "violated the fundamental principle that non-GAAP measures must be presented consistently"; (c) the executive bonus pool was set at "2% of the Company's net income" for the year ended December 31, 2024, meaning artificially inflated net income directly increased the pool from which executive bonuses were paid; (d) the 2022-2024 long-term performance share results were "adjusted for . . . [a]cquisition, portfolio optimization and

share repurchase activity not contemplated when the performance targets were set"—indicating that portfolio gains were affirmatively included in adjusted performance; and (e) the compensation risk assessment did not consider whether UHG's "culture of meeting financial projections" could incentivize portfolio refinement transactions and, indeed, the Board was rewarding the portfolio refinement transactions by factoring them into the compensation analysis.

444.   The 2025 Proxy Misstatements relating to UHG's MA program were also materially false and misleading for the reasons described *supra* ¶ 426 and because: (a) as reported by *The Guardian*, the Company paid nursing homes hundreds of thousands of dollars annually to decrease hospital "admits per thousand," while placing its own medical teams in nursing homes nationwide to implement cost-cutting tactics designed to maximize profits at the expense of patient safety; and (b) the OIG found that 1.7 million enrollees received no follow-up care whatsoever for diagnoses submitted for payment.

445.   The 2025 Proxy Misstatements relating to UHG's earnings and portfolio refinement were also materially false and misleading for the reasons described supra ¶ 409.

446.   The 2025 Proxy Misstatements relating to UHG's information security and fair competition were also materially false and misleading for the reasons described *supra* ¶¶ 392, 398.

447.   ***Response to July 15, 2025* Bloomberg *Article.*** On July 15, 2025, the Company responded to a *Bloomberg* article reporting on the questionable portfolio refinement transactions, denying any wrongdoing and stating that "the company had valid business reasons for the deals."

448.    These statements regarding portfolio refinement transactions were materially false and misleading for the reasons described *supra* ¶ 409.

449.    ***2025 Code of Conduct ("2025 Code")***. The Company's 2025 Code—adopted by the Board, touted in the 2025 Proxy, and published on the Company website sometime after October 3, 2025[93]—made several false and misleading statements.

450.    First, it made the same "Privacy and Information Security" statement as the 2021, 2022, and 2023 Codes. Second, the 2025 Code made statements relating to fair competition and firewalls under the heading "Fair Competition and Fair Dealings" that were substantially similar to those in previous years, but added an explicit reference to antitrust and firewall policies and access to competitor data:

> ***UnitedHealth Group's success is founded on honest competition.***
>
> ***We seek competitive advantages only through legal and ethical business practices. We succeed by outperforming our competitors honestly and fairly.***
>
> Many laws and regulations define and promote fair business practices to protect the competitive environment. For example, competition laws, known in the U.S. as antitrust laws, protect against practices that interfere with free competition. They are designed to promote a competitive economy in which business enterprises compete on the merits, including on the basis of price, quality, and service. ***To comply with these laws, each employee, director, and contractor must carefully follow our antitrust and firewall policies. Given the diversity of our enterprise, parts of our business may have access to information about our competitor that is competitively sensitive and should only be used as allowed by applicable firewall policies.***

---

[93] According to the Wayback Machine, the 2023 Code was available on the Company website until October 3, 2025, but by March 18, 2026—the next capture on the Wayback Machine—the 2025 Code was published.

451.    The 2025 Code's statements relating to information security and firewalls and fair competition were materially false and misleading for the reasons described regarding similar statements *supra* ¶¶ 392, 398.

## B.    Additional 10(b) Allegations

### 1.    Defendants Squandered Approximately $14 Billion in Corporate Capital on Stock Repurchases at Fraud-Inflated Market Prices

452.    In June 2018, the Board authorized a stock repurchase program and subsequently caused repurchases in every year of the Relevant Period, causing the Company to repurchase approximately $29.4 billion of UHG stock at prices artificially inflated by Defendants' fraud.[94] ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ These repurchase authorizations signaled to investors that the Director Defendants and management were bullish on the Company's prospects, despite their knowledge that the Company's whole business model depended on a fraudulent scheme that was unraveling.

---

[94] According to its Form 10-Ks, the Company repurchased approximately $7 billion in stock in 2022 at an average price of approximately $501.67 per share; $8 billion of stock in 2023 at an average price of $493.79 per share; $8.942 billion of stock in 2024 at an average price of $529.85 per share; and $5.503 billion of stock in the first half of 2025 at an average price of $454.82.

453. The Company made no repurchases of stock in the second half of 2025, after the scheme was fully disclosed.

### 2. The Company Relied on Defendants' False and Misleading Statements When Repurchasing Stock

454. In repurchasing shares through the stock repurchase program, the Company relied on Defendants' false or misleading statements and/or the integrity of the market price, either directly or through the "fraud on the market" doctrine in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

455. Throughout the Relevant Period, the Company expected Defendants to disclose material information as required by law and SEC regulations in public statements and periodic filings with the SEC. The Company would not have repurchased its securities at artificially inflated prices had Defendants disclosed all material information then known to them, as detailed in this Complaint. Thus, reliance by the Company should be presumed with respect to Defendants' omissions of material information as established under the *Affiliated Ute* presumption of reliance.

456. Additionally, the "fraud on the market" presumption applies to Defendants' misstatements of material fact or failures to disclose material facts. At all relevant times, the market for the Company's common stock was efficient, for the following reasons, among others:

- The Company's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

- As a regulated issuer, the Company filed periodic reports with the SEC and the NYSE;

- The Company's common-stock trading volume was substantial on a daily basis, exceeding an average of over 4.6 million shares per day throughout the Relevant Period;

- The Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services, the internet and investor conferences;

- The Company was followed by numerous securities analysts employed by major brokerage firms, including, but not limited to Baird, Bank of America, Bernstein, Deutsche Bank, HSBC, Jeffries, Raymond James, R.G. Associates, TD Cowen, and Wedbush, all of whom wrote reports that were distributed to those brokerage firms' sales force and certain customers, and each of those reports was publicly available and entered the public marketplace; and

- The market price of the Company's stock reacted rapidly to new information entering the market.

457. Accordingly, the market for UHG's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of the Company's stock. The foregoing facts indicate the existence of an efficient market for trading of UHG stock and support application of the fraud-on-the-market doctrine.

458. The Company relied on the integrity of the market price for the repurchase of its stock and is entitled to a presumption of reliance with respect to Defendants' misstatements and omissions alleged in this Complaint.

459. Had the Company known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, the Company would not have repurchased UHG's stock at artificially inflated prices

### 3. Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrine Applies to Defendants' Misrepresentations

460. Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward-looking statements under certain circumstances applies to any of the false or misleading statements pleaded in this Complaint. None constitutes a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions. Alternatively, to the extent any of the false or misleading statements could be construed as forward-looking, they were not accompanied by meaningful cautionary language.

461. Further, even if the PSLRA's safe harbor applied, Defendants are liable because at the time each statement was made, the speaker(s) knew the statement was false or misleading, or it was authorized or approved by an executive officer or Defendant who knew the statement was materially false or misleading when made.

### 4. Additional Facts Supporting a Strong Inference of Scienter

462. *Magnitude of Schemes and Centrality to UHG's Success*: The insurer-driven diagnoses at issue generated $8.7 billion in payments in 2021 alone—more than half of the Company's net income that year—and analysts estimated the Company's clawback exposure from CMS's 2018-2024 audits at as much as $20 billion. Indeed, when the V28

reforms curtailed the scheme, the Company had to resort to billions of dollars in "portfolio refinement" transactions to replace the earnings the scheme had produced. The scheme's centrality is confirmed by the scale of the business it protected: Medicare and Retirement, the Company's most profitable segment, generated over $139 billion in annual revenue—approximately 35% of the Company's total revenue. As a result, the Company pressured doctors "to treat patients as if they were fields of medical codes to be harvested, instead of people who have complex histories."[95]

463.   The scheme was implemented through highly structured, company-wide policies and processes—training programs, compensation incentives, quotas, audits, diagnosis-suggesting software, and "quality assurance" teams that pushed coding in only one direction—and operated within the most critical business segment. When V28 undermined the scheme, the Company's guidance collapsed. Statements about MA, HouseCalls, and the Company's risk-adjustment practices concerned the core of the Company's operations, about which its most senior officers are presumed to have known the truth.

464.   Defendants were also motivated to make false and misleading statements regarding the deficiency of its cybersecurity practices because the Change acquisition was integral to the Company's technological capabilities, cost structures, and the experience of providers, payers, and consumers. The Company described the acquisition as

---

[95] Bob Herman et al., "How UnitedHealth Harnesses Its Physician Empire To Squeeze Profits Out of Patients," *STAT News* (July 25, 2024), https://www.statnews.com/2024/07/25/united-health-group-medicare-advantage-strategy-doctor-clinic-acquisitions.

"foundational" to modernizing operations and creating a "technology-enabled healthcare platform." It touted the anticipated synergies, noting that "combining Optum's advanced data analytics with Change's intelligent healthcare network to support simpler, more informed, and accurate services and processing at considerably lower costs." In addition, during the Q1 2022 earnings call on April 14, 2022, Defendant Witty claimed the acquisition would result in "simplif[ied]" processes and "lower costs and better experience" in the health system." Then, on January 13, 2023, during the Q4 2022 earnings call, Defendant Witty stated that the "synergies of this combination" included a "more intelligent and simpler health system" and would enable the Company to continue to "innovate in and deliver" software, data analytics, and technology-enabled services.

465. *Actual Knowledge*: As described in detail *infra* § IX.B.1, Defendants were highly focused on the schemes at issue in the false and misleading statements, including providing or receiving regular Board reports that revealed the Company's misconduct with respect to fraudulent upcoding, antitrust violations and risk of vertical integration in healthcare, and lack of data and patient privacy. Indeed, the Board approved the vertical integration business model to evade the ACA's limits on insurer profits. And CW-1 and CW-2 described the rush to close the Change transaction, the lack of proper integration and acceptance of risk, executive sign-off on the risk register, and the downgrading of cybersecurity prior to the cyberattack.

466. Further, the Defendants regularly spoke on the misconduct at issue, including giving public statements, responding to analyst questions, and signing-off on SEC filings

regarding these topics and touting in the annual Proxy Statements their compliance with the Code of Conduct and its fair competition and fair dealing requirements.

467. In addition, Defendant Hemsley is the founder and owner of Cloverfields, which in 2023 fully sold out its $190 million UHG position, reflecting his knowledge of the misconduct and the impact it would have on UnitedHealth.

468. *Government Investigations*: The many government investigations—the DOJ's antitrust investigation, its civil fraud investigation, its criminal healthcare-fraud investigation, the OIG's repeated reports and audits, and the bipartisan Senate inquiries—and the Defendants' documented knowledge of them, including the November 6, 2023 executive-session briefing of the full Board, further support the inference. So does Witty's conduct: he spoke frequently and in detail about the HouseCalls program, underscoring his knowledge of it, or at minimum his reckless disregard of his obligation to speak truthfully about a subject he chose to address.

469. *Insider Trading*: As set forth *supra* § V.J, the Insider Trading Defendants capitalized on their materially false and misleading statements that inflated Company stock by disposing of shares at artificially inflated prices, reaping hundreds of millions from stock sales while in possession of material, non-public information. Indeed, when the Defendants learned of the DOJ's confidential antitrust investigation, the Officer Defendants responded by immediately selling tens of millions in UHG stock.

470. *Timing of Executive Departures*: Then-CEO Witty abruptly resigned on May 12, 2025—the same day the Company withdrew its 2025 guidance and one day before the *Wall Street Journal* reported the DOJ's criminal investigation—and the Compensation

Committee cancelled his recently granted performance stock units within weeks of his departure. Then-CFO and President Rex was announced to be departing on July 31, 2025—two days after the Company admitted that $3.65 billion in planned portfolio refinement transactions had been embedded in its 2025 guidance and that V28 would cost $11 billion over three years, an impact the Board had known of since 2023.

### 5. When the Truth Was Revealed, the Stock Price Crashed

471.    Throughout the Relevant Period, the price of UHG's common stock was artificially inflated by Defendants' materially false and misleading statements and omissions. When the truth was revealed through a series of partial disclosures, the artificial inflation dissipated and UHG stock price crashed. As a result of its purchases of the Company's shares during the Relevant Period, the Company suffered damages under the federal securities laws.

472.    On February 27, 2024, the *Wall Street Journal* reported on the DOJ antitrust investigation of the Company, including as to its MA billing and anti-competitive practices. As a result, the price of UHG stock dropped from closing at $525.32 on February 26, 2024, to closing at $513.42 on February 27, 2024, and continued to drop closing at $498.28 on February 28, 2024.

473.    Numerous outlets reported on the news and resulting stock price drop: *Reuters*, "UnitedHealth Shares Tumble After Report of Antitrust Investigation" (Feb. 28, 2024) ("Shares dropped about 5% on Wednesday following a report that the U.S. Department of Justice has launched an antitrust investigation into the healthcare conglomerate"); Rebecca Pifer Parduhn, *HealthcareDive*, "UnitedHealth Under Antitrust

Investigation by DOJ: Reports" (Feb. 28, 2024) ("Shares of UnitedHealth fell to their lowest level since September after news of the investigation broke."); *Bloomberg*, "UnitedHealth Executives Sold \$102 Million in Stock Before US Probe Became Public" (Apr. 11, 2024) ("Shares of UnitedHealth fell 5.2% in two trading sessions on Feb. 27-28, after the probe was widely reported in financial media.") (quoting Professor Charles Elson that the fact that shares fell after the news leaked "would suggest some materiality to investors").

474.   On February 21, 2025, the *Wall Street Journal* reported, during the trading day, a "new civil fraud investigation . . . examining the company's practices for recording diagnoses that trigger extra payments to its Medicare Advantage plans, including at physician groups the insurance giant owns." As a result, the price of UHG stock dropped from closing at \$502.42 on February 20, 2025, to closing at \$466.42 on February 21, 2025. CNBC reported that the Company "closed 7% lower on Friday following a report about the probe."

475.   On April 17, 2025, the Company reported disappointing first-quarter 2025 results and slashed its 2025 earnings guidance by roughly 12%, attributing the cut to problems in its MA business. On the analyst call, Witty tied the reduced outlook to difficulty adapting to the impact of V28 reforms to reduce the upcoding abuses (UHG's business model). As a result, the price of UHG stock dropped from closing at \$585 on April 16, 2025, to closing at \$454.11 on April 17, 2025. This was again covered by the press, including *The Minnesota Star Tribune* reporting that UHG stock closed down 22%, erasing

$120B in market value and CNBC interviewing a Bernstein analyst tying the stock drop to the last few years of DOJ scrutiny.

476. On May 13, 2025, the Company abruptly announced that Witty would depart and that it was rescinding its 2025 financial forecast. As a result, the price of UHG stock dropped from closing at $378.75 on May 12, 2025, to closing at $311.38 on May 13, 2025. CNBC reported the announcement sent shares "tumbling nearly 10%" as the Company "grappled with government investigations, a historic cyberattack," and other issues.

477. The next day, May 14, 2025, after the market closed, the *Wall Street Journal* reported the DOJ criminal investigation. As a result, the price of UHG stock dropped from closing at $308 on May 14, 2025, to closing at $274.35 on May 15, 2025. CNBC tied the stock price plunge to this news, and *FierceHealthcare* reported "UnitedHealth's stock has been in a slump" since the April "news of Witty's departure" and now was trading "at the lowest value in several years, and was down by nearly 20% Thursday following the news [of the criminal investigation]".

478. On May 21, 2025, *The Guardian* published an investigation that UHG paid nursing homes to stop or delay MA patients from hospital transfers to save money. As a result, the price of UHG stock dropped from closing at $321.58 on May 20, 2025, to closing at $302.98 on May 21, 2025. CNBC reported that "UnitedHealth shares fell more than 6% on Wednesday after the UK's *Guardian* newspaper" article. "The news is only seemingly getting worse for UnitedHealth," succinctly stated Sahak Manuelian, managing director, global equity trading at Wedbush. HSBC downgraded the stock to "reduce" from "hold," cutting the price target to a street-low of $270.

479.    On May 21, 2025, analysts at HSBC downgraded the Company's common stock to a "reduce" (sell) rating and cut their price target by roughly 45%, from $490.00 to $270.00 per share, pointing to the leadership change, the withdrawn 2025 guidance, and the allegations of Medicare fraud—developments that together had cut the Company's market capitalization roughly in half since its April 17, 2025 results.

480.    On July 24, 2025, the Company admitted it was under criminal and civil DOJ investigations regarding MA billing and on July 29, 2025, the Company disclosed that V28 reforms would cost approximately $11 billion over three years—an impact the Board had been quantifying internally since 2023—and conceded it had "misexecuted the planned efforts to offset these V28 funding cuts." The Company announced it was targeting a historically low MA margin; expected adjusted earnings would decline to $16 per share for 2025, down from earlier estimates of approximately $30 per share; and it was pausing or discontinuing its previously planned 2025 portfolio transactions and reducing its 2025 guidance by $3.65 billion as a result.

481.    Two days later, on July 31, 2025 it announced that it was replacing Rex, its chief financial officer since 2016 and its president since 2024. Market commentators reacted negatively to the news and the price of UHG stock dropped. In response to all of these revelations, the stock price crashed from $288.73 on July 23, 2025 to $234.70 on August 1, 2025

## C.    14(a) Violations

### 1.    The Director Defendants Caused UHG to Issue Materially False and Misleading Proxy Statements

482.    The Director Defendants also violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by issuing the false and misleading annual Proxy Statements described *supra* § VII.

483.    In each year of the Relevant Period, the Director Defendants solicited stockholder votes—for their own election or reelection, for advisory approval of executive compensation, and for other management proposals—through the Company's annual Proxy Statements, filed on April 22, 2022, April 21, 2023, April 22, 2024, and April 21, 2025 (together, the "Proxy Statements"). The materially false and misleading statements contained in each Proxy Statement—including the representations concerning the Board's "Enterprise-Wide Risk Oversight," the Company's compliance and ethics practices, the Governance Committee's conflicts-of-interest approval process, and the financial results whose true drivers Defendants concealed—are set forth in chronological context *supra* § VII, and each of those allegations is incorporated in this Section by reference.

484.    The Proxy Statements were materially false and misleading for the reasons detailed above: they touted financial results without disclosing that those results were driven by the upcoding scheme and, later, by the undisclosed portfolio refinement transactions; they represented that the Board and its committees were conducting robust oversight of the Company's compliance, risks, and internal controls when the Board was aware of pervasive misconduct and governance failures, or was aware of and ignored red

flags of such misconduct; and they represented that the Company maintained rigorous conflicts-of-interest controls ███████████████████████████████████

████████████████████████████████████████████████████████████

██████████ (UHG_00010405 at -10496).

485. The proxy statements' representations concerning the Board's "Enterprise-Wide Risk Oversight"—including that the Audit Committee "oversees management's internal controls and compliance activities" and that the HCPP Committee oversees clinical care and safety—were false and misleading in light of the conduct alleged above: the committees received information concerning the Company's pervasive misconduct and governance failures and responded with advocacy and communications strategies rather than reform. Defendants' disclosure breaches sustained the artificial inflation at which the Company repurchased approximately $29 billion of its own shares, secured the Director Defendants' reelections, and deprived stockholders of the information necessary to cast informed votes.

**2.     The False and Misleading Proxy Statements Were an Essential Link in the Director Defendants' Reelection and the Continuation of the Misconduct**

486. The false and misleading Proxy Statements were an essential link in the accomplishment of the harms alleged herein. On the strength of each Proxy Statement, the Company's stockholders—deprived of material information concerning the misconduct detailed in this Complaint—elected or reelected each of the Director Defendants at the Company's 2022, 2023, 2024, and 2025 annual meetings, and approved, on an advisory

basis, the executive compensation packages described above, and rejected certain shareholder proposals offered at annual meetings.

487.   At the 2022 Annual Meeting, held June 6, 2022, each of the eight director nominees was elected, and executive compensation was approved on an advisory basis by a vote of 736,876,105 to 46,176,651. At the 2023 Annual Meeting, held June 5, 2023, each of the nine director nominees was elected, and executive compensation was approved by a vote of 745,152,355 to 32,637,828. At the 2024 Annual Meeting, held June 3, 2024, each of the ten director nominees was elected, and executive compensation was approved by a vote of 729,597,136 to 29,075,527.

488.   At the 2025 Annual Meeting, held June 2, 2025—after only partial disclosure of the misconduct alleged herein—each of the nine director nominees was reelected, but by sharply reduced margins: Defendant Noseworthy received 105,639,631 votes against his reelection, Defendant Flynn 99,158,799, Defendant Hooper 62,277,727, and Defendant Hemsley 53,344,000, and executive compensation was approved by a vote of only 451,227,441 to 299,199,322. The sharp erosion in stockholder support that accompanied even partial disclosure confirms the materiality of the concealed information to stockholders' votes.

489.   Reelection of the Director Defendants, in turn, enabled the continuation of the misconduct and governance failures alleged herein: the reelected Director Defendants continued serving on the Board and committees through which the red flags passed; authorizing share repurchases; making or authorizing false and misleading statements;

approving a compensation structure keyed to manipulated earnings metrics; and permitting unlawful business practices.

490. Had the Proxy Statements disclosed the true facts, stockholders could have protected the Company by declining to reelect the Director Defendants, rejecting the compensation proposals, or otherwise—before the losses described *infra* § VIII were incurred.

## VIII.   HARM TO THE COMPANY

491. Defendants' breaches of fiduciary duty have inflicted catastrophic harm on UHG and exposed the Company to billions of dollars in damages, penalties, and ongoing expenditures that continue to mount.

492. ***Cyberattack and Breach-Related Losses***. The Change breach made possible by Defendants' oversight failures imposed enormous costs on the Company with total 2024 cyberattack quantified at $3.09 billion, or $2.60 per share. This includes $2.223 billion in direct response costs for the year ended December 31, 2024 alone; $867 million in business-disruption impacts at Optum Insight, reflecting lost revenue; and a $22 million ransom payment.

493. Nor did the losses end with fiscal 2024. To stabilize providers crippled by the outage, the Company advanced $9.03 billion in interest-free loans to care providers, of which $2.8 billion remains outstanding. In the fourth quarter of 2025, the Company recorded an additional $799 million charge to increase reserves for provider loans and other

customer balances it no longer expects to collect, recorded within operating costs at Optum Insight.

494.    The breach also exposed the Company to regulatory and litigation risk that persists today, including an investigation by HHS's Office for Civil Rights and a multidistrict data breach lawsuit, alleging among other claims that the Company violated HIPAA by failing to maintain an adequate data security system or adequately protect patient personal and confidential health information including as required by HIPAA.[96] On December 19, 2025, the district court judge granted in part and denied in part the defendants' motion to dismiss, holding that the plaintiffs sufficiently alleged (i) negligence per se based on the defendants' breach of their duty to provide adequate cybersecurity pursuant to the FTC Act and HIPAA; and (ii) state statutory violations.[97]

495.    ***Share Repurchase Losses***. UHG suffered approximately $14 billion in losses on the shares it repurchased at fraud-inflated prices. As detailed *supra* § V.H, between 2022 and mid-2025 the Company repurchased approximately $29.4 billion of its own stock—approximately 14 million shares in 2022 at an average price of $501.67 per share, 16 million shares in 2023 at an average price of $493.79 per share; approximately 17 million shares in 2024 at an average price of $529.85 per share; and approximately 12.1 million shares in the first half of 2025 at an average price of $454.82 per share—before

---

[96] Individual Plaintiffs' Master Compl. ¶ 382 *In re Change Healthcare, Inc. Customer Data Sec. Breach Litig.*, No. 0:24-md-03108-DWF-DJF, Dkt. No. 406; *see generally id.* ¶¶ 372 – 85.

[97] Order, *In re Change Healthcare, Inc. Customer Data Sec. Breach Litig.*, No. 0:24-md-03108-DWF-DJF (D. Minn. Dec. 19, 2025).

halting repurchases entirely once the fraud was disclosed (UHG_00003597 at -03638-39, -03642 and -03654). Measured against the $261.07 closing price on July 29, 2025, the decline in value of those repurchased shares alone is approximately $14 billion.

496. *Insider Trading Disgorgement*. UHG insiders sold more than $237 million in stock while in possession of material, non-public information, including more than $117 million before the DOJ's probe became public. These amounts are subject to disgorgement.

497. *DOJ Civil and Criminal Investigations.* UHG's misconduct in the MA program exposed the Company to massive federal civil and criminal liability under the False Claims Act (FCA), which imposes treble damages and civil penalties on those who knowingly submit false claims to the United States government. UHG's alleged upcoding scheme sits squarely in the crosshairs of that statute. Notably, the DOJ's broader FCA enforcement in the MA space reached record levels in fiscal year 2025. As the nation's most aggressive coder in MA, UHG faces tremendous exposure.

498. The DOJ's criminal investigation of UHG's MA billing practices in May 2025 represented a significant escalation beyond the civil probe, with potential consequences including criminal charges and associated fines.

499. CMS has announced that it will complete risk-adjustment data validation audits of every MA contract for payment years 2018 through 2024. The Company had received audit notices on 52 contracts as of August 2025, with more expected. Analysts estimate the Company's potential clawback exposure at as much as $20 billion. UHG_00003481 at -03571.

500. The Company faces potential civil damages, criminal penalties, clawback and repayment demands, and potential suspension or debarment from federal healthcare programs.

501. ***DOJ Antitrust Investigation***. The Company faces an ongoing DOJ antitrust investigation into its vertically integrated structure, including the UnitedHealthcare-Optum relationship; whether Optum's acquisitions harmed competition; whether UnitedHealthcare's contracting favored Optum-owned groups; and whether common ownership of insurers and providers impeded competition. The investigation also targeted whether combining UnitedHealthcare with Optum enabled the Company to evade federal MLR rules.

502. ***Securities Fraud Class Action***. Defendants' misconduct has also exposed the Company to extraordinary additional liability arising from a securities fraud class action pending in this District, targeting the upcoding scheme, portfolio refinement transactions, and other conduct described herein. *See California Public Employees' Retirement System v. UnitedHealth Group Inc.*, No. 0:24-cv-01743 (D. Minn. May 14, 2024).

503. That action exposes the Company to billions of dollars in potential judgment or settlement liability.

504. ***QuantaFlo Qui Tam Litigation***. The Company's use of QuantaFlo gave rise to a False Claims Act qui tam lawsuit against the Company and Semler, QuantaFlo's manufacturer, wherein the DOJ conducted a multi-year fraud investigation into "whether federal health programs paid out improper claims based on the use of QuantaFlo."

505.   On April 16, 2025, *STAT News* reported that Semler had "offered to pay the Department of Justice nearly $30 million" to settle the claims; with the article specifically noting that UHG uses QuantaFlo to diagnose PAD.[98] In September 2025, the DOJ formally intervened in the case for purposes of settlement with Semler specifically and finalized a settlement of $29.75 million. The Settlement Agreement states that from 2010-2024, Semler violated the False Claims Act by "knowingly causing, and conspiring to cause, the submission of false claims to Medicare Part B for tests performed using [QuantaFlo's predecessor] and QuantaFlo devices." Notably, the Settlement Agreement recited that QuantaFlo tests do not satisfy the CPT codes required for reimbursement and that Medicare has long deemed photoplethysmography non-reimbursable — a conclusion the Company's own reimbursement policy embraced, even as it relied on QuantaFlo-generated diagnoses to inflate its risk-adjustment payments.

506.   Since the DOJ's settlement with Semler, the plaintiffs in the original litigation filed an amended complaint against the Company on May 26, 2026 for False Claim Act violations based on UHG's "aggressive, centralized, and nationwide strategy to deploy Semler's products as a basis to diagnose its beneficiaries with PAD" and "automatic[]" mechanism to "capture[] the test results in the risk adjustment information submitted to Medicare." In light of the DOJ-Semler settlement, the complaint alleges that

---

[98] QuantaFlo was Semler's sole medical device product. The Company has since exited the medical space and is focusing on crypto. *See also STAT News*, "Semler Scientific Offers $30 Million Settlement Over QuantaFlo Device Fraud Allegations*,*" (April 16, 2025), https://www.statnews.com/2025/04/16/semler-scientific-quantaflo-unitedhealth-group-peripheral-artery-disease-doj-settle.

the Company "identified or acted in deliberate ignorance or reckless disregard of its receipt of overpayments arising from its use of QuantaFlo to diagnose enrollees with PAD" and "has not returned the overpayments it received arising from its submission of unsupported PAD diagnoses." As of the date of this Complaint, motion to dismiss briefing is ongoing and the United States filed a Statement of Interest making clear that use of QuantaFlo as a standalone diagnostic tool—the very conduct that UHG engaged in—is improper and violates FDA guidance.

507.   *Additional Litigation*. The Company also faces numerous lawsuits related to the misconduct described in this Complaint.

508.   *Algorithmic care denials*. A putative class action in this District alleges that the Company and its NaviHealth subsidiary used the nH Predict algorithm to improperly terminate coverage for MA members' skilled-nursing and home-health services; the court has allowed breach-of-contract and bad faith claims to proceed. *See Est. of Lokken v. UnitedHealth Grp., Inc.*, 766 F. Supp. 3d 835 (D. Minn. 2025).

509.   *Massachusetts AG Medicaid Fraud lawsuit*. On May 29, 2026, the Massachusetts AG filed an enforcement action alleging that UnitedHealthcare Insurance Company—a wholly owned subsidiary doing business as UnitedHealthcare Community Plans of Massachusetts—defrauded MassHealth of more than $100 million in violation of the Massachusetts False Claims Act.[99] The suit targets the same fraudulent upcoding

---

[99] The case is now in federal court. *See Commonwealth v. UnitedHealthcare Ins. Co.*, No. 2684CV01358 (Mass. Super. Ct. Suffolk Cnty. May 29, 2026). *See also Commonwealth v. UnitedHealthcare Ins. Co.*, No. 1:26-cv-12853 (D. Mass. June 23, 2026). *See also U.S. Dep't of Health & Hum. Servs.*, "AG Campbell Sues United Healthcare for Defrauding

scheme underlying the federal scrutiny described above, this time in the Company's MassHealth "Senior Care Options" plan for residents 65 and older. The complaint alleges that practices continued despite clear notice of their impropriety, including internal reviews documenting improper classifications, MassHealth audits identifying upcoding, employees telling leadership they were "frequently asked to change documentation . . . that was inaccurate," multiple reports to UnitedHealthcare's compliance team; and claims data showing many classified members received no treatment. It further alleges that UnitedHealthcare trained nurses "to conduct assessments with the goal of satisfying the requirements" for the highest rating.

510.    The Massachusetts AG alleged that UnitedHealthcare's "decision to choose profits over quality control and to incentivize overworked Field Nurses to code members higher" resulted in improper classifications and "higher capitated payments . . . than it should have." The scheme yielded over $100 million in excess payments.

511.    *Denial of Care*. The Company has also received adverse rulings and paid significant settlements to state attorneys general and private litigants in connection with lawsuits and investigations into unlawful denials of care.

512.    *Investigation and Legal Defense Costs*: UHG has spent and will continue to spend significant sums investigating and defending itself in each of these matters.

---

MassHealth Out of $100 Million," (May 29, 2026), https://oig.hhs.gov/fraud/enforcement/ag-campbell-sues-united-healthcare-for-defrauding-masshealth-out-of-100-million.

513.   ***Reputational Harm***. The convergence of the multiple overlapping scandals described above has inflicted severe and lasting reputational harm on the Company, destroying hundreds of billions of dollars in shareholder value and eroding the trust of customers, regulators, and the investing public. By August 2025, UHG's stock had fallen 55% from its December 2024 levels, representing a loss of over $277 billion in market value—a decline attributable not merely to financial underperformance, but to the reputational crises engulfing the Company. Indeed, UHG's own executives acknowledged in April 2025 that "the company had an image problem, and needed to communicate better with their customers about its coverage decisions and processes."[100]

514.   The reputational damage to UHG has been documented by market analysts, credit rating agencies, and brand intelligence firms. Infegy, a brand intelligence firm, conducted a comprehensive analysis of public sentiment and concluded that UHG presented "a rare convergence of sentiment, volume, and narrative trajectory that suggests long-term reputational damage":

> **UnitedHealthcare is navigating one of the most turbulent stretches in its corporate history, and social data suggests the company is still very much in the eye of the storm.** What began as a shocking and rare catalyst, the assassination of a high-profile CEO has cascaded into a much broader crisis encompassing legal scrutiny, financial underperformance, and sustained public mistrust.
>
> Infegy's social intelligence platform reveals that this isn't just a typical PR dip or an episodic controversy. Instead, we're witnessing a rare convergence of sentiment, volume, and narrative trajectory that suggests long-term reputational damage.

---

[100] *Axios*, "Buffett's Berkshire Hathaway Takes Stake In UnitedHealth," (Aug. 15, 2025), https://www.axios.com/2025/08/15/buffett-unitedhealth-stock.

**What makes this case particularly alarming is the absence of any rebound signals.** Brands typically recover once a news cycle cools down or once remedial action is taken. However, here, the conversation has not only persisted, but it has also evolved and intensified. The public has shifted from outrage over a singular event to sustained skepticism about the company's ethics, leadership, and viability as a trustworthy healthcare provider.

Infegy further noted that, beginning in February 2025, UnitedHealth became increasingly associated in public discourse with terms like "missed earnings," "stock downgrade," and "executive sell-off" — language that signaled, according to Infegy, "an erosion of trust not only among consumers but also among institutional investors and market analysts."[101]

515.   Independent market observers reached the same conclusion. A September 2025 financial analysis found that UHG faced "severe reputational damage, a loss of trust among healthcare providers, and the looming specter of hefty fines and potential structural changes mandated by federal regulators." Major equity analysts across Wall Street downgraded UHG stock, including:

- Bank of America, which cut UHG from Buy to Neutral in May 2025 and slashed its price target from $560 to $350 following the Company's guidance withdrawal and CEO resignation.

- Raymond James, which downgraded UHG from Strong Buy to Market Perform in May 2025, citing the compounding challenges of, among other things, guidance suspension, and leadership change, and noting, "it will be awhile before the smoke clears."

- TD Cowen, which downgraded UHG from Buy to Hold and slashed the price target from $520 to $308 in May 2025, lowering it again in July 2025 to $275, noting that the potential criminal investigation "adds further uncertainty."

---

[101] *Id. Infegy*, "A Look Back At UnitedHealthcare's Compounding Crises" (June 5, 2025), https://www.infegy.com/insight-brief/a-look-back-at-unitedhealthcares-compounding-crises.

- HSBC, which downgraded UHG to Reduce in May 2025, and lowered its price target from $490 to $270 (and lowered it again to $240 in July 205) and warned of a "delayed" potential recovery.

- Baird, which downgraded UHG twice—from Outperform to Neutral in June 2025, then from Neutral to Underperform/Strong Sell in July 2025, slashing the price target from $510 in May 2025 to $198 in July.

516. Credit rating agencies[102] downgraded UHG's credit outlook, increasing the Company's cost of borrowing and limiting access to capital:

- Moody's downgraded UHG's credit outlook from Stable to Negative in June 2025, citing "a number of adverse trends simultaneously" which had caused UHG's "financial and operating performance [to fall] below its typical standards."

- S&P Global, which downgraded UHG's credit outlook from Stable to Negative in a separate report published the same month, with both agencies noting the downgrades were unusual for the insurance giant.

- Fitch, which revised UHG's credit outlook to Negative from Stable.

517. The breadth and speed of these downgrades, across both equity analysts and credit agencies, demonstrated the market's assessment that the Company's misconduct caused fundamental, not merely cyclical, damage to UHG financial standing and long-term prospects.

518. The Company is now routinely described as the "poster child of a dysfunctional health care system" and as "perpetually mired in controversy and grievance," and years of repeated scandal have produced bipartisan calls in Congress to break the Company up.

---

[102] The Company's 2025 Annual Report (10-K) expressly warned: "A significant downgrade in our credit ratings or adverse conditions in the capital markets may increase the cost of borrowing for us or limit our access to capital."

519.    Indeed, on February 24, 2025, Senator Chuck Grassley launched an inquiry into the Company's Medicare billing practices, citing the *Wall Street Journal*'s reporting and Third OIG Report's as raising "serious questions" about "apparent fraud, waste, and abuse" that "harms not only Medicare beneficiaries, but also the American taxpayer." Rep. Greg Murphy (R-NC), a urologist, described UHG's practices as "immoral" and Chair Rep. David Schweikert (R-AZ) launched an inquiry by the House Ways and Means Committee.

520.    The Company's aggressive efforts to silence its critics have compounded the damage. A surgeon posted a social-media video describing her experience of receiving a call from UHG about insurance coverage while she was in surgery; UHG hired a law firm to pressure her to take the video down. They also hired a law firm to force Amazon and Vimeo to remove an amateur documentary series critical of Optum Rx. When activist investor Bill Ackman publicly stated that he "would not be surprised to find that the company's profitability is massively overstated due to its denial of medically necessary procedures and patient care," the Company contacted the SEC and retained counsel to pressure him to remove the post—prompting Ackman to respond publicly that the SEC should "take a very close look" at the Company and that the Board "should launch an immediate investigation" into its MA practices. Each episode generated further coverage of the underlying misconduct while confirming that the Company's instinct, at every level, was suppression rather than reform.

## IX.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

### A.   Derivative Allegations

521.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

522.   Plaintiffs are current owners of UHG common stock and were owners throughout the Relevant Period. UHG is named as a Nominal Defendant solely in a derivative capacity. This action is not collusive to confer jurisdiction on this Court.

523.   Plaintiffs bring this action derivatively to redress injuries suffered, and to be suffered, by the Company as a direct result of Defendants' breaches of fiduciary duty, misappropriation of material non-public information, unjust enrichment, and violations of Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 and Rules 10b-5 and 14a-9 promulgated thereunder, and to obtain contribution and indemnification. Plaintiffs will adequately and fairly represent the interests of UHG and have retained counsel experienced in litigation of this kind. Prosecution of this action, independent of the current Board, is in the Company's best interests.

### B.   Demand Futility Allegations

524.   Plaintiffs LF and ERSRI intervened in this action, and futility is assessed as of the original complaint. At that time, the UHG Board consisted of the following directors: Defendants Hemsley, Baker, Flynn, Garcia, Gil, Hooper, McNabb, Montgomery Rice,

Noseworthy, and Witty (the "Demand Board"). Demand on the Board is futile because a majority of the directors are not disinterested, lack independence, or both.103

### 1.   All Demand Board Members Face a Substantial Likelihood of Liability

#### a.   The Full Demand Board Faces a Substantial Likelihood of Liability for Breach of Fiduciary Duty

525.   UHG's misconduct pervaded the Company's mission-critical business and included breaches of fiduciary duty and overt misrepresentations to investors, regulators, and the courts during the Relevant Period concerning: the MA business; the Company's largest acquisition; its portfolio refinements and stock repurchases; and insider trading by UHG's Chairman, CEO, and Chief Executive of its largest operating segment.

526.   The Demand Board was directly informed of and surrounded by red flags regarding this misconduct and serious regulatory concerns, yet took no action to ensure compliance.  Instead, the Demand Board repeatedly "found a way" to maintain 13% to 16% annual earnings growth at the expense of abiding by laws and regulations, ███ ████████████████████████████████████ ███████████████████. UHG_00005565 at -05565.

527.   A strategy of illegality to generate earnings constitutes bad faith and each member of the Demand Board faces a substantial likelihood of liability for breach of

---

103 The futility of making a demand is made clear by ████████████ ████████████████████████████ UHG_00007233 at -07363.

fiduciary duty because they adopted, participated in, or consciously disregarded the resulting illegal practices.

b.     **Actual Knowledge and Red Flags Common to All Demand Board Members**

528.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ UHG_00006325 at -06328, -06358–59, -06368) ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ UHG_00000822 at -00827.

529.   As the public scrutiny continued, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ UHG_00002871) ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ UHG_00002997 at -02997–03000 ▮▮▮

▮▮▮▮▮▮ UHG_00010111 at -10114–15 ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ UHG_00002871 at -02872 ▮▮▮

▮▮▮▮▮. UHG's misconduct was regularly reported on by major national publications, and the 220 production makes clear that ▮▮▮▮▮▮▮▮▮▮▮

104 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

UHG_00002871 at -02872.

███████████████████████████████████████████

███████████████████████████████████████████

████    UHG_00001342 at -01342–55 (████████████████

████████████████████████); UHG_00001295 at -01296 (████████

███████████████████████████████████████████

████████████████████); UHG_00003002 at -03003 ███

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████. It is difficult for

the Demand Board to feign lack of knowledge after receiving an investigative report titled

███████████████████████████████████████████

███████████████████

530.    The Demand Board was also well aware of antitrust and data privacy

misconduct. ████████████████████████████████

█████████████████████ UHG_00004410 at -04410 (███████████

████████████████████████████████████). ███████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████ UHG_01356. ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████ HG_00005125 at -05131;

UHG_00004338 at -04348. Once the DOJ antitrust investigation was underway, ███████████

███████████████████████████████████████████████████

██████████ UHG_00000225; UHG_00001294.

531. And as discussed *supra* § V.G.4, the Board was well aware of the portfolio refinement earnings manipulation.

532. This cascade of information creating actual knowledge or clear red flags of UHG's misconduct creates a substantial likelihood of liability.

533. In the face of all of this information, the Board chose profit over legal compliance. ████████████████████████████ UHG_00000001 at -00007; UHG_00000205 at -00211)██████████████████████—capturing the Board's posture across four years of escalating knowledge and red flags. The Demand Board, like its leader, chose to "find a way" to generate earnings. It endorsed lobbying and public-relations campaigns designed to preserve a business model built on regulatory noncompliance, exposing each director to a substantial likelihood of liability.

      **c.     Committee-Specific Evidence of Actual Knowledge or Red Flags**

          *i.     Audit Committee Defendants (Flynn, Garcia, Gil, Hooper, and McNabb)*

534. In addition to information known or red flags available to the full Demand Board, the Audit Committee Defendants ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████ .

535. ███████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████ .

536. ███████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

UHG_00004029 at -04044–45.

537. ███████████████████████████████████

█████████████████████████████████████████

UHG_00005697 at -05709.██████████████████

█████████████████████████████████████████

██████   ▪

538. ███████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████ UHG_00002285 at -02411–12.

539. ███████████████████████████████████

█████████████████████████████████████████

███████████████████████████████ UHG_00000895 at -00930.

540. ███████████████████████████████████████

████████████████████████████████████████████

██████████ UHG_00002285 at -02327. ██████████████████████

████████████████████████████████████████████

██████████ UHG_00002285.

        *ii.*      *HCPP Committee Defendants (Hooper, Montgomery Rice, and Noseworthy)*

541. In addition to information known or red flags available to the full Demand Board, ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

542. ███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████ UHG_00006943 at -06997, -06945.

██████████████████████████████████████████████

████████████████████████████████████████████

████████████

544. ███████████████████████████████████████

████████████████████████████████████████████

██████████ UHG_00007524 at -07527. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ UHG_00007524 at -07530.

545.   ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ UHG_00001094 at -01095.

> *iii.*      *Governance Committee Defendants (Defendants Flynn, Hooper, McNabb, and Noseworthy)*

546.   In addition to information known or red flags available to the full Demand Board, the Governance Committee Defendants ████████████████████

████████████████████████████████████████████████

████████████████████████████████████

███ ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

---

[105] The specific date of this document is unclear due to Defendants' redactions. However, it appears to be from 2022. *See* UHG_00008229 at -08233 (indicating document is from before the 2022 election), -08235 ████████████████████████

██████████████████████████████████████

– 190 –

548. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ UHG_00007007 at -07013.

549. ███████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████ UHG_00005807 at -

05849.

550. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

UHG_00004879 at -5003; UHG_00005958 at -05962.

551. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ UHG_00001742 at -01744.

552. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

UHG_00007007 at -07013; UHG_00003679 at -03680–81.

> iv.    *CHR Committee Defendants (Flynn, Montgomery Rice, and Noseworthy)*

553. In addition to information known or red flags available to the full Demand Board, the CHR Committee Defendants received ███████████████████████ ██████████████████████████████████████████████ ██████████████████████

554. ██████████████████████████████████ ████████████████████ UHG_00011670 at -11691.

555. ██████████████████████████████████ █████████████████████████████ (UHG_00010450 at -10451) ███████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████. UHG_00010450; UHG_00011670. ██████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████ UHG_00010938 at -10939, -10944. This selective use of adjustment authority resulted in artificially inflated executive bonuses, wasting corporate assets and demonstrating that the CHR Committee rewarded earnings manipulation.

**d.      The Full Demand Board Faces a Substantial Likelihood of Liability for Breach of Fiduciary Duty and Violations of Section 10(b) and 14(a)**

556.    The Demand Board's involvement in (i) the misconduct described herein and (ii) the Company's SEC filings and public statements exposes each to a substantial likelihood of liability under Sections 10(b) and 14(a) of the Exchange Act, corporate waste, and for breach of their fiduciary duty of disclosure under *Malone*.

557.    Each member of the Demand Board signed one or more of the Company's materially false and misleading Annual Reports on Form 10-K—Hemsley, Flynn, Garcia, Hooper, McNabb, Montgomery Rice, and Noseworthy for fiscal years 2021 through 2024; Gil for 2022 through 2024; and Baker for 2023 and 2024—and each approved the false and misleading Proxy Statements issued to shareholders during their respective tenures. ███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████ .*g.*,

UHG_00000221 at -00221–222 █████████████████████

████████████████████ UHG_00010386 ███████████████

███████████████████████████████████████████████

UHG_00008280 at -08280 ██████████████████████████

███████████████████████████████████████████████

█████████████████████ UHG_00011504 at -11506-07 ███████

██████████████████████████████████████ ; UHG_00000895

at -00938, -00940 ██████████████████████████████████████████████████████

██████████

558. ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████ UHG_00001102 at -01104–05; UHG_00003939 at

-03943.

### e.   The Full Demand Board Faces a Substantial Likelihood of Liability for Corporate Waste

559.   As discussed in detail *supra* § V.G, the Demand Board approved improper portfolio refinement tactics to manipulate earnings in order to hit targets, and therefore each faces a substantial likelihood of liability for corporate waste and breach of their fiduciary duty.

### f.   Additionally, Defendants Hemsley, Witty, and Thompson Face a Substantial Likelihood of Liability for Violation of Brophy

560.   As discussed in detail *supra* § V.J, Defendants Hemsley, Witty, and Thompson face a substantial likelihood of liability for insider trading in violation of *Brophy*.

### 2.   A Majority of the Demand Board Lacks Independence

561.   All members of the Demand Board ████████████████████████

██████████████████████████████████████████████████████████████

UHG_00007233 at -07363. ████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████. Now,

they have a self-interest to justify and defend that decision and cannot independently examine whether to authorize suit following the Change data breach.

562.    Certain directors also lack independence for additional reasons.

### g.    Defendant Hemsley

563.    First, Hemsley is not independent, as UHG's proxy materials during the Relevant Period acknowledge. As CEO, his continued employment and compensation depend on approval by the other Board members, creating an inherent conflict that precludes him from impartially considering claims against them.

564.    Second, as an officer, he is personally involved in the misconduct and leading the businesses that are at issue in this case, preventing him from impartially deciding whether to sue himself for his own actions or his fellow officers and directors for approving or allowing those actions.

565.    Third, in addition to the claims discussed above, Defendant Hemsley personally enriched himself by selling more than $211 million in Company stock while in possession of material non-public information—sales for which he faces liability under *Brophy*, and that Congress members have asked the SEC to investigate.

566.    Fourth, Hemsley's private investment vehicle, Cloverfields Capital Group, owned a substantial number of shares in UHG which it sold in the open market at a profit (and at a profit to Hemsley) due to the material misstatements and omissions that inflated the price during the period in which the shares were sold.

567. Fifth, Hemsley's family ties create another basis for his lack of independence. His son Matthew serves as CEO of Piper Heartland Healthcare Crossover Fund I, LP—a private healthcare investment fund the Company's records identify as a Hemsley-affiliated entity—and as a director of Melodi Health, LLC; his son John is employed by Clovertrust, LLC, one of the Hemsley-controlled entities. Under corporate governance, UHG's proxy touts that "[t]o avoid potential conflicts of interest, a director is required to seek approval of the Governance Committee if the director or his/her immediately family member proposes to engage in a transaction or activity in the health care field." ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ (UHG_00008389 at -08415; UHG_00008613 at -08638; UHG_00008926 at -08952; UHG_00009153 at -09179; UHG_00009424 at -09450; UHG_00009041 at -09066; UHG_00009816 at -09842; UHG_00000001 at -00002–04; UHG_00000205 at -00206–08).

### h. Defendant Flynn

568. Defendant Flynn's financial entanglements with Hemsley make him non-independent.

569. *Cloverfields Management Fee Conflict*: ███████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

████ (UHG_00009648 at -09652–53). ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ (*Id.*, -09653). Zaetta is the Company's Executive Vice President, Chief Legal Officer and Corporate Secretary—the officer to whom directors are instructed to report changes to their questionnaire responses—██████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ (UnitedHealth Group Inc., Form 10-K for FY2025, at "Information About Our Executive Officers") (Zaetta has served as EVP, Chief Legal Officer and Corporate Secretary since May 2024); Hemsley 2025 D&O Questionnaire, UHG_00009648 at -09672 ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████ (Feb. 2024 Governance Comm. Consent Agenda, UHG_00010405 at -10406; Feb. 2025 Governance Comm. Consent Agenda, UHG_00010945 at -10946). ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████ UHG_00010405 at -10405–10406; UHG_00010945 at -10945–46; UHG_00011619 at -11621–22). ██████████████████████████

████████████████████████████████████████████

██████████████████████████████████████ (UHG_00009648 at -09671).

570.   ***Governance Committee Conflict***: ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████ (UHG_00011512 at -11512; UHG_00010405 at -10405; UHG_00010945 at -10945). The Governance Committee has primary authority under both the Director Conflict of Interest Policy and the Related-Person Transactions Approval Policy to approve transactions involving potential director conflicts. The Director Conflict of Interest Policy requires directors to provide advance notice of healthcare-related transactions and empowers the Committee to impose safeguards including restricting information access, requiring recusal, public disclosure, or requesting resignation. The Related-Person Transactions Approval Policy requires Committee approval of any transaction involving a director in which UHG is a participant and the amount involved exceeds $120,000.[106] ██████████████████████████

---

[106] The 2021 and 2025 versions of the Policy maintain the same substantive framework, with no changes to these monetary thresholds, the Committee's approval authority, the prohibition-unless-approved structure, or the core approval factors.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

571.   ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

(UHG_00009314 at -09412; UHG_00009424 at -09432, -09441 and -09530).

### i.   Defendant McNabb

572.   ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ (Hemsley 2025 D&O Questionnaire, Q. 49-50, UHG_00009648 at -09670-71.)

573.   McNabb is also compromised by the *Governance Committee Conflict* (like Flynn).

– 199 –

574.   And he is subject to the *Compensation Committee Conflict*; McNabb and the other members lack independence, ███████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

(UHG_00009648 at -09667, -09684). █████████████████████

██████████████████████████

### j.   Defendant Montgomery Rice

575.   Montgomery Rice is compromised by the **Compensation Committee Conflict** (like McNabb). Additionally, Defendant Montgomery Rice lacks independence from Hemsley because in April 2025, the Cloverfields Foundation—of which Hemsley is a Director and Board Member—made a $100,000 donation to Morehouse, where Montgomery Rice is the President and CEO of the Morehouse School of Medicine (UHG_00009648 at -09670; UHG_00008389 at -08391). Additionally, the 2025 Proxy Statement discloses that Morehouse paid UHG approximately $483,000 for claims software, equipment, maintenance licenses and subscriptions, and UHG paid Morehouse approximately $1,400,000 for services as a network care provider in 2024. ████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████ UHG_00008389.

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████



UHG_00008389.

576. 

UHG_00008503; UHG_00008389.

### k.    Defendant Garcia

577.    Garcia is compromised by the **Compensation Committee Conflict** (like McNabb).

### l.    Defendant Noseworthy

578.    Noseworthy is compromised by the **Compensation Committee Conflict** (like McNabb), and the **Governance Committee Conflict** (like Flynn).

### m.    Defendant Hooper

579.    Hooper is compromised by the **Governance Committee Conflict** (like Flynn).

### n.    Defendant Witty

580.    First, Witty is not independent, as UHG's proxy materials from 2022 through 2025 acknowledge. As a senior officer of UHG he received compensation awarded to him by the Board of more than $113 million, creating a conflict that precludes him from impartially considering claims against them. In addition, as a senior executive of UHG, he was personally involved in the misconduct and false and misleading statements described herein, further undermining his independence and impartiality.

**o.  The Full Demand Board Lacks Independence to Consider the Brophy Claims**

581.  The Demand Board cannot impartially consider the *Brophy* claims against Defendants Hemsley, Witty, and Thompson because the same underlying facts and legal violations go to the *Brophy* claims as to the breach of fiduciary duty claims against the other members of the Demand Board. The Demand Board could not find *Brophy* violations without, by implication, finding that they were themselves at fault and so are not independent as to the *Brophy* claim.

**p.  The Full Demand Board Members Lack Independence Due to Their Financial Dependence on their Compensation as UHG Directors**

582.  The Demand Board's independence is further compromised by its demonstrated unwillingness to hold insiders accountable.



(UHG_00005958 at -05962),

(UHG_00005958 at -05964)—even after seventeen Members of Congress asked the SEC to investigate those sales. A Board that declined to hold its Chairman and senior officers accountable for more than $237 million in suspicious stock sales cannot impartially decide whether to sue them now.

583.  The directors' stake in the status quo is significant. As set forth *supra* § IV.C, each director earned substantial compensation for serving on the board and several have no other employment—Flynn (since 2011), Garcia (since 2014), McNabb (since 2018), Noseworthy (since 2018), and Gil (since 2024)—making Board compensation a material

portion of their income and deepening their interest in renomination by the colleagues a demand would require them to sue.

## X.    CLAIMS AGAINST DEFENDANTS

### COUNT I

### (Breach of Fiduciary Duty Against the Director Defendants)

584.   Plaintiffs reallege and incorporate by reference each of the foregoing allegations as if fully set forth herein.

585.   Each Director Defendant owed fiduciary duties to UHG and its stockholders. By reason of their fiduciary relationships, the Director Defendants owed UHG the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the Company's affairs, including financial reporting, internal controls, compliance with legal and regulatory requirements, and compensation practices.

586.   Each of the Director Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to UHG and its stockholders in at least the following ways: (i) knowingly maintaining, expanding, and concealing illegal business practices—including the MA upcoding scheme, the algorithmic denial of post-acute care, the anti-competitive suppression of rival providers, portfolio refinement transactions, and the false firewall representations—that they knew violated positive law; (ii) consciously disregarding, in bad faith, the red flags detailed herein concerning the Company's MA coding compliance, information security, and anti-competitive conduct; (iii) causing or permitting the Company to issue materially false and misleading statements to stockholders, regulators, and the public, and failing to correct

them; (iv) causing or permitting the Company to repurchase approximately $29.4 billion of its own stock at prices they knew were artificially inflated; (v) approving the manipulation of the Company's reported earnings through undisclosed one-time asset sales and measuring executive compensation against the manufactured results; (vi) allowing Defendants Hemsley, Witty, and Thompson to misappropriate the Company's material non-public information for personal gain through insider stock sales; and (vii) failing to implement and maintain adequate internal controls and reporting systems with respect to the Company's mission critical legal and compliance obligations.

587.   Defendants, individually and in concert, engaged in the above-referenced conduct in intentional, reckless, or grossly negligent breaches of the fiduciary duties they owed to UHG to protect its rights and interests.

588.   In breach of their fiduciary duties owed to UHG, Defendants willfully participated in misrepresentations related to the Company's compliance and risk of their MA billing practices and HouseCalls, financial and legal risk, and other issues, failed to correct the Company's public statements, and failed to fully inform themselves prior to making decisions as directors, rendering them personally liable to the Company for breaching their fiduciary duties.

589.   Defendants had actual or constructive knowledge that they caused the Company to misrepresent the risks of MA billing practices and HouseCalls, and the Company's financial condition, yet failed to correct the Company's public statements. Defendants had actual knowledge of the misstatements and omissions set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and disclose

material facts available to them. Such misrepresentations and omissions were made knowingly or recklessly, and artificially inflated the price of UHG's securities.

590. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

591. Additionally, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including the charters of various Board committees and Codes of Conduct that, had they been discharged in accordance with the Director Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

592. The claims are not subject to an exculpatory provision. As detailed in this Complaint, the Director Defendants' misconduct involved: (i) breaches of their duty of loyalty; (ii) acts or omissions that involved intentional misconduct or a knowing violation of law constituting bad faith; and (iii) personal benefits to themselves.

593. As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, UHG has sustained and continues to sustain significant damages, and the Director Defendants are liable to the Company.

## COUNT II

### (Breach of Fiduciary Duty Against the Officer Defendants)

594. Plaintiffs reallege and incorporate by reference each of the foregoing allegations as if fully set forth herein.

595. This Count is brought against Defendants Hemsley, Witty, Rex and Thompson solely in their capacity as officers.

596.   The Officer Defendants owed fiduciary duties to UHG and its stockholders. By reason of their fiduciary relationship, the Officer Defendants owed UHG the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the Company's affairs, including MA billing practices and HouseCalls compliance, financial reporting, internal controls, compensation practices, and truthful public statements.

597.   Each of the Officer Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to UHG and its stockholders in at least the following ways: (i) knowingly maintaining, expanding, and concealing illegal business practices—including the MA upcoding scheme, the algorithmic denial of post-acute care, the anti-competitive suppression of rival providers, portfolio refinement transactions, and the false firewall representations—that they knew violated positive law; (ii) consciously disregarding, in bad faith, the red flags detailed herein concerning the Company's MA coding compliance, information security, and anti-competitive conduct; (iii) causing or permitting the Company to issue materially false and misleading statements to stockholders, regulators, and the public, and failing to correct them; (iv) causing or permitting the Company to repurchase approximately $29.4 billion of its own stock at prices they knew were artificially inflated; (v) approving the manipulation of the Company's reported earnings through undisclosed one-time asset sales and measuring executive compensation against the manufactured results; (vi) in the case of Defendants Hemsley and Thompson, misappropriating the Company's material non-public information for personal gain through insider stock sales; and (vii) failing to

implement and maintain adequate internal controls and reporting systems with respect to the Company's mission critical legal and compliance obligations.These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests. In breach of their fiduciary duties owed to UHG, Defendants willfully participated in misrepresentations related to the Company's compliance and risk of their MA billing practices and HouseCalls, financial and legal risk, and other issues, failed to correct the Company's public statements, and failed to fully inform themselves prior to making decisions as directors, rendering them personally liable to the Company for breaching their fiduciary duties. Defendants had actual or constructive knowledge that they caused the Company to misrepresent the risks of MA billing practices and HouseCalls, and the Company's financial condition, yet failed to correct the Company's public statements. Defendants had actual knowledge of the misstatements and omissions set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and disclose material facts available to them. Such misrepresentations and omissions were made knowingly or recklessly, and artificially inflated the price of UHG's securities.

598.   As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, UHG has sustained and continues to sustain significant damages.

599.   As a result of the misconduct alleged in this Complaint, the Officer Defendants are liable to the Company.

## COUNT III

**(Breach of Fiduciary Duty under *Brophy* for Insider Selling and Misappropriation of Confidential Information Against the Insider Trading Defendants)**

600.    Plaintiffs reallege and incorporate by reference each of the foregoing allegations as if fully set forth herein.

601.    At the time of the stock sales set forth above, the Insider Trading Defendants (Defendants Hemsley, Witty, and Thompson) possessed material, non-public information regarding the risk of MA billing practices and HouseCalls, the ongoing investigations, and the false and misleading statements, and sold UHG stock motivated, in whole or in part, by such information. To the extent any sales occurred pursuant to a Rule 10b5-1 trading plan, such plan was entered into while each defendant possessed material, non-public information and was motivated, in whole or in part, by such information.

602.    The information described above was proprietary non-public information concerning the Company's unlawful conduct associated with its MA billing and financial disclosure practices. The information was a proprietary asset belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold UHG common stock.

603.    The Insider Trading Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of UHG common stock. The Insider Trading Defendants' sales of UHG common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty

and good faith. The Insider Trading Defendants are therefore liable to the Company for insider trading.

604. Because the use of the Company's proprietary information for personal gain constitutes a breach of the fiduciary duties of the Insider Trading Defendants, the Company is entitled to disgorgement and/or the imposition of a constructive trust on any profits obtained thereby.

605. Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT IV

**(Violation of §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Against the Individual Defendants)**

606. Plaintiffs reallege and incorporate by reference each of the foregoing allegations as if fully set forth herein.

607. During the Relevant Period, the Individual Defendants disseminated or approved false or misleading statements about UHG as detailed above, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and the Individual Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

608. At the same time that the price of the Company's common stock was inflated due to the Individual Defendants' false or misleading statements, the Individual Defendants caused the Company to repurchase millions of shares at artificially inflated prices. The Individual Defendants engaged in a scheme to defraud UHG by causing the Company to

purchase millions of shares of UHG stock at artificially inflated prices. Defendants Hemsley, Witty, and Thompson also used the Company's non-public information to sell their stock at artificially inflated prices.

609. The Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon UHG in connection with the Company's purchases of UHG stock during the Relevant Period.

610. The Individual Defendants, individually and in concert, by use of interstate commerce or the mails, engaged in a continuous course of conduct that operated as a fraud on the Company; made false or misleading statements of material facts and omitted to state material facts necessary to make the statements made not misleading; made the above statements intentionally or with severe reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of UHG stock, which were intended to, and did: (a) deceive UHG regarding the MA billing practices, the risks of its illegal business practices, data security practices, portfolio refinement transactions, internal controls and compensation practices, and the Company's financial statements; (b) artificially inflate and maintain the market price of UHG stock; and (c) cause UHG to purchase stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the Relevant Period, the Individual Defendants possessed

material, adverse non-public information regarding the risks of the Medicare billing practices, HouseCalls, and portfolio refinement transactions.

611.   The Individual Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made, as alleged above.

612.   The Individual Defendants acted with scienter throughout the Relevant Period, in that they acted with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions set forth herein were either known to the Individual Defendants or were so obvious that they should have been aware of them.

613.   The Individual Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock.

614.   As a result of the Individual Defendants' misconduct, UHG has suffered and will continue to suffer damages. The Company paid artificially inflated prices for UHG common stock purchased through the repurchase program and suffered losses when the previously undisclosed facts relating to MA billing practices, HouseCalls, and the portfolio refinement transactions were disclosed beginning in February 2024 and continuing through July 2025. UHG would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation caused by the Individual Defendants' false or misleading statements. UHG was also damaged by Defendants Hemsley, Witty, and Thompson's use of non-public information to sell their stock.

615.   As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company has sustained and continues to sustain significant damages,

including damages in connection with its purchases of UHG stock during the Relevant Period. By reason of such conduct, the Individual Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5. Plaintiffs bring this claim within two years of the discovery of the violation and within five years of the violation, as well as tolling applying to each claim.

## COUNT V

### (Violation of §14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 Against the Officer Defendants)

616.    Plaintiffs reallege and incorporate by reference each of the foregoing allegations as if fully set forth herein, except to the extent any such allegation alleges fraud, scienter, or recklessness, which allegations are expressly disclaimed and are not incorporated into this Count.

617.    This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Officer Defendants. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

618.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation

of a proxy for the same meeting or subject matter which has become false or misleading.

619.    The Officer Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders which were contained in the Company's 2022, 2023, 2024 and 2025 Proxies, as identified *supra* § VII.A. These Proxies contained proposals to UHG shareholders urging them to elect and re-elect members of the Board and provide advisory votes on issues relating to executive compensation. These Proxies contained false and misleading statements concerning (i) UHG's financial success and compliance with standards for the financial success; (ii) the true basis for the success and the risks to the success, based on the upcoding scheme and the true purpose of the HouseCalls program; (iii) that the Board was actively involved in the oversight of risks; (iv) that Board-approved compensation structures properly rewarded Company executives for success, when it was based, inter alia, on an upcoding scheme and improper financial engineering, including the portfolio refinement transaction; (v) that the Board was actively involved in the oversight of conflicts, while the Board failed to oversee its executive and board members' purchases of stock in the healthcare industry, investments with defendant Hemsley's private investment company, and donations made to entities where directors were senior officers; and (vi) portraying the financial success and annual growth in average earnings per share, without disclosing the risks of the upcoding of MA billing practices, the HouseCalls program's true purpose, in order to get themselves elected or re-elected to the Board.

## COUNT VI

### (Violation of §14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 Against the Director Defendants)

620.    Plaintiffs reallege and incorporate by reference each of the foregoing allegations as if fully set forth herein.

621.    This claim is based on reckless or knowing conduct by or on behalf of the Director Defendants Baker, Flynn, Garcia, Gil, Hooper, McNabb, Montgomery Rice, and Noseworthy.

622.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

623.    The Director Defendants recklessly or knowingly issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders contained in the Company's 2022, 2023, 2024 and 2025 Proxies. These Proxies contained proposals urging shareholders to elect and re-elect Board members and provide advisory votes on executive compensation. The Proxies contained false and misleading statements concerning: (i) UHG's financial success and compliance standards; (ii) the true basis of that success and its associated risks, given the upcoding scheme and the true purpose of

HouseCalls; (iii) active Board oversight of risks; (iv) that Board-approved compensation structures properly rewarded executives for success when that success was based, *inter alia*, on an upcoding scheme and improper financial engineering; (v) that the Board actively oversaw conflicts, while failing to oversee executive and board members' healthcare stock purchases, investments with Defendant Hemsley's private investment company, and donations to entities where directors were senior officers; and (vi) financial success and annual EPS growth, without disclosing the risks of MA billing upcoding and HouseCalls' true purpose, to secure their election or re-election.

624.    The Director Defendants acted knowingly or recklessly because, at the time each authorized the issuance of each Proxy, each possessed specific information—detailed *supra* §§ VII.A, C—contradicting the Proxies' representations regarding the Company's compliance, risk oversight, and the basis of its financial results.

## COUNT VII

### (Unjust Enrichment Against the Officer Defendants)

625.    Plaintiffs reallege and incorporate by reference each of the foregoing allegations as if fully set forth herein.

626.    During the Relevant Period, the Officer Defendants received bonuses, stock options, stock, or similar compensation from UHG that was tied to the Company's inflated financial performance, or otherwise received compensation that was unjust in light of Defendants' bad faith conduct, violation of the Company's Code of Conduct, and self-dealing.

627.    Plaintiffs, as stockholders and representatives of UHG, seek restitution from the Officer Defendants and seek an order of this Court disgorging all profits, benefits, and other compensation—including any salary, options, performance-based compensation, and stock—obtained by the Officer Defendants due to their wrongful conduct alleged in this Complaint.

## COUNT VIII

### (Contribution and Indemnification Against the Individual Defendants)

628.    Plaintiffs reallege and incorporate by reference each of the foregoing allegations as if fully set forth herein.

629.    UHG is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to UHG.

630.    UHG's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants as alleged above, and UHG is entitled to contribution and indemnification from each Individual Defendant in connection with all such claims that have been, are or may in the future be asserted against, UHG by virtue of the Individual Defendants' misconduct.

631.    By reason of the foregoing, UHG was damaged.

632.    Plaintiffs, on behalf of UHG, have no adequate remedy at law.

## COUNT IX

### (Corporate Waste Against the Individual Defendants)

633. Plaintiffs reallege and incorporate by reference each of the foregoing allegations as if fully set forth herein.

634. By their wrongful acts and omissions, the Individual Defendants wasted UHG corporate assets by, *inter alia*: (i) paying excessive salaries, fees, and performance-based compensation—calculated on financial metrics inflated by the upcoding scheme and the portfolio refinement transactions—to fiduciaries who were breaching their duties to the Company; (ii) expending corporate resources on the lobbying and public-relations campaigns described herein, which were designed to obstruct regulatory enforcement rather than to achieve compliance; (iii) funding biased and misleading research to counter legitimate criticism of the Company's practices; (iv) paying a $22 million ransom to cybercriminals following a breach caused by the Company's own security failures; and (v) repurchasing more than $29 billion of UHG stock at prices artificially inflated by the Defendants' own misrepresentations.

635. UHG received no legitimate consideration or benefit from these expenditures, and no person of ordinary, sound business judgment could conclude that the Company received fair benefit for them.

636. As a direct and proximate result of the Individual Defendants' corporate waste, UHG has sustained and continues to sustain significant damages, and the Individual Defendants are liable to the Company.

637. Plaintiffs, on behalf of UHG, have no adequate remedy at law.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.  A determination that this action is a proper derivative action maintainable under the law and that demand is futile as the Board is incapable of conducting a fair and impartial investigation;

B.  Declaring that Defendants have breached their fiduciary duties to UHG, violated Sections 10(b) and 14(a) of the Securities Exchange Act of 1934, committed corporate waste, committed insider trading, and were unjustly enriched;

C.  Determining and awarding to UHG the damages sustained by it as a result of the violations set forth above from each Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

D.  Directing UHG and the Individual Defendants to take all necessary actions to reform and improve the Company's corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described in this Complaint, including: (i) requiring the Board to conduct meaningful oversight of the Company's legal and regulatory compliance; (ii) implementing compliance programs governing the Company's MA coding and risk-adjustment practices; (iii) establishing cybersecurity controls that meet industry standards; (iv) prohibiting the Individual Defendants from serving as officers or directors of UHG; and (v) putting forward for shareholder vote resolutions for amendments to the Company's

Bylaws or Certificate of Incorporation as necessary to prevent recurrence of the misconduct alleged herein;

E.      Extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets to assure that Plaintiffs, on behalf of UHG, have an effective remedy;

F.      Awarding to UHG restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants, including the proceeds of insider transactions made in violation of federal and state securities laws;

G.      Ordering an accounting of all compensation awarded to the Individual Defendants during the Relevant Period;

H.      Awarding to Plaintiffs costs and disbursements related to this action, including reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

I.      Awarding such other relief as this Court deems appropriate.

## XII.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

*Respectfully Submitted*,

**HENSON & EFRON, P.A.**

Dated: August 7, 2026            By  */s/ Court J. Anderson*
                                 Court J. Anderson, #331570
                                 Benjamin J. Hamborg, #0395401
                                 John N. Bisanz, Jr., #0389098
                                 225 South 6th Street, Suite 1600
                                 Minneapolis, MN 55402

Tel: (612) 252-2882
canderson@hensonefron.com
bhamborg@hensonefron.com
jbisanz@hensonefron.com

*Local Counsel for Länsförsäkringar
Fondförvaltning AB*

**SAXENA WHITE P.A**
David L. Wales (*admitted pro hac*)
Joshua Nelson (*pro hac* forthcoming)
10 Bank Street, 8th Floor
White Plains, New York 10606
Tel: (914) 437-8551
dwales@saxenawhite.com

and

Maya Saxena (*admitted pro hac*)
Joseph E. White, III (*admitted pro hac*)
Adam D. Warden (*admitted pro hac*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel: (561) 394-3399
msaxena@saxenawhite.com
jwhite@saxenawhite.com
awarden@saxenawhite.com

*Counsel for Länsförsäkringar Fondförvaltning AB*

**COHEN MILSTEIN SELLERS & TOLL LLP**
Kai H. Richter, #0296545
400 South 4th Street #401-27
Minneapolis, MN 55415
Tel: (612) 807-1575
krichter@cohenmilstein.com

Julie Goldsmith Reiser (admitted *pro hac vice*)
Molly Bowen (admitted *pro hac vice*)
1100 New York Avenue, Suite 800
Washington, D.C. 20005

Tel: (202) 408-4600
jreiser@cohenmilstein.com
mbowen@cohenmilstein.com

Richard A. Speirs (*pro hac vice* forthcoming)
Alexandra Gray (*pro hac vice* forthcoming)
88 Pine St., 14th Floor
New York, NY 10005
Tel.: (212) 838-7797
rspeirs@cohenmilstein.com
agray@cohenmilstein.com

*Counsel for the Employees' Retirement System of the State of Rhode Island*

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky, Esq.
Gina M. Serra, Esq.
Herbert W. Mondros, Esq.
300 Delaware Avenue, Suite 210
Wilmington, DE 19801
Tel: (302) 295-5310
sdr@rl-legal.com
hwm@rl-legal.com

*Counsel for Plaintiff Portia McCollum*

**GRABAR LAW OFFICE**
Joshua H. Grabar, Esq.
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (267) 507-6085
jgrabar@grabarlaw.com

*Additional Counsel for Plaintiff Portia McCollum*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Tel: (516) 922-5427
tbrown@thebrownlawfirm.net

*Counsel for Plaintiff Merry Kogut*

**ROWLEY LAW PLLC**
Shane T. Rowley
Danielle Rowland Lindahl
50 Main Street, Suite 1000
White Plains, NY 10606
Tel: (914) 400-1920
Fax: (914) 301-3514
srowley@rowleylawpllc.com
drl@rowleylawpllc.com

*Counsel for Plaintiff Gerald Joseph Lovoi*

**BRIAN MURRAY LAW PLLC**
Brian P. Murray
750 E. Main Street
Suite 620
Stamford, CT 06901
Tel: (203) 246-2368
bmurray@brianmurraylaw.com

*Additional Counsel for Plaintiff Gerald Joseph Lovoi*

### VERIFICATION TO VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

We, Sofia Aulin and Emelie Antonisen, verify and declare under penalty of perjury, under the laws of the United States of America, that the following is true and correct:

1.      We, Sofia Aulin, the Chief Sustainability Officer, and Emelie Antonisen, the Head of Legal of Länsförsäkringar Fondförvaltning AB ("Länsförsäkringar"), are authorized to execute this verification on behalf of Länsförsäkringar.

2.      We have reviewed the Verified Amended Shareholder Derivative Complaint ("Amended Complaint") prepared on behalf of Länsförsäkringar and authorize its filing.

3.      We have reviewed the allegations made in the Amended Complaint. As to those allegations to which we have personal knowledge, we believe those allegations to be true. As to those allegations to which we do not have personal knowledge, we believe those allegations to be true, based on the discussions with and reliance upon our counsel and their investigation.

4.      We further declare that Länsförsäkringar manages funds (the "Funds") which are the stockholders of UnitedHealth Group common stock, and the Funds have been stockholders throughout the Relevant Period and will continue to be stockholders throughout the pendency of this litigation. Länsförsäkringar has full power and exclusive authority to bring suit on behalf of the Länsförsäkringar managed Funds.

5.      Länsförsäkringar has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the court expressly approves be paid to Länsförsäkringar; or (ii) reimbursement, by its counsel, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

Dated: August _7_, 2026

| | |
|---|---|
| *Sofia Aulin* | *Sofia Aulin* |
| Sofia Aulin (Aug 7, 2026 17:16:43 GMT+2) | Sofia Aulin (Aug 7, 2026 17:16:43 GMT+2) |
| Sofia Aulin | Emelie Antonisen |
| Chief Sustainability Officer | Head of Legal |
| Länsförsäkringar Fondförvaltning AB | Länsförsäkringar Fondförvaltning AB |

**Signature:**  *Emelie Antonisen*
Emelie Antonisen (Aug 7, 2026 16:48:18 GMT+2)

**Email:**  emelie.antonisen@lansforsakringar.se

## VERIFICATION TO AMENDED SHAREHOLDER
## DERIVATIVE COMPLAINT

I, Eileen K. Cheng, verify and declare under penalty of perjury that the following is true and correct:

1.     I am General Counsel of the State of Rhode Island, Office of the General Treasurer and am authorized to execute this verification on behalf of Employees' Retirement System of the State of Rhode Island ("ERSRI").

2.     I have reviewed the Amended Shareholder Derivative Complaint ("Amended Complaint") prepared on behalf of ERSRI and authorize its filing.

3.     I have reviewed the allegations made in the Amended Complaint, and to those to which I have personal knowledge, I believe those allegations to be true. As for those allegations to which I do not have personal knowledge, I believe those allegations to be true, based on the discussions with and reliance upon my counsel and their investigation.

4.     I further declare that ERSRI is a stockholder of UnitedHealth Group, has been a stockholder throughout the Relevant Period, and will continue to be a stockholder throughout the pendency of this litigation.

5.     ERSRI has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except (i) such fees, costs, or other payments as the court expressly approves be paid to ERSRI; or (ii) reimbursement, by its counsel, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

Dated: August 6 , 2026

Eileen K. Cheng
General Counsel